# EXHIBIT "A"

Filing # 114774237 E-Filed 10/12/2020 02:20:56 AM

IN THE FIFTEENTH JUDICIAL CIRCUIT, IN AND
FOR PALM BEACH COUNTY, FLORIDA

MARALAGO CAY
HOMEOWNERS ASSOCIATION,
INC., F/K/A ARROWHEAD MOBILE
HOMEOWNERS ASSOCIATION, INC.,
on behalf of themselves, the
class of current and former mobile
homeowners in the Park and all
others similarly situated,

      PLAINTIFFS,                    CASE NO.

Vs.

MHC OPERATING LIMITED
PARTNERSHIP, EQUITY LIFESTYLE
PROPERTIES, INC., MHC
MARALAGO CAY, L.L.C.,
ERIC ZIMMERMAN, STANLEY
MARTIN, SYDNEY MORRIS,
RENE SCOTT, BEVERLY
SAGEHORN, BERTHA RODRIGUEZ,
MILAGROS RIVERA, FLORIDA
MANUFACTURED HOUSING
ASSOCIATION, INC., J. ALLEN
BOBO, AND LUTZ, BOBO &
TELFAIR, P.A., D/B/A LUTZ,
BOBO, TELFAIR, EASTMAN &
BOBO, F/K/A LUTZ, WEBB &
BOBO, P.A.,

      DEFENDANTS.
_____/

**COMPLAINT AND DEMAND
FOR JURY TRIAL**

1

NOT A CERTIFIED COPY

EXHIBIT "A"

<u>**TABLE OF CONTENTS**</u>                                      Page

I.  **INTRODUCTION**                                                     3

   A.  Representative Action by the Maralago Cay HOA            5

   B.  The Nature of the Product or Service: "55 or Older" Mobile
       Home Park                                               5

   C.  Sam Zell, Chairman of Equity Lifestyle, Likes the "Oligopoly"
       Nature of the Mobile Home Park Industry                 6

   D.  Geographic Area or the Market: Pasco County, Florida     6

II.  **DEFENDANTS**                                                      7

   A.  The MHC/Equity LifeStyle Defendants                     7

   B.  The FMHA Trade Association Defendant                    9

   C.  The Lutz Bobo Law Firm Defendants                      10

III.  **JURISDICTION AND VENUE**                                        10

IV.  **ACTS IN FURTHERANCE OF THE CONSPIRACY**                          11

   A.  Concealed Illegal Sale of the Park in Violation of Right of
       First Refusal                                          11

   B.  Extort Adoption of an Illegal Rental Agreement          13

   C.  Divert Resales to the Benefit of the MHC/Equity Lifestyle
       Defendants                                             19

   D.  Concealed Contaminated Water Supply From Home Purchasers  19

   E.  Fraudulent and Unreasonable Lot Rental Categories & Amount  20

   F.  Unreasonable Elimination or Reduction of Services        20

   G.  Unreasonable Restriction of Sub-lessee Terms to Six Months  23

V.  **COUNT 1:   FLORIDA ANTITRUST ACT**                                24

VI.  **COUNT 2:   VIOLATION OF THE ADA**                                29

VII.  **JURY TRIAL DEMANDED**                                           33

EXHIBIT "A"

The Maralago Cay Homeowners Association, Inc., in its representative capacity on behalf of itself, and more than 1,000 current and former mobile homeowners in the Maralago Cay Mobile Home Park ("Park"), by and through the undersigned counsel, bring this Complaint against these Defendants, divided into four defined relationships:

- The **MHC/Equity LifeStyle Defendants**: MHC Operating Limited Partnership, an Illinois limited partnership, Equity LifeStyle Properties, Inc., a foreign (Maryland) corporation, MHC Maralago Cay, L.L.C., a foreign (Delaware) limited liability company, Eric Zimmerman, an individual, Stanley Martin, an individual, Sydney Morris, an individual, Rene Scott, an individual, Beverly Sagehorn, an individual, Bertha Rodriguez, an individual, and Milagros Rivera, an individual;

- The **FMHA Trade Association Defendant**: Florida Manufactured Housing Association, Inc., a Florida corporation;

- The **Lutz Bobo Law Firm Defendants**: J. Allen Bobo, an individual, and Lutz, Bobo & Telfair, P.A., d/b/a Lutz, Bobo, Telfair, Eastman & Bobo, f/k/a Lutz, Webb & Bobo, P.A., a Florida corporation.

The individuals and entity defendants defined above are collectively referred to in this Complaint as "Defendants." The Plaintiff further alleges:

## I.   INTRODUCTION

1.   Beginning at a time uncertain, but at least as early as 2012, and continuing on through the present time, the Defendants have entered into and engaged in a conspiracy, combination, or concert of action in unreasonable restraint of trade and commerce within the State of Florida and elsewhere with effects in the State of Florida in violation of § 542.18, *Fla. Stat.*, by agreeing to the following:

3

EXHIBIT "A"

A.   Avoid and frustrate the Plaintiff's statutory right of first refusal to purchase the Park on behalf of itself and the mobile homeowners represented by the Plaintiff;

B.   Extort the Plaintiff into adoption of an illegal lot rental agreement;

C.   Divert resales to the benefit of the MHC/Equity LifeStyle Defendants;

D.   Concealed contaminated water supply from home purchasers;

E.   Imposed fraudulent and unreasonable lot rental categories and amount;

F.   Unreasonably eliminated or reduced services; and

G.   Unreasonably restrict sub-lessee rental terms to a maximum of six months.

Engaging in the business of owning and operating mobile home parks within the State of Florida constitutes trade or commerce within the meaning of Chapter 542, *Fla. Stat.*

2.   As a result of the unlawful conduct, the elderly mobile home owners represented by the Maralago Cay Homeowners Association, Inc., suffered an antitrust injury resulting in damages in excess of $30,000.00. This conspiracy, combination, or concert of action resulted in higher mobile home lot rental prices paid by elderly natural persons for the use of mobile home park facilities than would have existed in a competitive market.

3.   Defendants' unlawful conduct is continuing and unless equitable relief is granted artificially inflated mobile home lot rental prices for the use of mobile home park facilities will continue unabated.

4

A.     **Representative Action by the Maralago Cay HOA**

4.      Plaintiff **Maralago Cay Homeowners Association, Inc. ("Maralago Cay HOA")** f/k/a Arrowhead Mobile Homeowners Association, Inc., is a Florida not-for-profit corporation with its principal place of business located in the Park at 6201 Holly Lane, Palm Beach County, Lantana, Florida. The Maralago Cay HOA is the legal representative under § 723.075, *Fla. Stat.*, of all of the mobile home owners in the Park "in all matters relating to the Florida Mobile Home Act." *See* §§ 723.075(1) and 723.076(1) and in "matters of common interest." *Rule* 1.222, *Fla. R. Civil P.* The Plaintiff represents itself, and more than 1,000 current and former mobile homeowners in the Park. The relationship between the Maralago Cay HOA, the homeowners represented by the Maralago Cay HOA and the Park owner or operators is regulated under Chapter 723, *Fla. Stat.*, and encompasses a broadly defined "lot rental agreement" which includes, *inter alia*, a prospectus. (Exh. A is attached and adopted).

B.     **The Nature of the Product or Service: "55 or Older" Mobile Home Park**

5.      The Park is an age 55 or older mobile home park with 603 mobile home lots. The Park is located at 6280 S. Ash Lane, Palm Beach County, Lantana, Florida. The mobile homeowners represented by the Maralago Cay HOA are largely elderly persons more than 65 years of age. The mobile homes are valued between $25,000 and more than $100,000. Most homes are paid for with cash, usually comprising all or a substantial amount of the homeowners' life savings. They lease the lot underneath their mobile home from the Park owner or operators.

EXHIBIT "A"

C.    **Sam Zell, Chairman of Equity Lifestyle, Likes the "Oligopoly" Nature of the Mobile Home Park Industry**

6.      Approximately 1.8 million Floridians today live in a mobile home. In a 2014 Tampa Bay Times newspaper article, it was noted that the population of Florida mobile homeowners represents five times the entire population of the city of Tampa, Florida. Most of those homeowners earn less than $30,000 per year. Largely, those mobile homeowners are a captive audience: "... As Frank Rolfe, a park owner who runs [the[ Mobile Home University, a boot camp for investors, told *Bloomberg*, 'We're like a Waffle House where everyone is chained to the booths." *Mobile home park investors bet on older, poorer America*, Tampa Bay Times, May 19, 2014.[1] "Years ago, the mobile home industry was mostly ignored save for a few investment titans. Warren Buffet paid $1.7 billion in 2003 to buy Clayton Homes, one of America's largest mobile home conglomerates. Sam Zell, the billionaire chairman of Equity Lifestyle, said in a 2012 conference call he liked the 'oligopoly nature of our business.'" [referring to the mobile home park industry] *Id.* The MHC/Equity LifeStyle Defendants directly or indirectly own, control, or operate 77 age-qualified Florida mobile home parks with approximately 32,000 mobile home sites with gross revenues in excess of $230 million annually.

D.    **Geographic Area or the Market: Palm Beach County, Florida**

7.      Palm Beach County has a population of approximately 1.6 million persons. Twenty three per cent of the population is 65 years of age or older. There are 130 mobile home parks in Palm Beach County, Florida. Seventy three of those parks are "55 or older" mobile home parks which would market to a group of elderly retirees, such as those represented by the Maralago Cay HOA. The monthly lot rental amount varies by only a minor amount between the Park and the "comparables" used by the Defendants in rejecting the representative Maralago Cay HOA's attempts to negotiate mitigation of the

---

1       https://www.tampabay.com/news/business/realestate/mobile-home-park-investors-bet-on-older-poorer-america/2180277/

NOT A CERTIFIED COPY

EXHIBIT "A"

existing regular annual lot rental increases of four to five per cent.

## II.    DEFENDANTS

### A.    The MHC/Equity LifeStyle Defendants

8.      Defendant **MHC Operating Limited Partnership ("MHC Operating")**, is a foreign (Illinois) limited partnership, formed in 1993 with a principal address of Two North Riverside Plaza, Suite 800, Chicago, Illinois, which is also the Chicago corporate headquarters for Defendants Equity LifeStyle Properties, Inc. and MHC Maralago Cay, L.L.C. MHC Operating is also engaged in business at the Park. MHC Operating is a general partner of Equity LifeStyle Properties, Inc., since April 2004. MHC Operating is described in official court records in the Pasco County Clerk of Court as the "mobile home park owner" of the Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." MHC Operating is also an operator of the Park.

9.      Defendant **Equity LifeStyle Properties, Inc., ("Equity LifeStyle")** is a foreign (Maryland) corporation with its principal place of business in Florida at 4300 W. Cypress St., Suite 400, Tampa, in Hillsborough County; and in Illinois at Two North Riverside Plaza, Suite 800, Chicago, Illinois. Equity LifeStyle, is the "mobile home park owner" of the Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." Equity LifeStyle, is also an operator of the Park. Equity LifeStyle, is publicly traded on the New York Stock Exchange.

10.     Defendant **MHC Maralago Cay, L.L.C. ("MHC Maralago")**, is a foreign (Delaware) limited liability company since 2011 with a principal address of Two North Riverside Plaza, Suite 800, Chicago, IL 60606, which is also the Chicago corporate headquarters for Defendants Equity LifeStyle Properties, Inc., and MHC Operating Limited Partnership. MHC Maralago is also engaged in business at the Park. MHC Maralago is described in official court records in the Palm Beach County Clerk of Court as the "mobile home park owner" of the Park as defined by § 723.003(13), *Fla. Stat.,* which

EXHIBIT "A"

includes an "owner" or "operator." MHC Maralago is also an operator of the Park.

11.     Defendant **Eric Zimmerman** is an individual citizen of Florida domiciled at 12629 New Brittany Blvd., #16, Fort Myers, in Lee County, Florida. Eric Zimmerman was a Southeast Division President of Hometown America from January 2003 through December 2011. He was a Regional Vice President of Defendant Equity LifeStyle, from January 2011 through July 2018. He is currently Vice President and Chief Operating Officer at Murex Properties, LLC. Eric Zimmerman was also engaged in business from 2011 through July 2018 as an operator of the Park as defined by § 723.003(16), *Fla. Stat.* He has held leadership positions of the Defendant FMHA Trade Association Defendant – the trade association for park owners.

12.     Defendant **Stanley Martin** is an individual citizen of Florida domiciled in Hillsborough County, Florida at an unknown physical location. Stanley Martin is employed at 4300 W. Cypress St., Suite 400, Tampa, in Hillsborough County, Florida. Stanley Martin is a Vice President and Corporate Counsel of Defendant Equity LifeStyle, from 2015 through present day. He is a licensed Florida lawyer since 1999. Stanley Martin is described in official court records in the Palm Beach County Clerk of Court as a lawyer for Defendants MHC Maralago, and Equity LifeStyle

13.     Defendant **Sydney Morris** is an individual citizen of Florida domiciled in Plant City, Hillsborough County, Florida at an unknown physical location. Sydney Morris is employed at 4300 W. Cypress St., Suite 400, Tampa, in Hillsborough County, Florida. Sydney Morris is a Senior Regional Manager of Defendant Equity LifeStyle, and has been employed as such since 2015. Sydney Morris is also engaged in business at the Park. Sydney Morris is also an "operator" of the Park as defined by § 723.003(16), *Fla. Stat.*

14.     Defendant **Rene Scott** is an individual who currently resides in Hillsborough County, Florida. Rene Scott is a Senior Regional Manager of Defendant Equity LifeStyle Properties, Inc. Rene Scott is also engaged in business from 2018 through

EXHIBIT "A"

the present as an operator of the Park.

15.     Defendant **Beverly Sagehorn** is an individual who currently resides at 9863 Cross Pine Court, Lake Worth, Palm Beach County, Florida. Beverly Sagehorn was a General Manager and an employee of Defendant Equity LifeStyle Properties, Inc. Beverly Sagehorn was also engaged in business from 2011 through July 2018 as an operator of the Park.

16.     Defendant **Bertha Rodriguez** is an individual who currently resides at 5229 Ginger Way, #284, Lake Worth, Palm Beach County, Florida. Bertha Rodriguez is a General Manager and an employee of Defendant Equity LifeStyle Properties, Inc. Bertha Rodriguez is also engaged in business from 2011 through the present as an operator of the Park.

17.     Defendant **Milagros Rivera ("Millie Rivera")** is an individual who currently resides at 27 Baytree Circle, Boynton Beach, Palm Beach County, Florida. Millie Rivera is a Marketing and Sales Associate and an employee of Defendant Equity LifeStyle Properties, Inc. Millie Rivera is also engaged in business at least from 2015 through the present as an operator of the Park.

18.     Defendants MHC Operating, Equity LifeStyle, MHC Maralago, Eric Zimmerman, Stanley Martin, Sydney Morris, Rene Scott, Beverly Sagehorn, Bertha Rodriguez, and Millie Rivera are collectively referred to herein as the "MHC/Equity LifeStyle Defendants."

**B.     The FMHA Trade Association Defendant**

19.     Defendant **Florida Manufactured Housing Association, Inc., ("FMHA Trade Association Defendant")** is a Florida corporation with its principal place of business at 1284 Timberlane Rd., Tallahassee, Florida. The FMHA Trade Association Defendant is the trade association for Florida mobile home park owners.

EXHIBIT "A"

**C.   The Lutz Bobo Law Firm Defendants**

20.      Defendant **J. Allen Bobo ("Allen Bobo")** is an individual citizen of Florida domiciled in Sarasota County, Florida at an unknown physical address. Allen Bobo is a licensed Florida lawyer since 1982, a partner, principal, or shareholder of Defendant Lutz, Bobo & Telfair, P.A., 2 N. Tamiami Trail, Ste. 500, Sarasota County, Sarasota, Florida.

21.      Defendant **Lutz, Bobo & Telfair, P.A. ("Lutz Bobo Law Firm")**, d/b/a Lutz, Bobo, Telfair, Eastman, Gabel & Lee, f/k/a Lutz, Webb & Bobo, P.A., is a Florida corporation which operates in Leon County, Florida at 2155 Delta Blvd., Suite 201B, Tallahassee, Florida and in Sarasota County, Florida at One Sarasota Tower, Two North Tamiami Trail, Fifth Floor, Sarasota, Florida.

22.      Defendants Allen Bobo and the Lutz Bobo Law Firm are collectively referred to herein as the "Lutz Bobo Law Firm" Defendants.

**III.   JURISDICTION AND VENUE**

23.      Count One of this Complaint is an action for treble damages arising under § 542.18, *Fla. Stat.*, in accordance with § 542.22, *Fla. Stat.*, and for injunctive relief in accordance with § 542.23, *Fla. Stat.* This Court has jurisdiction of this claim arising under the Florida Antitrust Act, Chapter 542, *Fla. Stat.* Plaintiff also seeks relief in Count Two under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.* Jurisdiction of the federal ADA claim is concurrent under 18 U.S.C. § 3231, as construed by *Tafflin et al., v. Levitt, et al.*, 493 U.S. 455 (1990). This Court also has personal jurisdiction over each Defendant under § 48.193, *Fla. Stat.*, because, among other reasons, each Defendant operates, conducts, engages in, or carries on a business or business venture in the State of Florida or has an office in the State of Florida or has committed tortious acts within the State of Florida.

24.      Venue is proper under §§ 47.011, 47.021, and § 542.30, *Fla. Stat.*

10

NOT A CERTIFIED COPY

25.     Plaintiff seeks damages in excess of $30,000.00, injunctive relief, attorneys' fees, and costs on behalf of itself and the represented mobile homeowners.

## IV.   ACTS IN FURTHERANCE OF THE CONSPIRACY

### A.   Concealed Illegal Sale of the Park in Violation of Right of First Refusal

26.     In August 1986 the Maralago Cay HOA f/k/a Arrowhead Mobile Homeowners Association, Inc., recorded its "Notice of Right to Purchase the Park," (then known as "Arrowhead Village") under § 723.071, *Fla. Stat.* (Exh. B is attached and adopted). On that date, Arrowhead Village was owned by Arrowhead Village, Inc., and Ellis Johnson, President of Arrowhead Village, Inc.

27.     In September 1997 Pres. Johnson, on behalf of Arrowhead Village, Inc., recorded an affidavit that Arrowhead Village, Inc., had "accepted" an offer by MHC Operating to purchase the Park. (Exh. C is attached and adopted).

28.     Pres. Johnson averred that Arrowhead Village, Inc., complied with § 723.071(2), *Fla. Stat.*, when he gave the HOA notice of the offer and disclosed the price and materials terms and conditions upon which the Corporation would consent to selling the Park. (Exh. C).

29.     But, Arrowhead Village, Inc.'s sale to MHC Operating (Exh. D is attached and adopted) was in direct violation of § 723.071(2), *Fla. Stat.*, which prohibits such an acceptance until after Arrowhead Village, Inc., disclosed the price, terms, and conditions of the offer and "consider any offer made by the home owners ...." § 723.071(2), *Fla. Stat.*

30.     The Defendant MHC Operating concealed the illegal nature of the sale or transfer of the Park to MHC Operating from the elderly mobile homeowners and the Maralago Cay HOA. The mobile homeowners and the Maralago Cay HOA only just learned of the illegal nature of that sale or transfer of the Park in September 2019.

31.     MHC Maralago was formed in Delaware on September 17, 2003.

11

EXHIBIT "A"

32.     On October 17, 2003 MHC Operating sold or transferred its interest in the Park to MHC Maralago in further violation of § 723.071, *Fla. Stat.*, and the Maralago Cay HOA's statutory right to meet the price, terms, and conditions of an offer made by MHC Maralago to MHC Operating Limited Partnership. (Exh. E is attached and adopted).

33.     MHC Maralago was not a partner of MHC Operating.

34.     MHC Operating's sale or transfer to MHC Maralago was not excused by § 723.071(4)(c), *Fla. Stat.*, since the transferor MHC Operating is a partnership; only a transfer by a corporation to an affiliate or a partnership is excused.

*****

§ 723.071(4)     This section [granting the HOA's right off first refusal] does **not apply** to:

***

(c)     Any transfer **by a corporation** to an affiliate. As used herein, the term "affiliate" means any shareholder of the transferring corporation; any corporation or entity owned or controlled, directly or indirectly, by the transferring corporation; or any other corporation or entity owned or controlled, directly or indirectly, by any shareholder of the transferring corporation.

(d)     Any transfer by a **partnership to any of its partners.**

§ 723.071(4), *Fla. Stat.* (Emphasis Added)

*****

35.     Nor was the sale or transfer excused by any other provision of § 723.071(4), *Fla. Stat.*

36.     The Defendants MHC Operating and MHC Maralago *again concealed* the illegal nature of the sale or transfer of the Park from MHC Operating to MHC Maralago from the elderly mobile homeowners and the Maralago Cay HOA. The mobile

12

NOT A CERTIFIED COPY

EXHIBIT "A"

homeowners and the Maralago Cay HOA only just learned of the illegal nature of that sale or transfer of the Park in September 2019.

**B.      Extort Adoption of an Illegal Rental Agreement**

37.      In 2016, the MHC/Equity LifeStyle Defendants, outside of either statutory meetings or confidential mediation efforts, extorted the representative Maralago Cay HOA to adopt an illegal standardized lot rental agreement ("LTA") authored and drafted by the Lutz Bobo Law Firm Defendants. The FMHA Trade Association Defendant encouraged distribution and discussion of the terms of the LTA among its assembly of mobile home park owners. A copy of the form or standardized LTA is attached as Exhibit F and adopted.

38.      The standardized LTA extorts and injures the homeowners represented by the Plaintiff by requiring them to forfeit their statutory and constitutional protections and remedies in direct contravention of the Florida Mobile Home Act including, but not limited to: Section 4 of the standardized LTA required that if the Maralago Cay HOA contended that MHC Maralago was in violation of the LTA, the prospectus, any rental agreement, or the Florida Mobile Home Act, the Maralago Cay HOA must notify MHC Maralago in writing of the facts "giving rise to and constituting such alleged Non-Compliance" by certified mail within ninety days of the date the Maralago Cay HOA received reasonable notice of such facts. The LTA then provided MHC Maralago forty-five days from receipt of the notice to "cure" the alleged non-compliance. Upon completion of any such cure, MHC Maralago was to be "deemed" not to have been in default or in violation.

39.      Section 4 of the LTA further required that the ninety day notice and forty-five day opportunity to cure provisions be deemed to be a condition precedent to any legal action.

13

40.     Section 5 of the LTA prohibited an award of attorneys' fees or costs in any proceeding "by or on behalf of any former or current Homeowner seeking to invalidate or otherwise dispute the validity of the [LTA]." Further, section 5 of the LTA required, in direct contravention of the Florida Mobile Home Act's statutory declaration of a fiduciary relationship between the Maralago Cay HOA and the Plaintiff homeowners, the Maralago Cay HOA and MHC Maralago to "mutually enforce this Agreement and cooperate fully in the event the validity or integrity of this Agreement is attacked or disputed by any such Homeowner."

41.     Section 6 of the LTA required that any controversy or claim related to the LTA shall first require non-binding mediation under Chapter 44, *Fla. Stat.*

42.     Section 6 of the LTA also required, in direct contravention of the Florida Mobile Home Act, the Florida Constitution, and the U.S. Constitution, that in any court proceeding "arising out of or relating to" the LTA, the parties must waive their right to a jury trial.

43.     Section 8 "Mutual Release" of the LTA expressly releases the Defendants (along with a broad litany of unknown and unidentified persons and entities) and:

> ... their parents, affiliates, subsidiaries, officers, directors, agents, stockholders, members, attorneys, successors and assigns from any and all claims, actions or causes of action of any kind whatsoever ("Claims"), whether legal, equitable, administrative, or otherwise, which the Association now has or ever had including, but not limited to, Claims involving or relating to rents, services, maintenance, or Owner's compliance with or delivery of the Community's prospectuses, rental agreements, as well as any other alleged violation of Chapter 723, Florida Statutes. With the exception of Claims involving the subject matter of this Agreement, this release shall address only Claims existing on the Effective Date. This release shall not apply to any Homeowner's failure to pay rent or a rules violation.

44.     Section 9 of the LTA elevated the LTA as controlling in the event of a conflict between the LTA and the statutory prospectus or rental agreement.

14

45.     Section 10 of the LTA declared that the LTA superseded all prior and contemporaneous discussions, negotiations, conditions or understandings relating to the LTA.

46.     The MHC/Equity LifeStyle Defendants' close relationships with the FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants enable them to collaborate with other mobile home park owners and ultimately with each other to develop and expand state-wide adoption of the LTA by other mobile home park owners. In 2016 Attorney Allen Bobo, partner in the Lutz Bobo Law Firm, described that he worked closely with Eric Zimmerman, then Senior Vice President of Equity LifeStyle, on revisions and implementation of LTAs identical to the LTA in the instant cause. In one instance, recited Allen Bobo, a homeowner (in another Equity LifeStyle, Park) pointed to an ambiguity in the LTA favorable to their homeowner association. In response, Eric Zimmerman then quipped to Allen Bobo: "How did you miss that one, Allen?"

47.     The Maralago Cay HOA was aware of the MHC/Equity LifeStyle Defendants' intense interest in the representative Maralago Cay HOA's adoption of the standardized LTA through the earlier executed 2008 LTA and references to the standardized LTA in meeting notes of the Equity LifeStyle supported "Networking for Progress Group," and exchanges between the Maralago Cay HOA and the MHC/Equity LifeStyle Defendants.  In the March 28, 2013 meeting notes of the Networking for Progress Group, the notes taken of the meeting between representatives of various Florida Equity LifeStyle mobile home parks and Eric Zimmerman referenced and elaborated upon the LTA:

****

15

EXHIBIT "A"

ELS standardized the Long Term Agreement 3-4 years ago but has made some minor tweaks to it as needed. The only thing that will change from community to community will be the amount of the increase and the term. There will be no wish lists included in future LTAs, strictly rent. Wish lists (to be included in the Capx budget), are to be discussed with the manager and regional manager at the quarterly meetings (which must be requested).

****

(Exh. G is attached and adopted)

48.    In the September 12, 2013 meeting notes of the Select Committee of the Equity LifeStyle, supported Networking for Progress Group, the notes taken of the meeting between representatives of various Florida Equity LifeStyle mobile home parks and Eric Zimmerman discussed the LTA:

****

Long Term Agreements: were discussed, first with the ELS definition being a rental agreement that may change the terms of the prospectus. This was not an in depth discussion of rental agreements but was brought up because several communities are reporting that ELS has refused to meet and discuss long term agreements. We were reminded by Eric [Zimmerman] that they are actually required to meet just once and that should be within the thirty days (as requested) after receiving the 90 day notice per FS, Chapter 723.037. Eric [Zimmerman] pointed out that the negotiating committee has the full authority to sign the long term agreement.

****

(See Exh. G)

49.    In the November 21, 2013 meeting notes of the Select Committee of the Equity LifeStyle, supported Networking for Progress Group, the notes taken of the meeting between representatives of various Florida Equity LifeStyle mobile home parks and Eric Zimmerman discussed the LTA:

****

16

EXHIBIT "A"

Future LTAs will be reviewed by in house counsel. It was pointed out that the language in the LTA, particularly that referring to the waiver, is one of the reasons that communities are not signing the agreement. Eric [Zimmerman] pointed out that that paragraph refers only to situations that have occurred to that point (NOT FUTURE SITUATIONS). If there are issues serious enough that you are considering legal action against ELS they should be discussed (prior to signing the agreement) in an effort to work them out. The purpose of the waiver is after working out a favorable agreement in good faith, they (ELS) don't want to be faced with a lawsuit.

Remember, if you previously signed the long term agreement (LTA) (containing the clauses referenced above), when the LTA expires, so do the terms of those clauses, UNLESS the LTA contained language stating otherwise. Communities with CPI (only) based increases typically don't have long term agreements. Eric [Zimmerman] explained that the release for ELS in the LTA speaks to the many reasons somebody may choose to sue them. The reason the HOA isn't offered the same release is because there don't appear to be any reasons why ELS would want to sue them.

Long Term Agreements may vary, but are typically three years. Rounding of rent increases are determined by the prospectus for the community, some allow rounding up to one (1) dollar, some allow up to five (5) dollars.

There are no penalties for not signing the long term agreement.

Market, CPI, home sales and a variety of economic factors are taken into consideration to determine rates of increase, not the expected return to stockholders, as suggested.

****

(See Exh. G)

50.      In the February 19, 2015 meeting notes of the Select Committee of the Equity LifeStyle, supported Networking for Progress Group, the notes taken of the meeting between representatives of various Florida Equity LifeStyle mobile home parks and Eric Zimmerman discussed the LTA:

****

17

EXHIBIT "A"

... Relocating resident policy: ELS's policy regarding relocating residents
is the same as addressed in the LTA under Homeowners Affected by this
Agreement; Transferees. If ..... any included Homeowner transfers or
sells any legal or equitable interest in such Homeowner's mobile home
to any transferee or resale purchaser (collectively, a "Transferee"), the
Transferee shall be permitted to assume such included Homeowners rental
agreement but only for the remainder of the annual lease term then in
effect between the included Homeowner and Owner. Upon the expiration
of such annual lease term the Transferee's rent shall be adjusted to the
Community's then prevailing market rate ..... " Which is basically the same
as FS Chapter 723.059 (3) The purchaser of a mobile home who becomes
a resident of the mobile home park in accordance with this section has the
right to assume the remainder of the term of any rental agreement then in
effect between the mobile home park owner and the seller ........... .

It should be noted that residents relocating within the community that are
purchasers of ELS inventory homes won't have a lease to assume and will
start their new lease at market rent but are eligible for any rent concession
programs being offered to new residents at that time.

****

(Exh. H is attached and adopted)

     51.    In 2016, Florida Attorney Shawn Arbeiter disclosed that Attorney Allen

Bobo (then a partner and shareholder of the Lutz Bobo Law Firm) had made numerous

and regular annual presentations to the FMHA Trade Association Defendant's annual

meeting of Florida mobile home park owners informing the FMHA Trade Association

Defendant's assembly of litigation tactics of mobile home plaintiffs' attorneys. According

to Arbeiter, those lengthy presentations by Bobo included opinionated and disparaging

remarks by Bobo and assembly members of the undersigned Plaintiff's Counsel Perry's

trial strategy including, but not limited to: application of the Florida Deceptive and Unfair

Trade Practices Act to lot rental, common area maintenance, and LTA issues in state court

litigation. Attorney Bobo also disclosed that in an earlier and separate presentation to the

FMHA Trade Association Defendant assembly, he described existing statewide mobile

EXHIBIT "A"

home lot rental amounts as "not high enough," explaining that if lot rent increases were appropriately higher, that retiree mobile homeowners would be filing lawsuits all over the state.

**C.    Divert resales to the benefit of the Defendants**

52.    Defendants Eric Zimmerman, Stanley Martin, Sydney Morris, Rene Scott, MHC Maralago, Equity LifeStyle, and MHC Operating routinely encouraged or encourage Defendants Beverly Sagehorn, Bertha Rodriguez, and Millie Riviera to repeatedly divert Plaintiffs seeking approval to purchase a resale mobile home in the Park from an individual homeowner or through an outside third party realtor to instead purchase a different resale home through the Defendants. The consequence of Defendants' deceit and manipulation is reduced and impaired resales of homes through outside realtors.

**D.    Concealed Contaminated Water Supply From Home Purchasers**

53.    The elderly mobile homeowners throughout the Park regularly report and complain to the MHC/Equity LifeStyle Defendants that their drinking water has an odd, dirty, chalky brownish-yellow appearance, and repulsive odor and taste. The MHC/ Equity LifeStyle Defendants refuse to address their complaints or correct the problem.

54.    In the Park's 2018 Drinking Water Quality Report, U.S. Water Services Corporation reported that the Park's potable water tested in February, April, June, July, and November and concluded that: "In 2018, our water system exceeded the MCL [Maximum Contaminant Level] for color. Secondary contaminants are considered to be aesthetic violations, and they are not considered to have major health effects. The Dept. of Environmental Protection and the utility continues to monitor the situation ." The Report further noted that the *secondary contaminants constituted a violation and exceeded the highest range of results: **twice that permitted by law.** The likely source of the contamination was*

19

*described as "[n]aturally occurring organics."* (Exh. I is attached and adopted) (Emphasis Added)

55.    Since 2016 the MHC/Equity LifeStyle Defendants concealed from the elderly Plaintiff mobile homeowner purchasers that the water system was compromised by a high level of contaminants.

56.    The elderly mobile homeowners have serious medical conditions including, but not limited to, impaired immune systems, risks of allergic and respiratory illnesses, and infection risk.

57.    As a consequence, nearly every elderly mobile homeowner has had to spend considerable sums of monies to provide alternate drinking, cooking water or purchase expensive filtration systems.

    **E.**    **Fraudulent and Unreasonable Lot Rental Categories & Amount**

58.    Since 2016 the MHC/Equity LifeStyle Defendants imposed a four per cent to a five per cent annual lot rental increase. The MHC/Equity LifeStyle Defendants refused to discuss with the representative Homeowners' Committee of the Maralago Cay HOA the basis or justification for the four to five per cent lot rental increase. The MHC/ Equity LifeStyle Defendants flatly rejected the Maralago Cay HOA's Homeowners' Committee's submission of other park comparables and other matters in mitigation of a four to five per cent lot rental increase in violation of Florida law.

    **F.**    **Unreasonable Elimination or Reduction of Services**

59.    The MHC/Equity LifeStyle Defendants unreasonably eliminated or reduced services without an advance 90 day written notice or a corresponding reduction in lot rent in violation of Florida law, including, but not limited to:

EXHIBIT "A"

A.  The MHC/Equity LifeStyle Defendants are unresponsive and have reduced maintenance;

    1.  Full-time maintenance staff reduced;

    2.  The MHC/Equity LifeStyle Defendants do not respond to the majority of phone calls, emails, and other correspondence;

    3.  The MHC/Equity LifeStyle Defendants arbitrarily enforce rules and regulations. In one instance, illegally prohibit homeowners from receiving business mail at their home address.  The MHC/Equity LifeStyle Defendants are unavailable after normal business hours to enforce the rules and regulations.

B.  Security

    1.  The Park security gates are inoperative for weeks, months, and even years at a time. Even when operative, the MHC/ Equity LifeStyle Defendants restrict access to only one mobile telephone access number per home.

C.  Clubhouse

    1.  The MHC/Equity LifeStyle Defendants have no security or supervision of members of the general public who use the clubhouse facilities;

    2.  The Clubhouse was shut down in March 2020 as a result of the existing COVID-19 pandemic and reopened in August 2020 without proper sanitization or enforcement of a mask requirement, exposing the homeowners to a virulent infectious disease and an enhanced morbidity due

21

to their largely immuno-supressed pre-existing medical conditions and advanced age. Neither the closure nor the improper re-opening was accompanied by an advance 90 day written notice to the Plaintiff or a reduction in lot rent corresponding to the reduced service. The MHC/Equity LifeStyle Defendants unreasonably deny the Plaintiff's requests to have HOA functions, activities, or events in the Park common areas on weekends or evenings.

3. The MHC/Equity LifeStyle Defendants illegally and unreasonably restrict or condition the Maralago Cay HOA's use of the clubhouse upon the provision of general liability insurance.

D. Common Areas - Streets

1. The streets throughout the Park and clubhouse parking lots are in disrepair, crumbling and dangerous to pedestrians and bicycle traffic;

2. Streets throughout the Park are unsightly. Grass grows in some of the cracks in the pavement;

E. "55 and Older" Park

1. The MHC/Equity LifeStyle Defendants have failed to supervise or restrict under age occupants or children in the shared facilities in the Park as required by the properly promulgated Park rules and regulations.

F. Electrical Systems

1. The electrical utility connections, electrical poles, and

22

NOT A CERTIFIED COPY

EXHIBIT "A"

systems for which the MHC/Equity LifeStyle Defendants were or are responsible is in an aged, poorly maintained, and severely deteriorated condition throughout the Park. In some instances, the electrical poles are held together with zip ties.

G.   Water Outages

1.   The elderly mobile homeowners regularly experience near-complete cessation of the water pressure without advance notice by the MHC/Equity LifeStyle Defendants.

**G.   Unreasonable Restriction of Sub-lessee Terms to Six Months**

60.   The MHC/Equity LifeStyle Defendants sub-lease the homes they own for a maximum of one year, But, the  MHC/Equity LifeStyle Defendants unreasonably and arbitrarily restrict the sub-lessee rental terms for the mobile homeowners represented by the Plaintiff Maralago Cay HOA to a maximum of six months.

EXHIBIT "A"

**V.    COUNT I:    FLORIDA ANTITRUST ACT - RESTRAINT ON TRADE OR COMMERCE - PRICE-FIXING**

**(Against All Defendants)**

*Fla. Stat.* § 542.18

61.    Plaintiff realleges and restates paragraphs 1 through 60 as if fully set forth herein and further state:

62.    This is an action against the MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants for their violation of the Florida Antitrust Act, Section 542.18, *Fla. Stat.*

63.    Since at least October 2016, the MHC/Equity LifeStyle Defendants (or one or more of its subsidiaries) leased mobile home lots to the homeowners represented by the Plaintiff, in a continuous and uninterrupted flow of interstate trade or commerce, including through and into this judicial district within the meaning of the Florida Antitrust Act.

64.    The  MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants knowingly—that is, voluntarily and intentionally—extorted under Florida law and attempted to entered into a continuing agreement, understanding, and conspiracy to raise, fix, maintain, and/or to impose a mobile home lot rental by subjecting the mobile homeowners, their representative mobile homeowner associations ("HOAs"), and the Park lot rental agreements to, among other things, impose a LTA, thereby reducing or eliminating price competition.

65.    To be clear, Plaintiff is not alleging that the Hometown Park Sale Defendants and the MHC/Equity LifeStyle Defendants, working with FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants, conspired to fix the prices of mobile home lot rental amount at the same level. Instead, the Hometown Park Sale Defendants and the MHC/Equity LifeStyle Defendants, working with FMHA

24

Trade Association Defendant, and the Lutz Bobo Law Firm Defendants, conspired to eliminate discounting of lot rental amount by ensuring that all park owners charged the same minimum price and used the same terms.[2] The MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm all share an interest in not reducing the lot rental amount.

66.     The scheme was anything but "unilateral." The conduct at issue here can be characterized similarly to how the United States Supreme Court characterized the conduct at issue in *United States v. General Motors Corp.*: "once the agreements were secured, General Motors both solicited and employed the assistance of its alleged co-conspirators in helping to police them. What resulted was a fabric interwoven by many strands of joint action to eliminate the discounters from participation in the market, to inhibit the free choice of dealers to select their own methods of trade and to provide multilateral surveillance and enforcement. This process for achieving and enforcing the desired objective can by no stretch of the imagination be described as 'unilateral' or merely 'parallel.'" 384 U.S. 127, 148 (1966)

67.     The FMHA Trade Association Defendant, as the Florida mobile home park owners' trade association represented by the Lutz Bobo Law Firm Defendants, worked with the MHC/Equity LifeStyle Defendants and the Lutz Bobo Law Firm Defendants to develop and implement LTAs and other matters alleged herein, *supra*, across Florida mobile home parks. That is, FMHA Trade Association Defendant, was in a position to communicate to Florida mobile home park owners before it implemented the scheme including, but not limited to, the LTA that its competitors also intended to do so and the suggested format of the LTA.

68.     The MHC/Equity LifeStyle Defendants and the Lutz Bobo Law Firm

---

2       As the United States Supreme Court stated in *Catalano, Inc. v. Target Sales*, 446 U.S. 643, 648 (1980), an "agreement to eliminate discounts" "falls squarely within the traditional *per se* rule against price fixing." (Emphasis added)

EXHIBIT "A"

Defendants' close relationships with FMHA Trade Association Defendant, enabled them to collaborate with other mobile home park owners and ultimately with each other to develop these conspiratorial plans, including the LTA. Since 2015 Allen Bobo, and the Lutz Bobo Law Firm worked closely with Eric Zimmerman, then Senior Vice President of Equity LifeStyle, on revisions and implementation of LTAs, for example.

69.     Each of the MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants had a motive to maintain high retail prices for mobile home lot rental amounts. In addition, in order to encourage independent mobile home park owners to adopt and implement LTAs, the MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants needed to keep the resale mobile home lot rental amounts high.

70.     The MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants have also demonstrated a past propensity to conspire against other mobile home park owners discounting mobile home lot rental amounts.

71.     The MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants' agreement to implement LTAs has harmed and continues to harm competition by increasing prices for the mobile home lot rental amounts made subject to them. Consumers ultimately pay the economic cost of this wrongful conduct in the form of higher prices for mobile home lot rental amounts affected by LTAs. The effect of the LTAs has been to limit consumer choice by depriving them of the ability to shop around for discounts on mobile home lot rental amounts.

72.     The  MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants (and their co-conspirators) furthered and effectuated their conspiracy in the following ways, among others:

A.  Participating in secret communications, discussions, and meetings in the U.S. to exchange confidential and competitively sensitive information regarding each other's lot rental amounts charged in their Florida mobile home business;

B.  From time to time, discussing and agreeing during those conversations and meetings to set a price floor to be quoted to a mobile homeowner;

C.  Perpetuating the Florida mobile home industry-wide intentional frustration of the Plaintiff's and other representative homeowners' associations' statutory right of first refusal to purchase their Park;

D.  Perpetuating the distribution of an illegal LTA which supports their fixed rent increases and violates Chapter 723, *Fla. Stat.*, and the homeowners' right to a civil jury trial in violation of the Florida and United States Constitution;

E.  Divert resales to the benefit of the MHC/Equity LifeStyle Defendants;

F.  Concealed contaminated brownish-yellow water supply from the home purchasers;

G.  Imposed fraudulent and unreasonable lot rental categories and amount; and

H.  Unreasonably eliminated or reduced services.

73.  As a direct and proximate result of the MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants' conduct, the homeowners represented by the Plaintiff have been harmed and will continue to be harmed by paying supra-competitive lot rental amounts charged in Florida mobile home parks that they would not have paid in the absence of the conspiracy.

NOT A CERTIFIED COPY

EXHIBIT "A"

74. The MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants' combination, conspiracy, acts, and practices, or the effects thereof, are continuing and will continue and are likely to recur unless permanently restrained and enjoined.

**RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests the following relief:

1. A jury verdict for compensatory damages;

2. A judgment against all defendants, jointly and severally, by the Court for treble the amount of the jury verdict and for attorney's fees, costs and interest as allowable by law for violations of the Florida Antitrust Act;

3. An order that each defendant be permanently enjoined from future violations of Chapter 542, *Fla. Stat.*

4. An order that the plaintiff be awarded its costs of this suit and reasonable attorney's fees pursuant to § 542.22(1), *Fla. Stat.*;

5. A judgment and decree that the defendants have engaged in an unlawful combination or a conspiracy restricting trade and commerce in violation of § 542.18, *Fla. Stat.*

6. Award the Plaintiff such other and further equitable and legal relief as the Court deems just and necessary.

EXHIBIT "A"

## VI.    COUNT 2:    VIOLATION OF THE AMERICANS WITH DISABILITIES ACT ("ADA")

**(Against Defendants MHC Operating, Equity LifeStyle, MHC Maralago, Eric Zimmerman, Stanley Martin, Sydney Morris, Rene Scott, Beverly Sagehorn, Bertha Rodriguez, and Millie Rivera)**

### 42 U.S.C. §§ 12101 *et seq*

75.    Plaintiff realleges and restates paragraphs 1 through 18, and 23 through 25 as if fully set forth herein and further state:

76.    The homeowners represented by the Plaintiff are elderly persons. They have mobility, balance, gait, vision, and hearing difficulties. When traveling about in public, many mobile homeowners require the use of either walking canes or sticks, walkers, wheelchairs, audiovisual devices, and hearing aids. Consequently, many mobile homeowners are physically disabled, as defined by all applicable Florida and United States laws, and a member of the public whose rights are protected by these laws.

77.    The homeowners represented by the Plaintiff suffer from low vision and age-related cognitive decline as a "qualified disability" under the ADA as defined in 42 U.S.C. §12012 (1)(A) and in 42 U.S.C. 3602, §802(h). They are substantially limited in performing one or more major life activities, including but not limited to accurately visualizing their world, adequately traversing obstacles and walking without assistance.

78.    Many of the elderly mobile homeowners are disabled and have mobility and accessibility challenges. The MHC/Equity LifeStyle Defendants refuse to make even common areas of public accommodation ADA compliant. In response to the Plaintiff's expressed concerns, the MHC/Equity LifeStyle Defendants asserted that the Americans with Disabilities Act is inapplicable to the Park Clubhouse and refuse to discuss it further.

79.    The MHC/Equity LifeStyle Defendants regularly meet with and encourage the general public to enter the clubhouse facilities to discuss Park business

NOT A CERTIFIED COPY

EXHIBIT "A"

and permit outside guests and vendors to traverse the Park facilities. The clubhouse was also previously used as a public voting precinct. The MHC/Equity LifeStyle Defendants have no security or supervision of members of the general public who use the clubhouse facilities.

80.     The Park clubhouse, main room with seating for 200 persons (or 300 persons standing) and dance floor, library, billiards area, pool, card and game room are public accommodations, open to the public, which is intended for nonresidential use and whose operation affects commerce. The Park has 603 homes.

81.     The Plaintiff mobile home owners live in the Park and visit the Park facilities on a regular basis. Plaintiff mobile home owners regularly encounter barriers (both physical and intangible) that interfered with - if not outright denied - their ability to use and enjoy the goods, services, privileges and accommodations offered at the Park. Plaintiff mobile home owners personally encountered the following barriers at the Facility:

A.     The only ramp located at the right side of the Clubhouse parking area is improperly configured and contains no guide curbs;

B.     On numerous occasions during their visits to the Clubhouse, Plaintiff mobile home owners experienced problems when transferring onto their wheelchair from their vehicle because of the configuration of the designated parking space and access aisle located next to it;

C.     During many visits to the rental office located inside the Clubhouse, Plaintiff mobile home owners have attempted but been unable to enter the office because the door of the office is too narrow for a wheelchair;

D.     Plaintiff mobile home owners have been unable to enter the rental office by using an alternative entrance. Plaintiff mobile home

NOT A CERTIFIED COPY

EXHIBIT "A"

owners have been unable to place their rental payment into the box previously located outside of the office and have had to return to place their payment in the box. The box has now been eliminated entirely;

E.   The public restrooms located inside the Clubhouse lack necessary wheelchair clearances for the entrance doors and for use of the sink. Plaintiff mobile home owners experienced difficulty on many occasions while trying to use the restroom in the four years preceding this action;

F.   Neither the pool or jacuzzi whirlpool spa has a lift.

82.   Plaintiff mobile home owners were, and continue to be deterred from visiting the Clubhouse because they know that the Clubhouse's goods, services, facilities, privileges, advantages, and accommodations deny full and equal access to Plaintiff mobile home owners due to their physical disabilities. As a consequence, numerous homeowners avoid socialization at daily, weekly, and monthly meetings of the Maralago Cay HOA and associated social activities.

83.   Plaintiff mobile home owners live at the Park and must have ongoing access to the Clubhouse.

84.   The MHC/Equity LifeStyle Defendants knew or should have known that these elements and areas of the Clubhouse were inaccessible, violate state and federal law, and interfere with or deny access to the physically disabled. Moreover, the MHC/Equity LifeStyle Defendants have the financial resources to remove these barriers from the Park without much difficulty or expense, and make the Park accessible to the physically disabled. To date, however, the MHC/Equity LifeStyle Defendants refuse to either remove those barriers or seek an unreasonable hardship exemption to excuse non-compliance.

31

85.     At all relevant times, the MHC/Equity LifeStyle Defendants have possessed and enjoyed sufficient control and authority to modify the Park to remove impediments to wheelchair access and to comply with the 2010 Standards for Accessible Design. The MHC/Equity LifeStyle Defendants have not removed the impediments and have not modified the Park to conform to accessibility standards. The MHC/Equity LifeStyle Defendants have intentionally maintained the Park in its current condition and have intentionally refrained from altering the Park so that it complies with the accessibility standards.

86.     Title III of the ADA holds as a "general rule" that no individual shall be discriminated against on the basis of disability in the full and equal enjoyment (or use) of goods, services, facilities, privileges, and accommodations offered by any person who owns, operates, or leases a place of public accommodation. 42 U.S.C. § 12182(a).

87.     The MHC/Equity LifeStyle Defendants discriminated against the homeowners represented by the Plaintiff by denying them "full and equal enjoyment" and use of the goods, services, facilities, privileges and accommodations of the Clubhouse during each visit.

88.     The ADA specifically prohibits failing to remove architectural barriers, which are structural in nature, in existing facilities where their removal is readily achievable. 42 U.S.C. § 12182(b)(2)(A)(iv).

89.     When an entity can demonstrate that removal of a barrier is not readily achievable, a failure to make goods, services, facilities, or accommodations available through alternative methods is also specifically prohibited if these methods are readily achievable. *Id*. § 12182(b)(2)(A)(v).

90.     The homeowners represented by the Plaintiff allege that the MHC/Equity LifeStyle Defendants can easily remove the architectural barriers at the Park without much difficulty or expense, and that the MHC/Equity LifeStyle Defendants, when it was

32

readily achievable to do so.

91.     In the alternative, if it was not "readily achievable" for the MHC/Equity LifeStyle Defendants to remove the Park's barriers, then the MHC/Equity LifeStyle Defendants violated the ADA by failing to make the required services available through alternative methods, which are readily achievable.

92.     Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action. Plaintiff is entitled to have reasonable attorneys' fees, costs and expenses paid by the MHC/Equity LifeStyle Defendants.

**RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests the following relief:

1.     Enter judgment under the Americans With Disabilities Act, 42 U.S.C. §§ 12101, *et. seq.*, against the MHC/Equity LifeStyle Defendants for injunctive and declaratory relief;

2.     An order that the plaintiff be awarded its costs of this suit and reasonable attorney's fees.

3.     Award the Plaintiff such other and further equitable and legal relief as the Court deems just and necessary.

**VII.   JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues triable by jury.

October 11, 2020

/s/ Daniel W. Perry
DANIEL W. PERRY
FBN: 376671
4767 New Broad St #1007
Orlando, FL 32814-6405
Tel: 407.894.9003
Fax: 407.650.3459
dan@danielperry.com
Attorney for Plaintiff Maralago Cay HOA

33

EXHIBIT "A"

Filing # 114774237 E-Filed 10/12/2020 02:20:56 AM



### MARALAGO CAY OF WEST PALM BEACH
6280 South Ash Lane
Lantana, Florida  33462

INTEGRATED PROSPECTUS    Approval No. PRMZ000681-P20110

APPROVAL DATE:      August 21, 2003

AMENDMENTS THROUGH:

PARK OWNER:       MHC OPERATING LIMITED PARTNERSHIP

PERSON AUTHORIZED:    REGIONAL VICE PRESIDENT
            Manufactured Home Communities, Inc.
            28050 U.S. Highway 19 North, Suite 400
            Clearwater, FL  33761

This Prospectus may be delivered to Tenants of this Park who became Residents on
or after August 21, 2003

OR

Tenants who assumed the tenancy of such a Resident;

OR

Tenants who agreed to accept this Prospectus.

**EXHIBIT A**

NOT A CERTIFIED COPY

STP:21645813

EXHIBIT "A"

## RULES AND REGULATIONS

### A GUIDE FOR RESIDENTS OF
### MARALAGO CAY OF WEST PALM BEACH

EFFECTIVE AS OF *5-27-2004*

The owner of MARALAGO CAY OF WEST PALM BEACH, 6280 South Ash Lane, Lantana, Florida 33462 (the "COMMUNITY"), has adopted the following rules and regulations ("Rules and Regulations") to provide the COMMUNITY'S residents ("RESIDENTS") a safe, convenient and attractive community in which to live. Most of the Rules and Regulations deal with common sense courtesy; some of them are necessary to comply with law. All of the Rules and Regulations are intended to promote the convenience, safety and welfare of the RESIDENTS and to provide comfortable and pleasant surroundings. RESIDENTS are encouraged to make suggestions on any aspect of COMMUNITY life.

As used herein, the term "MANAGEMENT" means MHC Operating Limited Partnership, an Illinois limited partnership that is the owner ("COMMUNITY OWNER") and manager of the COMMUNITY, together with its agents, employees and managers. MANAGEMENT is affiliated with Manufactured Home Communities, Inc.

A.    MANUFACTURED HOMES - QUALITY STANDARDS

1.     The location and installation of all manufactured homes must comply with all applicable governmental laws, codes and regulations.

2.     No manufactured home may be moved into the COMMUNITY, or be transferred to a new RESIDENT within the COMMUNITY, unless the size, condition, appearance and design thereof have been approved in writing by MANAGEMENT in accordance with the quality standards set forth in these Rules and Regulations. MANAGEMENT may reject any manufactured home if the same does not meet the reasonable requirements of MANAGEMENT as to its size, condition, appearance, design, location and compatibility with the COMMUNITY and other manufactured homes therein. No unfinished, unsafe or highly combustible materials may be used for any repair or patch work on the exterior of the manufactured home or other home site improvements. RESIDENT is responsible for any damage to other manufactured homes or the COMMUNITY caused by RESIDENT or the mover. Hitches must be removed from the manufactured home within thirty (30) days of set up.

3.     All manufactured homes must continue to meet all applicable laws, codes and regulations as such may be amended from time to time. Under state law, RESIDENT'S tenancy may be terminated for failure of RESIDENT to comply with local ordinances and state laws and regulations relating to manufactured homes, or with these Rules and Regulations.

4.     No unauthorized structures may be erected on any home site. Permission to erect any structure must be obtained in writing from MANAGEMENT in advance.

5.     All permits and approvals required for the installation or removal of a manufactured home must be obtained by RESIDENT, at RESIDENT'S sole expense, in advance of such installation or removal.

6.     No materials or items of any nature may be used to secure the roof of a manufactured home without the prior written approval of MANAGEMENT, and the same must be installed in compliance with all applicable laws, codes and regulations. "Tie-downs" satisfactory to MANAGEMENT must be installed within thirty (30) days of set up.

7/7/2003  9:56 am

EXHIBIT "A"

NOT A CERTIFIED COPY

EXHIBIT "A"

# "P2" PROSPECTUS

## FOR

## MARALAGO CAY OF WEST PALM BEACH

(Division File Number PRMZ000681–P2)

Original Prospectus Approval Date: Aug. 21, 2003

Latest Revision Date: Dec. 12, 2008

Integrated Approved Copy Assembled
January 14, 2009

NOT A CERTIFIED COPY

EXHIBIT "A"

PROSPECTUS

FOR

<u>MARALAGO CAY OF WEST PALM BEACH</u>

1. THIS PROSPECTUS CONTAINS VERY IMPORTANT INFORMATION REGARDING YOUR LEGAL RIGHTS AND YOUR FINANCIAL OBLIGATIONS IN LEASING A MOBILE HOME LOT. MAKE SURE THAT YOU READ THE ENTIRE DOCUMENT AND SEEK LEGAL ADVICE IF YOU HAVE ANY QUESTIONS REGARDING THE INFORMATION SET FORTH IN THIS DOCUMENT.

2. THE STATEMENTS CONTAINED HEREIN ARE ONLY SUMMARY IN NATURE. A PROSPECTIVE LESSEE SHOULD REFER TO ALL REFERENCES, ALL EXHIBITS HERETO, THE CONTRACT DOCUMENTS, AND SALES MATERIALS.

3. ORAL REPRESENTATIONS SHOULD NOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE COMMUNITY OWNER OR OPERATOR. REFER TO THIS PROSPECTUS (OFFERING CIRCULAR) AND ITS EXHIBITS FOR CORRECT REPRESENTATIONS.

4. UPON DELIVERY OF THIS PROSPECTUS TO A PROSPECTIVE LESSEE, THE RENTAL AGREEMENT IS VOIDABLE BY THE LESSEE FOR A PERIOD OF FIFTEEN (15) DAYS.

NOT A CERTIFIED COPY

EXHIBIT "A"

**SUMMARY OF
ALL STATEMENTS REQUIRED TO BE
IN CONSPICUOUS TYPE BY
SECTION 723.012(2), Florida Statutes**

1.   THIS PROSPECTUS CONTAINS VERY IMPORTANT INFORMATION REGARDING YOUR LEGAL RIGHTS AND YOUR FINANCIAL OBLIGATIONS IN LEASING A MOBILE HOME LOT. MAKE SURE THAT YOU READ THE ENTIRE DOCUMENT AND SEEK LEGAL ADVICE IF YOU HAVE ANY QUESTIONS REGARDING THE INFORMATION SET FORTH IN THIS DOCUMENT.

2.   THE STATEMENTS CONTAINED HEREIN ARE ONLY SUMMARY IN NATURE. THE PROSPECTIVE LESSEE SHOULD REFER TO ALL REFERENCES, ALL EXHIBITS HERETO, THE CONTRACT, DOCUMENTS, AND SALES MATERIALS.

3.   ORAL REPRESENTATIONS SHOULD NOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE COMMUNITY OWNER OR OPERATOR. REFER TO THIS PROSPECTUS (OFFERING CIRCULAR) AND ITS EXHIBITS FOR CORRECT REPRESENTATIONS.

4.   UPON DELIVERY OF THIS PROSPECTUS TO A PROSPECTIVE LESSEE, THE RENTAL AGREEMENT IS VOIDABLE BY THE LESSEE FOR A PERIOD OF FIFTEEN (15) DAYS.

(NOTE: Section 723.012(2), Florida Statutes, requires that this page "must contain all statements required to be in conspicuous type in the prospectus or offering circular in a summary form." The foregoing statements are also required by the Statutes to be on the first page and are here repeated to comply with the Statutes.)

EXHIBIT "A"

MARALAGO CAY OF WEST PALM BEACH
INDEX OF CONTENTS AND EXHIBITS

I. COMMUNITY NAME AND ADDRESS..............................................................1

II. NOTICES AND DEMANDS...........................................................................1

III. DESCRIPTION OF THE COMMUNITY PROPERTY ........................................1

IV. DESCRIPTION OF RECREATIONAL AND OTHER COMMON FACILITIES..........8

V. COMMUNITY MANAGEMENT ....................................................................10

VI. OCCUPANCY ..........................................................................................10

VII. IMPROVEMENTS REQUIRED OF TENANTS ..............................................13

VIII. UTILITIES AND OTHER SERVICES...........................................................14

IX. INCREASES IN LOT RENTAL AMOUNT AND OTHER CHARGES...................16

X. OPTIONAL USER FEES ............................................................................21

XI. COMMUNITY RULES AND REGULATIONS .................................................21

XII. COMMUNITY ZONING.............................................................................22

XIII. MISCELLANEOUS .................................................................................22

XIV. AMENDMENTS TO PROSPECTUS...........................................................23

**EXHIBITS**

| | |
|---|---|
| Exhibit "A" | Rules and Regulations |
| Exhibit "B" | Plan of Community |
| Exhibit "C" | Zoning, Covenants and Restrictions |
| Exhibit "D" | Rental Agreement |
| Exhibit "E" | Inventory of Personal Property |

NOT A CERTIFIED COPY

EXHIBIT "A"

PROSPECTUS FOR
MARALAGO CAY OF WEST PALM BEACH

I. COMMUNITY NAME AND ADDRESS

The name and address of the mobile home community (the "Community") is as follows:

MARALAGO CAY OF WEST PALM BEACH
6280 South Ash Lane
Lantana, Florida  33462

II. NOTICES AND DEMANDS

The name and address of the person authorized to receive notices and demands on behalf of the owner of the Community (the "Community Owner") is as follows:

Regional Vice President
Manufactured Home Communities, Inc.
5100 W. Lemon Street, Suite 308
Tampa, Florida 33609

III. DESCRIPTION OF THE COMMUNITY PROPERTY

A.  Number of Lots.  The Community consists of 603 mobile home lots (the "Community Property").  On the date (the "Filing Date") this Prospectus was filed with the Division of Florida Land Sales, Condominiums, and Mobile homes of the Department of Business and Professional Regulation (the "Division"), the lots in the Community are all classified as standard lots.  However, the Community Owner reserves the right from time to time to reclassify any or all of the lots in the Community with respect to such reasonable factors as size and/or location.

B.  Size of Lots.  The approximate sizes of the lots in the Community are as follows:

| LOT NO | APPROXIMATE SIZE (FEET) | LOT NO | APPROXIMATE SIZE (FEET) |
|---|---|---|---|
| 1 | 40 x 86 x 78 x 80 | 303 | 67 x 80 |
| 2 | 58 x 85 | 304 | 67 x 80 x 97 x 85 |
| 3 | 58 x 85 | 305 | 75 x 80 x 43 x 101 |
| 4 | 58 x 85 | 306 | 33 x 85 x 72 x 85 |
| 5 | 58 x 85 | 307 | 58 x 85 |
| 6 | 60 x 85 x 50 x 80 | 308 | 58 x 85 |
| 7 | 40 x 85 x 78 x 80 | 309 | 58 x 85 |
| 8 | 58 x 85 | 310 | 58 x 85 |
| 9 | 58 x 85 | 311 | 62 x 85 x 43 x 80 |
| 10 | 58 x 85 | 312 | 58 x 75 |
| 11 | 58 x 85 | 313 | 58 x 75 |
| 12 | 65 x 85 x 50 x 80 | 314 | 58 x 75 |
| 13 | 58 x 80 | 315 | 58 x 75 |
| 14 | 58 x 80 | 316 | 58 x 75 |
| 15 | 58 x 80 | 317 | 58 x 75 |
| 16 | 58 x 80 | 318 | 58 x 75 |
| 17 | 58 x 80 | 319 | 58 x 75 |
| 18 | 32 x 100 x 86 x 80 | 320 | 62 x 75 |
| 19 | 32 x 100 x 90 x 85 | 321 | 40 x 90 x 80 x 65 |

STP:267015:11

7/3/2003 1:41 PM

EXHIBIT "A"

NOT A CERTIFIED COPY

| LOT NO | APPROXIMATE SIZE (FEET) | LOT NO | APPROXIMATE SIZE (FEET) |
|---|---|---|---|
| 20 | 58 x 85 | 322 | 60 x 90 |
| 21 | 58 x 85 | 323 | 60 x 90 |
| 22 | 58 x 85 | 324 | 60 x 90 |
| 23 | 58 x 85 | 325 | 60 x 90 |
| 24 | 58 x 85 | 326 | 60 x 90 |
| 25 | 58 x 85 | 327 | 60 x 93 |
| 26 | 58 x 85 | 328 | 32 x 93 x 90 x 106 |
| 27 | 58 x 85 | 329 | 29 x 85 x 117 x 106 |
| 28 | 58 x 85 | 330 | 60 x 85 |
| 29 | 58 x 85 | 331 | 59 x 80 x 50 x 85 |
| 30 | 58 x 85 | 332 | 60 x 80 x 90 x 80 |
| 31 | 58 x 85 | 333 | 58 x 85 |
| 32 | 58 x 85 | 334 | 45 x 85 x 85 x 98 |
| 33 | 58 x 85 | 335 | 35 x 98 x 85 x 82 |
| 34 | 40 x 85 x 64 x 80 | 336 | 55 x 82 x 70 x 80 |
| 35 | 58 x 85 | 337 | 58 x 80 |
| 36 | 58 x 85 | 338 | 58 x 80 |
| 37 | 58 x 85 | 339 | 58 x 80 |
| 38 | 58 x 85 | 340 | 58 x 80 |
| 39 | 30 x 85 x 80 x 85 | 341 | 58 x 80 |
| 40 | 58 x 85 | 342 | 58 x 80 |
| 41 | 58 x 85 | 343 | 58 x 80 |
| 42 | 38 x 86 x 82 x 86 | 344 | 58 x 80 |
| 43 | 58 x 85 | 345 | 58 x 80 |
| 44 | 58 x 85 | 346 | 58 x 80 |
| 45 | 58 x 85 | 347 | 58 x 80 |
| 46 | 58 x 85 | 348 | 58 x 80 |
| 47 | 42 x 80 x 64 x 85 | 349 | 58 x 80 |
| 48 | 60 x 80 | 350 | 58 x 80 |
| 49 | 60 x 80 | 351 | 58 x 80 |
| 50 | 75 x 80 | 352 | 35 x 105 x 100 x 88 |
| 51 | 75 x 80 | 353 | 34 x 88 x 64 x 80 |
| 52 | 60 x 80 | 354 | 48 x 80 |
| 53 | 60 x 80 | 355 | 68 x 80 |
| 54 | 75 x 80 | 356 | 67 x 80 |
| 55 | 70 x 80 | 357 | 58 x 80 |
| 56 | 58 x 80 | 358 | 40 x 80 x 82 x 95 |
| 57 | 48 x 80 | 359 | 32 x 95 x 90 x 94 |
| 58 | 58 x 80 | 360 | 41 x 80 x 81 x 94 |
| 59 | 58 x 80 | 361 | 58 x 80 |
| 60 | 58 x 80 | 362 | 58 x 80 |
| 61 | 58 x 80 | 363 | 58 x 80 |
| 62 | 58 x 80 | 364 | 58 x 80 |
| 63 | 58 x 80 | 365 | 58 x 80 |
| 64 | 58 x 80 | 366 | 58 x 80 |
| 65 | 58 x 80 | 367 | 58 x 80 |
| 66 | 80 x 80 | 368 | 67 x 80 |
| 67 | 80 x 80 | 369 | 67 x 80 |
| 68 | 58 x 80 | 370 | 62 x 80 |
| 69 | 58 x 80 | 371 | 62 x 80 |
| 70 | 58 x 80 | 372 | 62 x 80 |
| 71 | 58 x 80 | 373 | 62 x 80 |

EXHIBIT "A"

| LOT NO | APPROXIMATE SIZE (FEET) | LOT NO | APPROXIMATE SIZE (FEET) |
|---|---|---|---|
| 72 | 58 x 80 | 374 | 62 x 80 |
| 73 | 58 x 80 | 375 | 62 x 80 |
| 74 | 58 x 80 | 376 | 62 x 80 |
| 75 | 58 x 80 | 377 | 62 x 80 |
| 76 | 48 x 80 | 378 | 62 x 80 |
| 77 | 58 x 80 | 379 | 67 x 80 |
| 78 | 70 x 80 | 380 | 67 x 80 |
| 79 | 58 x 87 | 381 | 67 x 80 |
| 80 | 58 x 87 | 382 | 67 x 80 |
| 81 | 58 x 87 | 383 | 68 x 80 |
| 82 | 58 x 87 | 384 | 68 x 80 |
| 83 | 58 x 87 | 385 | 71 x 80 |
| 84 | 58 x 87 | 386 | 71 x 80 |
| 85 | 58 x 87 | 387 | 71 x 80 |
| 86 | 58 x 79 | 388 | 80 x 68 |
| 87 | 58 x 79 | 389 | 73 x 80 |
| 88 | 58 x 79 | 390 | 73 x 80 |
| 89 | 58 x 79 | 391 | 58 x 80 |
| 90 | 58 x 79 | 392 | 58 x 80 |
| 91 | 58 x 79 | 393 | 58 x 80 |
| 92 | 58 x 79 | 394 | 58 x 80 |
| 93 | 58 x 79 | 395 | 58 x 80 |
| 94 | 69 x 85 | 396 | 58 x 80 |
| 95 | 59 x 85 | 397 | 58 x 80 |
| 96 | 59 x 85 | 398 | 58 x 80 |
| 97 | 59 x 85 | 399 | 58 x 80 |
| 98 | 59 x 85 | 400 | 58 x 80 |
| 99 | 59 x 85 | 401 | 58 x 80 |
| 100 | 59 x 85 | 402 | 58 x 80 |
| 101 | 58 x 84 x 75 x 86 | 403 | 58 x 80 |
| 102 | 48 x 61 x 120 x 84 | 404 | 58 x 80 |
| 103 | 52 x 80 x 85 x 80 | 405 | 58 x 80 |
| 104 | 58 x 80 | 406 | 58 x 80 |
| 105 | 52 x 80 x 85 x 80 | 407 | 58 x 80 |
| 106 | 48 x 80 x 120 x 80 | 408 | 67 x 80 |
| 107 | 58 x 80 x 75 x 80 | 409 | 58 x 80 |
| 108 | 59 x 80 | 410 | 58 x 80 |
| 109 | 59 x 80 | 411 | 58 x 80 |
| 110 | 59 x 80 | 412 | 58 x 80 |
| 111 | 59 x 80 | 413 | 58 x 80 |
| 112 | 59 x 80 | 414 | 58 x 80 |
| 113 | 59 x 80 | 415 | 58 x 80 |
| 114 | 69 x 80 | 416 | 58 x 80 |
| 115 | 69 x 80 | 417 | 58 x 80 |
| 116 | 59 x 80 | 418 | 58 x 80 |
| 117 | 59 x 80 | 419 | 58 x 80 |
| 118 | 59 x 80 | 420 | 58 x 80 |
| 119 | 59 x 80 | 421 | 58 x 80 |
| 120 | 59 x 80 | 422 | 58 x 80 |
| 121 | 59 x 80 | 423 | 85 x 80 |
| 122 | 69 x 80 | 424 | 85 x 80 |
| 123 | 69 x 80 | 425 | 58 x 80 |

NOT A CERTIFIED COPY

EXHIBIT "A"

| LOT NO | APPROXIMATE SIZE (FEET) | LOT NO | APPROXIMATE SIZE (FEET) |
|---|---|---|---|
| 124 | 59 x 80 | 426 | 58 x 80 |
| 125 | 59 x 80 | 427 | 58 x 80 |
| 126 | 59 x 80 | 428 | 58 x 80 |
| 127 | 59 x 80 | 429 | 58 x 80 |
| 128 | 59 x 80 | 430 | 58 x 80 |
| 129 | 59 x 80 | 431 | 58 x 80 |
| 130 | 69 x 80 | 432 | 58 x 80 |
| 131 | 69 x 80 | 433 | 58 x 80 |
| 132 | 59 x 80 | 434 | 58 x 80 |
| 133 | 59 x 80 | 435 | 58 x 80 |
| 134 | 59 x 80 | 436 | 58 x 80 |
| 135 | 59 x 80 | 437 | 58 x 80 |
| 136 | 59 x 80 | 438 | 58 x 80 |
| 137 | 59 x 80 | 439 | 67 x 80 |
| 138 | 60 x 80 | 440 | 67 x 80 |
| 139 | 58 x 80 | 441 | 58 x 80 |
| 140 | 68 x 80 | 442 | 58 x 80 |
| 141 | 60 x 80 | 443 | 58 x 80 |
| 142 | 58 x 80 | 444 | 58 x 80 |
| 143 | 58 x 80 | 445 | 58 x 80 |
| 144 | 58 x 80 | 446 | 58 x 80 |
| 145 | 58 x 80 | 447 | 58 x 80 |
| 146 | 58 x 80 | 448 | 58 x 80 |
| 147 | 58 x 80 | 449 | 58 x 80 |
| 148 | 58 x 80 | 450 | 58 x 80 |
| 149 | 58 x 80 | 451 | 58 x 80 |
| 150 | 58 x 80 | 452 | 58 x 80 |
| 151 | 67 x 80 | 453 | 58 x 80 |
| 152 | 67 x 80 | 454 | 58 x 80 |
| 153 | 58 x 80 | 455 | 85 x 80 |
| 154 | 58 x 80 | 456 | 127 x 80 x 97 x 85 |
| 155 | 58 x 80 | 457 | 62 x 85 |
| 156 | 58 x 80 | 458 | 62 x 85 |
| 157 | 58 x 80 | 459 | 62 x 85 |
| 158 | 58 x 80 | 460 | 62 x 85 |
| 159 | 58 x 80 | 461 | 62 x 85 |
| 160 | 55 x 80 x 75 x 80 | 462 | 62 x 85 |
| 161 | 48 x 80 x 120 x 80 | 463 | 62 x 85 |
| 162 | 52 x 80 x 80 x 80 | 464 | 58 x 85 |
| 163 | 58 x 80 | 465 | 58 x 85 |
| 164 | 52 x 85 x 85 x 85 | 466 | 58 x 85 |
| 165 | 48 x 85 x 120 x 85 | 467 | 58 x 85 |
| 166 | 55 x 85 x 75 x 85 | 468 | 58 x 85 |
| 167 | 58 x 85 | 469 | 58 x 85 |
| 168 | 58 x 85 | 470 | 35 x 85 x 84 x 70 |
| 169 | 58 x 85 | 471 | 58 x 85 |
| 170 | 58 x 85 | 472 | 58 x 85 |
| 171 | 58 x 85 | 473 | 58 x 85 |
| 172 | 58 x 85 | 474 | 58 x 85 |
| 173 | 58 x 85 | 475 | 58 x 85 |
| 174 | 58 x 85 x 75 x 85 | 476 | 58 x 85 |
| 175 | 40 x 85 x 100 x 85 | 477 | 58 x 85 |

NOT A CERTIFIED COPY

EXHIBIT "A"

| LOT NO | APPROXIMATE SIZE (FEET) | LOT NO | APPROXIMATE SIZE (FEET) |
|---|---|---|---|
| 176 | 40 x 85 x 87 x 85 | 478 | 58 x 85 |
| 177 | 58 x 85 | 479 | 58 x 85 |
| 178 | 67 x 80 | 480 | 58 x 85 |
| 179 | 58 x 80 | 481 | 58 x 85 |
| 180 | 58 x 80 | 482 | 58 x 85 |
| 181 | 58 x 80 | 483 | 58 x 85 |
| 182 | 58 x 80 | 484 | 58 x 85 |
| 183 | 58 x 80 | 485 | 58 x 85 |
| 184 | 58 x 80 | 486 | 58 x 85 |
| 185 | 58 x 80 | 487 | 58 x 85 |
| 186 | 67 x 80 | 488 | 58 x 85 |
| 187 | 67 x 80 | 489 | 58 x 85 |
| 188 | 58 x 80 | 490 | 50 x 80 x 70 x 90 |
| 189 | 58 x 80 | 491 | 40 x 87 x 104 x 117 |
| 190 | 58 x 80 | 492 | 67 x 80 |
| 191 | 58 x 80 | 493 | 67 x 80 |
| 192 | 58 x 80 | 494 | 67 x 80 |
| 193 | 58 x 80 | 495 | 67 x 80 |
| 194 | 58 x 80 | 496 | 67 x 90 |
| 195 | 67 x 80 | 497 | 62 x 80 |
| 196 | 58 x 85 | 498 | 62 x 80 |
| 197 | 58 x 85 | 499 | 62 x 80 |
| 198 | 58 x 85 | 500 | 62 x 80 |
| 199 | 50 x 85 | 501 | 62 x 80 |
| 200 | 50 x 85 | 502 | 62 x 80 |
| 201 | 58 x 70 | 503 | 62 x 80 |
| 202 | 58 x 70 | 504 | 62 x 80 |
| 203 | 81 x 70 | 505 | 62 x 80 |
| 204 | 101 x 80 | 506 | 67 x 80 |
| 205 | 58 x 80 | 507 | 62 x 75 |
| 206 | 58 x 80 | 508 | 58 x 75 |
| 207 | 58 x 80 | 509 | 58 x 75 |
| 208 | 58 x 80 | 510 | 58 x 75 |
| 209 | 58 x 80 | 511 | 58 x 75 |
| 210 | 58 x 80 | 512 | 58 x 75 |
| 211 | 58 x 80 | 513 | 58 x 75 |
| 212 | 58 x 80 | 514 | 58 x 75 |
| 213 | 58 x 80 | 515 | 58 x 85 |
| 214 | 58 x 80 | 516 | 58 x 85 |
| 215 | 58 x 80 | 517 | 58 x 85 |
| 216 | 58 x 80 | 518 | 58 x 75 x 85 x 85 |
| 217 | 58 x 80 | 519 | 58 x 85 |
| 218 | 58 x 80 | 520 | 58 x 85 |
| 219 | 58 x 80 | 521 | 58 x 85 |
| 220 | 58 x 80 | 522 | 58 x 85 |
| 221 | 58 x 80 | 523 | 54 x 85 x 93 x 85 |
| 222 | 58 x 80 | 524 | 58 x 85 |
| 223 | 58 x 80 | 525 | 46 x 84 x 63 x 84 |
| 224 | 70 x 80 | 526 | 30 x 80 x 79 x 80 |
| 225 | 70 x 80 | 527 | 25 x 85 x 63 x 85 |
| 226 | 58 x 80 | 528 | 58 x 90 |
| 227 | 58 x 80 | 529 | 58 x 90 |

NOT A CERTIFIED COPY

EXHIBIT "A"

| LOT NO | APPROXIMATE SIZE (FEET) | LOT NO | APPROXIMATE SIZE (FEET) |
|---|---|---|---|
| 228 | 58 x 80 | 530 | 58 x 90 |
| 229 | 58 x 80 | 531 | 58 x 90 |
| 230 | 58 x 80 | 532 | 58 x 90 |
| 231 | 58 x 80 | 533 | 58 x 90 |
| 232 | 58 x 80 | 534 | 75 x 90 x 55 x 90 |
| 233 | 58 x 80 | 535 | 67 x 80 |
| 234 | 58 x 80 | 536 | 58 x 80 |
| 235 | 58 x 80 | 537 | 58 x 80 |
| 236 | 58 x 80 x 70 x 80 | 538 | 58 x 80 |
| 237 | 36 x 80 x 92 x 80 | 539 | 58 x 80 |
| 238 | 30 x 80 x 75 x 80 | 540 | 58 x 80 |
| 239 | 26 x 85 x 55 x 80 | 541 | 58 x 80 |
| 240 | 58 x 85 | 542 | 58 x 80 |
| 241 | 58 x 85 | 543 | 36 x 95 x 80 x 80 |
| 242 | 58 x 85 | 544 | 27 x 97 x 80 x 95 |
| 243 | 58 x 85 | 545 | 39 x 80 x 83 x 97 |
| 244 | 58 x 85 | 546 | 58 x 80 |
| 245 | 58 x 85 | 547 | 67 x 80 |
| 246 | 58 x 85 | 548 | 67 x 80 |
| 247 | 58 x 85 | 549 | 62 x 80 |
| 248 | 58 x 85 | 550 | 62 x 80 |
| 249 | 58 x 85 | 551 | 62 x 80 |
| 250 | 58 x 85 | 552 | 62 x 80 |
| 251 | 58 x 85 | 553 | 62 x 80 |
| 252 | 58 x 85 | 554 | 62 x 80 |
| 253 | 58 x 85 | 555 | 67 x 80 |
| 254 | 58 x 85 | 556 | 45 x 85 x 84 x 85 |
| 255 | 58 x 85 | 557 | 58 x 85 |
| 256 | 58 x 85 x 85 x 80 | 558 | 58 x 85 |
| 257 | 60 x 85 x 93 x 80 | 559 | 58 x 85 |
| 258 | 58 x 85 | 560 | 58 x 85 |
| 259 | 58 x 85 | 561 | 58 x 85 |
| 260 | 58 x 85 | 562 | 58 x 85 |
| 261 | 58 x 85 | 563 | 58 x 85 |
| 262 | 58 x 85 | 564 | 74 x 85 x 55 x 85 |
| 263 | 58 x 85 | 565 | 45 x 85 x 84 x 85 |
| 264 | 58 x 85 | 566 | 58 x 85 |
| 265 | 58 x 85 | 567 | 58 x 85 |
| 266 | 58 x 85 | 568 | 58 x 85 |
| 267 | 58 x 85 | 569 | 58 x 85 |
| 268 | 58 x 85 | 570 | 58 x 85 |
| 269 | 58 x 85 | 571 | 58 x 85 |
| 270 | 58 x 85 | 572 | 58 x 85 |
| 271 | 58 x 85 | 573 | 74 x 85 x 55 x 85 |
| 272 | 58 x 85 | 574 | 67 x 80 |
| 273 | 58 x 85 | 575 | 62 x 80 |
| 274 | 52 x 80 x 130 x 138 | 576 | 62 x 80 |
| 275 | 52 x 80 x 138 x 130 | 577 | 62 x 80 |
| 276 | 58 x 80 | 578 | 62 x 80 |
| 277 | 58 x 80 | 579 | 62 x 80 |
| 278 | 58 x 80 | 580 | 62 x 80 |
| 279 | 58 x 80 | 581 | 67 x 80 |

NOT A CERTIFIED COPY

EXHIBIT "A"

| LOT NO | APPROXIMATE SIZE (FEET) | LOT NO | APPROXIMATE SIZE (FEET) |
|--------|-------------------------|--------|-------------------------|
| 280 | 67 x 80 | 582 | 40 x 78 x 106 x 117 |
| 281 | 70 x 80 | 583 | 58 x 78 |
| 282 | 60 x 80 | 584 | 58 x 78 |
| 283 | 60 x 80 | 585 | 58 x 78 |
| 284 | 60 x 80 | 586 | 58 x 78 |
| 285 | 70 x 80 | 587 | 58 x 78 |
| 286 | 70 x 80 | 588 | 58 x 78 |
| 287 | 60 x 80 | 589 | 58 x 78 |
| 288 | 60 x 80 | 590 | 58 x 78 |
| 289 | 60 x 80 | 591 | 58 x 78 |
| 290 | 70 x 80 | 592 | 58 x 78 |
| 291 | 70 x 80 | 593 | 48 x 78 x 76 x 78 |
| 292 | 60 x 80 | 594 | 58 x 85 |
| 293 | 60 x 80 | 595 | 58 x 85 |
| 294 | 60 x 80 | 596 | 58 x 85 |
| 295 | 70 x 80 | 597 | 58 x 85 |
| 296 | 70 x 80 | 598 | 58 x 85 |
| 297 | 60 x 80 | 599 | 58 x 85 |
| 298 | 60 x 80 | 600 | 58 x 85 |
| 299 | 60 x 80 | 601 | 58 x 85 |
| 300 | 70 x 80 | 602 | 58 x 85 |
| 301 | 67 x 80 | 603 | 58 x 85 |
| 302 | 58 x 80 | | |

C.   **Setback and Separation Requirements.** There are several requirements of law with respect to how far each mobile home within the Community must be set back from the borders of its lot and the distance that must be maintained from each mobile home in the Community and its supporting facilities (for example, a carport) to other mobile homes, supporting facilities, and structures in the Community.

Pursuant to Rule 4A-42.005 of the Florida Administrative Code, the State Fire Marshal has adopted the Code of the National Fire Protection Association. The applicable provisions of that Code provide as follows:

5-2.1 Fire Safety Separation Requirements
5-2.1.1

Any portion of a mobile home, excluding the tongue, shall not be located closer than 10 ft. (3.04 m) side to side, 8 ft. (2.44 m) end to side or 6 ft. (1.83 m) end to end horizontally from any other mobile home or community building unless the exposed composite walls and roof of either structure are without openings and constructed of materials which will provide a one-hour fire rating, or the structures are separated by a one-hour fire rated barrier. (See 5-4.1)

5-4 Accessory Building or Structure Fire Safety Requirements
5-4.1

A carport, awnings ramada, or open (screened) porch shall be permitted to be located immediately adjacent to a lot line when constructed entirely of materials which do not support combustion and provided that such facilities are not less than 3 ft. (0.91 m) from a building, cabana, or enclosed porch on an adjacent lot. A carport, awning, or ramada or open (screened) porch using combustible materials shall not be located closer than 5 ft. (1.52 m) from the lot line of an adjoining lot.

In addition to the requirements of the State Fire Marshal, the Palm Beach County Zoning Commission of Palm Beach County, Florida, has enacted certain zoning regulations controlling the setback

EXHIBIT "A"

and separation of mobile homes within the Community. The portions of such zoning regulations that set forth the setback and separation requirements applicable to the Community are as follows:

a)      Front: The minimum front set-back is twenty-five (25) feet from the center of the street or fifteen (15) feet from the street right-of-way

b)      Side: The side setbacks are six (6) feet.

c)      Rear: The set-back from the rear property line is ten (10) feet.

The requirements quoted and referenced above of the various governing agencies having jurisdiction in these matters may overlap or be inconsistent with one another. In addition, governmental rules or regulations are subject to amendment or repeal. Consequently, no representation is made hereby as to the continuing applicability or interpretation of the requirements quoted and referenced above, nor as to the continuing applicability of such requirements. Prospective Tenants of the Community ("Tenants") are strongly advised to make their own independent inquiry with respect to these matters. Please note that the above quoted and referenced requirements concern only the setback and separation requirements applicable to the Community on the Filing Date, that any one or more of such requirements may be subsequently modified or repealed, and that there may exist additional requirements of various governmental entities with respect to the placement and installation of mobile homes on lots within the Community. No obligation is undertaken by the Community Owner to advise any Tenant of any such modification or repeal, or of any such additional requirements.

D.      Use of Shared Facilities. The total number of lots in the Community is the maximum number of lots that will use the recreational and other common facilities in the Community (the "Shared Facilities"). On the Filing Date, the total number of lots and sites in the Community that will use the Shared Facilities is six hundred three (603). The Shared Facilities will be used at the Community Owner's sole discretion both by Tenants of existing development phases in the Community as well as Tenants of development phases in the Community which the Community Owner may at some time in the future develop to add up to twenty (20) additional lots in the Community. All of such twenty (20) additional lots in the Community will also use the Shared Facilities of the Community. The total number of lots and sites in the Community that will use the Shared Facilities will not exceed six hundred twenty-three (623).

Pursuant to applicable law, the Community Owner reserves the right from time to time to alter or change any of the Shared Facilities by the removal, relocation or alteration of existing facilities or the construction of new facilities. No assurance is given that any of the foregoing facilities will remain available for the Tenants' use for any specified period.

## IV.  DESCRIPTION OF RECREATIONAL AND OTHER COMMON FACILITIES

A.      Clubhouse. The Community has a Clubhouse, which is located in on Fifth Avenue, directly in from the entrance of the Community. The Clubhouse is comprised of eleven (11) rooms. A description of each room, its intended purpose, approximate floor area and capacity follows:

| Description of Rooms Therein | Purpose | Approximate Floor Area: Sq. Footage | Capacity |
|---|---|---|---|
| Main Hall | Entertainment, Meetings, Dancing, etc. | 4,350 | 450 |
| North Stage Room | Dressing Room for Stage and Exercise Room | 312 | 24 |
| South Stage Room | Billiards and Dressing Room for Stage | 480 | 35 |

EXHIBIT "A"

| Description of Rooms Therein | Purpose | Approximate Floor Area: Sq. Footage | Capacity |
|---|---|---|---|
| Original Auditorium | Library, Food Serving Room and Meeting Room | 1,036 | 150 |
| Laundry Room | Washing and Drying of Clothes | 510 | 5 |
| Kitchen | Food Preparation | 209 | 2 |
| Storage/Heater Room | Storage and Hot Water Heaters for Kitchen and Laundry | 66 | 1 |
| Storage Room | Storage of Shuffleboard Equipment | 120 | 1 |
| Men's Room | Restroom | 209 | 3 |
| Ladies' Room | Restroom | 140 | 3 |
| Storage Room | Storage | 130 | 1 |
| Financial Center | Financial Planning | 150 | 2 |

B.    The following are all other facilities and permanent improvements which will serve the Community:

1.    Swimming Pools. The Community has two (2) swimming pools which may be used by the Tenants and their guests, subject to the Community's Rules and Regulations. Both swimming pools are located to the south of the Clubhouse.

(a)    The First Swimming Pool is approximately forty (40) feet by twenty feet (20), ranges in depth from three (3) to six (6) feet, and is heated. The total capacity of the First Swimming Pool is sixteen (16) people.

(b)    The Second Swimming Pool is approximately seventeen (17) feet by thirty-eight (38) feet, ranges in depth from three (3) to six (6) feet, and is heated. The total capacity of the Second Swimming Pool is thirteen (13) people. The pool is surrounded by a deck of approximately 6,694.5 square feet and has a capacity of two hundred twenty-three (223) people.

2.    Shuffleboard Facilities. The Community contains eight (8) lighted shuffleboard courts, which may be used by the Tenants and their guests, subject to the Community's Rules and Regulations. The Shuffleboard Facilities are located west of the Clubhouse. The total of all eight (8) courts can accommodate up to thirty-two (32) players.

3.    Outside Grill. The Community contains an outdoor grill which may be used by the Tenants and their guests, subject to the Community's Rules and Regulations. The grill is located west of the Clubhouse.

4.    Clothes Drying Area. The Community contains a clothes drying area which may be used by the Tenants and their guests, subject to the Community's Rules and Regulations. The Clothes Drying Area is located west of the Clubhouse and is approximately 780 square feet.

EXHIBIT "A"

C.      Personal Property. A general description of the items of personal property and the approximate number of each item of personal property that the Community Owner is committing to furnish for each room or other facility is listed in the Inventory contained in Exhibit "E" of this Prospectus.

D.      Days and Hours of Operation. All recreational facilities will be available for use between the hours of 9:00 a.m. and 9:00 p.m., seven (7) days a week, except that the swimming pool hours are from 6:00 am. to 10:00 p.m., seven (7) days a week. Hours of use may be changed or restricted for special occasions, seasonal or safety reasons, and be limited during routine maintenance or major repairs.

E.      Service Facilities. In addition to the recreational and common facilities described above, the Community contains several service improvements such as roadways and water, sewer and other utility facilities.

F.      In General. All facilities described in this Section IV have been completed as of the Filing Date. The Community Owner reserves the right from time to time to alter or change any of such facilities by the removal, relocation or alteration of existing facilities or the construction of new facilities. No assurance is given that any of the foregoing facilities will remain available for the Tenants' use for any specified period after the Filing Date.

From time to time the Community Owner, in the future, may be required by government action or by its own decision, to construct, build or provide for permanent or non-permanent improvements in the Community not yet known or contemplated, which permanent or non-permanent improvements shall be for the use or benefit of the Tenants of the Community or used for the operation and management of the Community. In such event, the Community Owner intends and shall pass on to the Tenants on a pro-rata basis the cost of such permanent or non-permanent improvements after giving the proper notice to the Tenants as provided by the applicable law in force and effect at that time.

## V. COMMUNITY MANAGEMENT

The management of the Community is the responsibility of the Community Owner and the person designated by the Community Owner to manage the Community (the "Manager"). The Manager's office is located in the Sales and Information Center, and will have posted days and hours of operation. The Community Owner and the Manager will also oversee the maintenance and operation of the Community, which are subject to change. However, the Community Owner may from time to time employ such additional maintenance personnel as the Community Owner may deem necessary or appropriate to properly maintain and operate the Community. The management services provided by the Community Owner as of the Filing Date include Community management and maintenance of streets, ditches, recreational facilities and common areas. The Community Owner reserves the right, upon ninety (90) days (or such lesser period as may be allowed under applicable law) prior written notice to each Tenant, to increase, reduce, eliminate or modify from time to time any or all of the services that are provided by the Community Owner.

In general, and except as expressly provided to the contrary in this Prospectus, each Tenant is responsible for the maintenance and repair of their mobile home, Lot, and all improvements thereon (including, but not limited to, landscaping, fertilization and application of insecticide as necessary). Also, each Tenant is responsible for compliance with the Community Rules and Regulations, and for the timely performance of their obligations under their lot rental agreement.

## VI. OCCUPANCY

A. In accordance with the Federal Housing for Older Persons Act of 1995 (as amended or modified from time to time, "HOPA"), the Community is intended to be and is operated as "housing for older persons." Under HOPA, "older persons" are defined as persons fifty-five (55) years of age or older. The Community complies with HOPA and is intended to be reserved for occupancy by persons fifty-five (55) years of age or older, with certain exceptions as allowed by HOPA. Each occupied home lot within the Community must be permanently occupied by at least one person fifty-five (55) years of age or older as of

10

NOT A CERTIFIED COPY

EXHIBIT "A"

the date of occupancy. As such, this Community adheres to and enforces the requirements of the "Housing for Older Persons Act" of 1995.  Consequently, at least 80% of the occupied homes must be occupied by at least one person who is 55 years of age or older as of the date of occupancy and any other occupant must be 40 years of age or older (except spouses and permanent full-time care givers whose presence is required by a licensed physician.

      B.    <u>Approval.</u> All prospective Tenants must be approved in writing by the Manager before any sale of a mobile home to such prospective Tenant is consummated. If the mobile home is sold to a person who has not been previously approved by the Manager for residency in the Community, the mobile home must be moved from the Community at the time of sale.

      C.    <u>No Liability.</u> In all areas of the Community, including but not limited to common areas and the lots, both the safety of Tenants, their families, licensees, invitees and guests, as well as Tenants' personal property (including mobile homes placed in the Community), shall be at Tenants' sole risk and the Community Owner and the Manager shall incur no liability for loss, damage or injury with respect thereto or with respect to any other property or persons, due to any causes, including but not limited to "Acts of God," storm, sinkhole, fire, explosion, erosion, flood, smoke, water damage, water escape, changes in level of underground water table, changes in aboveground water level, soil subsidence, erosion, windstorm, hail, lightning, animals (domestic or wild), freeze, aircraft, vehicles, falling objects, negligence, trees, shrubbery, vines, earthquake and insect damage of any nature whatsoever. Tenants agree to hold the Community Owner, the Manager, and their respective agents, owners, partners, successors and assigns harmless from any and all liability arising from loss, damage or injury to person or property caused by any act or omission of any Tenant, any Tenant's family, licensees, invitees or guests. In general, and except as expressly provided to the contrary in this Prospectus, each Tenant is solely responsible for the maintenance and repair of such Tenant's mobile home, lot and all improvements (both natural and man-made) thereon, including but not limited to landscaping, trees, tree roots, tree trimming, driveways, porches, septic systems, water lines and sewer lines. Also, each Tenant is responsible for compliance with the Community Rules and Regulations and for the timely performance of such Tenant's obligations under their lot rental agreement.

      D.    <u>Inspection and Acceptance of Lot, Common Areas and Community.</u> Tenant has inspected the lot, the Common Areas and the Community in general and accepts same in their present condition "As is" on commencement of this Prospectus.

      E.    <u>Use of Premises.</u> The Tenant shall not, without the prior written consent of the Community Owner or such other conditions as the Community Owner may prescribe, occupy or use the mobile home or permit the same or any part thereof to be occupied or used for any purpose other than: (i) as a private dwelling for the Tenant or members of the Tenant's family in compliance with the Community Rules and Regulations and this Prospectus; and (ii) any residential use permitted under, and subject to compliance with, the Community Rules and Regulations and this Prospectus, applicable zoning laws, building code or other rules and regulations of governmental authorities having jurisdiction. In addition to the foregoing, the mobile home may be occupied from time to time by qualifying guests of the Tenant as long as such occupancy is not a violation of applicable zoning laws, building codes, the Community Rules and Regulations and this Prospectus, or other rules and regulations of governmental authorities having jurisdiction. Occupancy by guests of the Tenant shall be for a period of time not exceeding fifteen (15) consecutive days or thirty (30) total days per year, unless a longer period is approved in writing by the Community Owner, but no guests may occupy the mobile home unless one or more of the permitted Tenants are then in occupancy. The spouse of a Tenant shall not be considered a guest.

      F.    <u>Assignment and Subletting.</u> The mobile home must be owner-occupied, with at least one (1) Tenant appearing at all times as the registered owner thereof per the Department of Highway Safety and Transportation Certificate(s) of Title(s) to the mobile home. Tenant shall have neither the right nor the power to assign, rent or sublet the mobile home, the lot or any portion thereof. Notwithstanding the foregoing, the Community Owner reserves the right to assign, rent and sublet mobile homes in the Community as it sees fit in its sole discretion.

11

NOT CERTIFIED

EXHIBIT "A"

G.    Selling Mobile Homes in Community/Acceptance

1.    Tenants may not sell, convey or transfer their mobile home in place or transfer title thereto without first notifying the Manager, in writing (the "Offer Notice"), that their mobile home is being sold, conveyed or transferred in place.

2.    Tenants must also secure written approval of the Manager as to condition of the mobile home and the lot by having the Manager perform an exterior inspection of said mobile home and lot prior to the sale, conveyance or other transfer of the mobile home.  Such inspection shall include but not be limited to:

(a)    Washing and/or painting of the mobile home and skirting; and
(b)    Flower beds weeded and mulched; and
(c)    Driveway seal coated, painted or cleaned; and
(d)    Screen or vinyl windows in good condition; and
(e)    Trim shrubs and trees on Tenant's lot.

The Tenant shall do what is required to bring the mobile home and the lot into compliance with these requirements before closing.

3.    Tenants may avail themselves of the In-Community sales services or select an outside brokerage service of their own choice. If Tenants so desire, they may sell their mobile home themselves. Credit application and pre-approval by the Manager of the prospective buyer applies regardless of the sales/purchase method employed.

4.    Any Tenant intending to remove his or her mobile home from the Community must give the Manager ninety (90) days notice in writing prior thereto. The Tenant shall remain responsible for the Lot Rental Amount (as defined herein) until such time as their lot rental agreement has expired or has been assigned, as set forth in this Prospectus.

5.    All prospective buyers of mobile homes in the Community must furnish verification of their age with a picture identification card and a driver's license, passport or other governmental documentation.

H.    Alterations to the Mobile Home.  The Tenant shall not, without first obtaining the written consent of the Community Owner, alter the lot in any way or add to the mobile home presently located upon the lot or any of its fixtures and appurtenances. The Tenant shall not change the color of the mobile home located on the lot, or substantially alter its outward appearance, without first having obtained written approval thereof from the Community Owner. All fixtures, including but not limited to plants, shrubs and trees planted on the lot as well as all structures including fences embedded in the ground, black top or concrete, shall, at the option of the Community Owner, become the property of the Community Owner and shall not be removed by the Tenant without the prior written consent of the Community Owner.

I.    Insurance.  The Tenant shall be responsible for any insurance insuring the mobile home and its contents (and Tenant shall be responsible for maintaining the same in effect at all times) against any loss, damage or injury and the Community Owner and the Manager shall not be liable or responsible for any such loss, damage or injury.

J.    Mechanic's Liens.  No Tenant shall have the right to cause the Community Owner's interest in the Community or any portion thereof to become subject to a mechanic's lien under applicable laws. Should a mechanic's lien be filed against the mobile home, then the Tenant shall forthwith cause the lien to be discharged by payment, removal to security, or otherwise; and, if the Tenant shall fail to do so within ten (10) days after notice from the Community Owner, then the Community Owner may cause the lien to be discharged by payment, without investigation as to the validity thereof or any offsets of defenses thereto, and shall have the right to collect as additional assessments hereunder all amounts paid and all costs and expenses paid or

EXHIBIT "A"

incurred in connection therewith, including reasonable attorney's fees, if any, together with interest thereon from the time or times of payment at the maximum rate allowed by law.

## VII. IMPROVEMENTS REQUIRED OF TENANTS

As a condition of occupancy in the Community, the following improvements must be installed at the Tenant's expense:

A.     All axles, wheels and hitches will be removed. All aluminum products must be new material. All mobile homes must be properly anchored with tie-downs in accordance with applicable government laws, ordinances and regulations. The design of all appurtenances and additions to the mobile home and lot must be approved by the Community Owner or the Manager in writing prior to construction of said appurtenances and additions. All such construction and installation shall begin only after appropriate building permits have been obtained. All work is to be done by a licensed, qualified and bonded contractor, who has proof of valid workmen's compensation insurance coverage, if applicable, and who has registered with the Manager.

B.     All homes must have a concrete or paved driveway extending at least three-quarters (3/4) of the length of the mobile home to the street, a minimum of twelve (12) feet in width, and guttering at the street access from the driveway;

C.     A screen-enclosed porch enclosing a concrete patio, the patio abutting the mobile home, an aluminum or shingled roof and a screen mesh totally enclosing the patio and extending from the patio to the roof;

D.     Attractive and safe steps at each entrance to the mobile home and to the raised screen-enclosed porch, if applicable;

E.     Solid block or vinyl skirting at all street facing ends and sides of the mobile home and attachments. The skirting shall be in conformity with that of the other mobile homes in the Community;

F.     Split block or vinyl skirting around the mobile home and in conformity with that of the other mobile homes in the Community;

G.     A fully sodded lawn;

H.     All newly-sided mobile homes shall have and wood or vinyl lap-sided exterior siding to the bottom of mobile the home; and

I.     All newly-roofed mobile homes shall be shingle-roofed.

Each of such improvements must be designed and installed in accordance with the requirements of the Community Rules and Regulations and this Prospectus and in accordance with plans that have been approved in advance in writing by the Community Owner or the Manager. All such construction and installation shall begin only after appropriate building permits have been obtained. All work is to be done by a licensed, qualified and bonded contractor, who has proof of valid workmen's compensation insurance coverage, if applicable, and is registered with the office.

To the extent permitted by law, the Tenant may also be required to bear, in the form of increases in the Lot Rental Amount, the costs incurred by the Community Owner in installing capital

NOT CERTIFIED COPY

EXHIBIT "A"

Improvements or performing major repairs in the Community. Factors affecting increases in the Lot Rental Amount are described in Section X of this Prospectus. Section 723.011(3), Florida Statutes, prohibits the Community Owner from requiring home owners who resided in the Community on June 4, 1984 from installing any permanent improvements. Rule 61B-31.001(4), Florida Administrative Code, states that this prohibition also applies to any assumptions of those tenancies.

## VIII.  UTILITIES AND OTHER SERVICES

A.  Water. As of the Filing Date, water is provided by the Community Owner. As of the Filing Date, the Tenant is separately billed for the Tenant's pro-rata share (i.e., the total cost charged to the Community Owner for water service is divided equally by the number of occupied Lots in the Community) for water charges, and the charge for water service is not included in the Base Rent or the Lot Rental Amount. However, the Community Owner reserves the right, upon ninety (90) days prior written notice to each Tenant (or such lesser period as may be allowed under applicable law), to cause each Tenant to be separately billed for water by the installation of individual meters for Lots in the Community at the expense of the Tenants. Responsibility for water mains in the Community from the meter at the Community entrance up to, but not including, the shut-off valve providing water to the Lot is the responsibility of the Community Owner. The shut-off valve and the water lines from the shut-off valve to the mobile home are the responsibility of the Tenant.

B.  Sewage. As of the Filing Date, sewage disposal is provided to the Community by The Town of Lake Clarke Shores. Sewage disposal charges are billed to the Community in a lump sum and the Tenant is separately billed for the Tenant's pro-rata share (i.e., the total bill is divided by the number of occupied Lots in the Community). The charge for sewage disposal service is not included in the Base Rent or the Lot Rental Amount. The Community Owner reserves the right, upon ninety (90) days prior written notice to each Tenant (or such lesser period as may be allowed under applicable law), to cause each Tenant to be separately billed for sewage disposal service by the installation of individual water meters for each Lot in the Community at the expense of the Tenants. Responsibility for sewer lines in the Community up to, but not including, the ground connection of the sewer to the mobile home sewer lines, is the responsibility of the Community Owner. The ground connection and the sewer lines from the ground connection to the mobile home are the responsibility of the Tenant.

C.  Waste Disposal. As of the Filing Date, waste disposal (garbage and trash collection) is provided to the Community through arrangements with an independent contractor collection company, and is included in the Base Rent and the Lot Rental Amount. The provision of adequate containers and delivering the containers to the appropriate location for pickup at the appropriate time is the responsibility of the Tenant. As of the Filing Date, the Community Owner does not separately bill the Tenants for the waste disposal charges as such charges are billed in a lump sum to the Community and not separately billed to the Tenants. However, the Community Owner reserves the right, upon ninety (90) days prior written notice to each Tenant (or such lesser period as may be allowed under applicable law), to (i) charge each Tenant separately for the waste disposal services through an equitable apportionment of the cost of such services; or (ii) cause each Tenant to be separately billed for waste disposal services by direct billing from the company providing such service; or (iii) a combination of both such apportionment and such direct billing.

D.  Storm Drainage. As of the Filing Date, storm drains within the Community are provided and maintained by the Community Owner. Storm drainage is included in the Base Rent and the Lot Rental Amount.

E.  Electricity. As of the Filing Date, electric power consumed within the Community is provided by Florida Power and Light Company and is not included in the Base Rent or the Lot Rental Amount. All electricity consumed on the Lots within the Community is separately metered and billed directly to each Tenant, and is the sole responsibility of the Tenant. Electric power for the street lights and common facilities in the Community is separately metered and billed to the Community Owner and is included in the Lot Rental Amount. The Community Owner is responsible for the maintenance of the underground electric lines to the pedestal located on each Lot and for the meter on the pedestal. The Tenant is responsible for the maintenance of the pedestal, the main electrical circuit breaker, the electrical lines from the pedestal to the

EXHIBIT "A"

mobile home, and for any other connections outside the mobile home, including connections to utility sheds and other outdoor receptacles.

    F.    <u>Cable Television Service</u>.  As of the Filing Date, Cable Television Service is provided by Adelphia Cable.  Cable television service is separately metered and billed directly to each Tenant, is the sole responsibility of the Tenant, and is not included in the Base Rent or the Lot Rental Amount.

    G.    <u>Satellite Dishes</u>.  As of the Filing Date, Satellite Dishes are obtained at the Tenants' discretion and option from the satellite provider of their choice.  Satellite Dish service is separately metered and billed directly to each Tenant, is the sole responsibility of the Tenant, and is not included in the Base Rent or the Lot Rental Amount.

    H.    <u>Telephone Service</u>.  As of the Filing Date, Telephone Service is provided by Bell South.  Telephone service is separately metered and billed directly to each Tenant, is the sole responsibility of the Tenant, and is not included in the Base Rent or the Lot Rental Amount.

    I.    <u>Changes to Utilities and Other Services</u>.  The description of the utility and other services at the Community set forth above reflects the manner in which such services are provided and charged, and the parties responsible for the maintenance of the facilities necessary to provide such services, as of the Filing Date.  The Community Owner reserves the right, upon ninety (90) days prior written notice to each Tenant (or such lesser period as may be allowed under applicable law), to discontinue the provision or maintenance of any utility or such other service or utility described above that is presently provided and/or maintained by the Community Owner, so long as such discontinued service or utility is replaced by a comparable service or utility.  In the event of such discontinuation and replacement, the Tenant may be billed separately for utilities or services that are billed to the Community Owner as of the Filing Date and/or may become responsible for the maintenance of utility facilities that are the responsibility of the Community Owner as of the Filing Date.

    For example, the Community Owner reserves the right to provide water and/or wastewater utility services by a utility entity or entities that may be privately or publicly owned, and may be sold to a third party without the consent of the Tenant.  The Community Owner reserves the right to obtain certificates of authorization subject to the regulatory jurisdiction of the Florida Public Service Commission ("FPSC") pursuant to the provisions of Chapter 367, Florida Statutes, as it may be amended from time to time, and the rules enacted pursuant to the authority thereof, as amended from time to time, or the Community Owner may obtain a franchise or certificate of authorization subject to the regulatory jurisdiction of Palm Beach County, pursuant to the provisions of §367.171, Florida Statutes, as it may be amended from time to time, and any ordinances, rules, regulations or orders which may be enacted by Palm Beach County in the exercise of that jurisdiction.  In the event that the utilities are or become regulated pursuant to the jurisdiction of either the FPSC or Palm Beach County, the Tenant may become responsible for paying all rates and charges to the utilities and will be subject to the rules and regulations of the utilities, as approved by the FPSC or Palm Beach County (as applicable) and as set forth in the utilities' tariffs.  In the event that said utilities are or become exempt from regulation by either the FPSC or Palm Beach County, the Tenant may become responsible for paying the utilities their current rates and charges, as they may be charged from time to time.

    J.    <u>Exculpation</u>.  The Community Owner and the Manager shall not be liable for any failure in, or insufficiency of, the water supply, electric current, gas, telephone, cable television or other service provided for hereunder or for any interference with light, air, view or other interest of the Tenant.  No abatement or offset against any amounts due from the Tenant to the Community Owner or claim of eviction or dispossession shall be made or allowed because of the making or failure to make or delay in making any repairs or alterations to utilities or common facilities or any fixtures or appurtenances therein or for space taken to comply with any law, ordinance or governmental regulation or for interruption or curtailment of any such service due to accidents, alterations, repairs or due to difficulty or delay in securing supplies or labor or due to any other causes.  The Community Owner reserves the right and easement to enter upon the lot at {any time} [reasonable times] for the purpose of installing, inspecting, maintaining and replacing water, gas (if applicable), electrical, sewage, telephone and drainage pipes, lines, systems and facilities[, in accordance with §723025, Florida Statutes].

EXHIBIT "A"

## IX. INCREASES IN LOT RENTAL AMOUNT AND OTHER CHARGES

A.    Lot Rental Amount.  The Tenant will be responsible for payment of the base rent, pass-through charges, assessments, and other financial obligations (which amounts, together with any special use fees, shall be referred to herein as the "Lot Rental Amount") effective on the Delivery Date, as follows:

1.    Rent:  The initial base rent ("Base Rent") for the Lot is $_____ per month, payable in advance in full on the first day of each month.  Said initial Base Rent amount will be in effect from _____, 200___ to _____, 200___.  Payment of rent and any other charges due hereunder is due on the first day of each month at the Manager's office, without any set-off, counterclaim or deduction whatsoever.  Payment of the delinquent lot rental amount fee does not in any way relieve the Tenant of the obligation to pay rent and other charges due hereunder by the first day of the month and is levied to cover the costs of additional accounting and collection expenses.  The parties hereby agree that the actual amount of costs and/or damages to the Community Owner attributable to a late payment or returned check is difficult and/or impractical to fix, and both parties hereto agree to regard Community Owner's costs and/or damages for these items as equal to the amount stated herein as liquidated damages.

2.    Special Use Fees:  Following is a list of all special use fees currently charged by the Community Owner:

(a)  Residency Application Fee:    $_____ non-refundable fee due upon application to cover the costs of registration and credit and personal reference verification [If fee is determined to be an entrance fee prohibited by § 723.041, Florida Statutes, it will be refunded.]

(b)  Additional Occupant/Guest Fee:    $_____ per person for visits in excess of thirty (30) days total per calendar year.  This fee will be equal to ten percent (10%) of the Base Rent per additional occupant/guest per month in excess of the thirty (30) days per calendar year threshold.  This fee will be computed on a pro-rata basis for partial guest months using thirty (30) days as the average number of days per month at the discretion of the Management.

(c)  Delinquent Lot Rental Amount Fee:    Payment due on first day of month; after the fifth (5th) business day of month $_____ charged.

(d)  Returned Check Fee:    $_____, or at the discretion of the Community Owner, the maximum amount allowed under §832.08, Florida Statutes, per occurrence, plus any bank charges billed to the Community Owner for any checks or other bank drafts that are not honored by the drawee bank and are returned unpaid to the Community Owner or any checks drawn on non-US banks discounted for exchange rate differential.

(e)  Recreation Hall Use Fee:    $_____ per use (such as a private party).

(f)  Recreation Hall Damage Deposit:    $_____ per use, returned to the Tenant upon the Tenant's restoration of the Recreation Hall to same condition as prior to reserved use.

(g)  Security Deposit:    $_____, in addition to rent due and will not be treated as first or last months' rent.  Said Security Deposit will be retained during the course of the tenancy in accordance with §83.49, Florida Statutes.

EXHIBIT "A"

(h) Lot Restoration Deposit:   $_____ Amount not to exceed two (2) months' Base Rent, to be deposited with the Community Owner prior to moving.

(i) Towing and Storage Fee (for Vehicle, Trailer, Boat or other Watercraft):   $_____, plus the cost of the towing and storage and labor involved.

(j) Rules and Regulations Enforcement Fee:   $_____, plus the actual cost will be based on the time involved and expenses incurred in correcting the problem will be charged if the Tenant does not maintain the appearance of the Tenant's mobile home and lot in accordance with the Community Rules and Regulations.

(k) Lot/Lawn Maintenance Fee:
 (i) Minimum   $_____ per performance of required maintenance resulting from the Tenant's failure to maintain the lot.
 (ii) Maximum   $_____ per performance of required maintenance resulting from the Tenant's failure to maintain the lot, plus any costs incurred by Community Owner, including but not limited to materials, equipment, supplies and labor involved, to correct the non-complying conditions.

(l) Excess Lawn Watering Fee:   $_____ per occurrence, not to exceed five percent (5%) of one month's Base Rent per occurrence.

(m) Special Service Fee:   $_____ per hour, but not less than $_____ per service call, for any repair or service that is performed by the Community Owner (at its option) at the request of the Tenant, but which is the responsibility of the Tenant.

(n) Annual Fee due to Florida Department of Business and Professional Regulation:   $_____ annually.

(o) Governmental Regulation Violation Charge:   Full amount assessed against the Community Owner by any governmental authority for any violation caused by the Tenant, including but not limited to any administrative fees, interest and/or penalties.

(p) Pest Control Fee:   $_____ per performance or full amount charged by pest control company (if greater) for any necessary services performed resulting from the Tenant's failure to maintain the lot.

(q) Utility Repair Fee:   $_____ plus the actual costs incurred to repair damage caused by the Tenant to any utility collection or distribution line, pipe, valve, connection or meter, including penalties and administrative fees charged by the utility owner to the Community Owner

(r) Pet Permit Fee:   $_____ per month per pet.

3. Pass-Through Charges: These are amounts which are itemized and charged separately from the Base Rent and represent the Tenant's proportionate share of the necessary and actual direct costs and impact or hookup fees for a governmentally mandated capital improvement, which may include the necessary and actual direct costs and impact or hookup fees incurred for capital improvements

EXHIBIT "A"

required for public or private regulated utilities which will be charged to the Tenant, and may be increased at any time during the year following ninety (90) days' (or such lesser period as may be allowed under applicable law) notice to the Tenant. All pass-through charges will be assessed to the Tenant on a proportionate share basis. The proportionate share will be determined by dividing equally among the affected developed lots in the Community the total costs for the necessary and actual direct costs and impact or hookup fees incurred for governmentally mandated capital improvements serving the recreational and common areas and all affected developed lots in the Community. However, the Community Owner reserves the right to recoup these costs in the form of future Lot Rental Amount increases rather than as pass-through charges.

    4.    <u>Pass On Charges</u>: These are amounts which are itemized and charged separately from the Base Rent. The Park Owner may pass on, at any time during the term of the lot rental agreement, ad valorem property taxes and utility charges, or increases of either. Pass on charges will be charged to the tenants on a proportionate share basis, as hereinafter defined.

    5.    <u>In General</u>:

        The costs of all other services required by the Tenant are solely the Tenant's responsibility.

        The dollar amounts set forth above represent only the amounts charged for each category on the Delivery Date. As disclosed herein, such amounts are subject to change.

        Wherever "0" appears above a blank for the amount charged for any rental category described in this section, it means that on the Delivery Date there is no current dollar amount for that particular charge. In the manner disclosed in this Prospectus, the Community Owner may, from time to time, commence the imposition of charges for such rental categories and, once such charges have been imposed, such charges shall be subject to increase.

        Nothing in this Prospectus shall be deemed a waiver of the Community Owner's right to collect from the Tenant any damages that the Community Owner may sustain as a result of or in connection with the tortious act, neglect or breach of the lot rental agreement by the Tenant or any person permitted to be on the Community property by the Tenant.

    B.    <u>Manner of Lot Rental Amount Increases and Other Charges</u>.

    1.    <u>Definitions</u>.

    (a)    "Lot Rental Amount" means all financial obligations, except Optional User Fees, which are required as a condition of the tenancy. The monthly Base Rent is one element of the Lot Rental Amount.

    (b)    "Special Use Fees" mean those separately itemized amounts for specific services or privileges which are charged in addition to Base Rent, including but not limited to, such charges as guest fees and pet fees.

    (c)    "Pass-through charges" means the mobile home owner's proportionate share of the necessary and actual direct costs and impact or hookup fees for a governmentally mandated capital improvement, which may include the necessary and actual direct costs and impact or hookup fees incurred for capital improvements required for public or private regulated utilities which will be charged to the Tenant, and may be increased at any time during the year following ninety (90) days' notice to the Tenant.

    (d)    "Proportionate Share" means an amount calculated by dividing equally among the affected developed lots in the Community the total costs for the necessary and actual direct costs and impact or hookup fees incurred for governmentally mandated capital improvements serving the recreational and common areas and all affected developed lots in the Community .

NOT A CERTIFIED COPY

EXHIBIT "A"

(e)      "Pass-On Charges" means items that the Community Owner may pass on, at any time during the term of the lot rental agreement, ad valorem property taxes and utility charges, or increases of either.

2.      Notice of Increase.

A description of the Base Rent and other fees and charges applicable to the lot effective as of the Filing Date are as set forth hereinabove in this Section of this Prospectus. The Base Rent and other fees and charges are subject to annual increases, effective January 1st of each year, with the Community Owner to furnish at least ninety (90) days' (or such lesser period as may be allowed under applicable law) written notice to the Tenant of any such increase. The pass-through charges are subject to increase and immediate payment in full by the Tenant upon the Community Owner giving at least ninety (90) days' (or such lesser period as may be allowed under applicable law) written notice to the Tenant of any such amount due and payable by the Tenant.

The Community Owner's failure to implement any rent increase or pass-through authorized by this Prospectus on the date specified hereinabove for such implementation shall not be deemed a waiver of the Community Owner's right to implement said rent increase or pass-through or any other rent increase or pass-through authorized by this Prospectus, and the Community Owner may implement any such rent increase or pass-through on a date later than (but not earlier than) the date specified hereinabove for such implementation.

3.      Lot Rental Amount Increases:

(a)      General - The Lot Rental Amount and each of the categories of charges currently or hereafter comprising a part of the Lot Rental Amount are subject to periodic increases by the Community Owner. However, except for increases resulting from the imposition of pass-through charges, the Lot Rental Amount will not be increased more frequently than annually.

(b)      Factors Affecting Lot Rental Amount Increases - The factors which may affect the amount of increases in the Lot Rental Amount (or in any fee or charge currently or hereafter comprising a part of the Lot Rental Amount) may include Increased Costs, Prevailing Market Rent, Prevailing Economic Conditions, and other factors set out below, each as determined and evaluated by the Community Owner at or prior to the time of furnishing notice of any increase in the Lot Rental Amount.

(i)      "Increased Costs" - Refers to any increases experienced by the Community Owner since the delivery of notice of the last increase in the Lot Rental Amount in the total costs arising out of the ownership, operation and management of the Community.

(ii)      "Prevailing Market Rent" - Refers to the Lot Rental Amount and other charges imposed in manufactured housing communities comparable to the Community, and the Lot Rental Amount willingly paid from time to time by new Tenants of the Community.  A manufactured housing community will be deemed comparable if it is located in the same general vicinity as the Community, and offers similar densities, amenities and services.

(iii)      "Prevailing Economic Conditions" - Refers to those factors which bear on the economic viability of a real estate investment which would be considered by a prudent businessman in establishing the Lot Rental Amount and other fees and charges or any increase in the amount thereof. These factors may include: (1) the costs attendant to the replacement of the Community in the economic environment existing at the time of any Lot Rental Amount increase, including land acquisition costs, construction costs, losses associated with the operation of a manufactured housing community prior to full occupancy, and the level at which the Lot Rental Amount must be established in order that the Community Owner will realize a reasonable return on the costs referred to in this clause (1); (2) the levels of interest rates and other financing charges associated with construction, interim and permanent financing; (3) the availability of alternative forms of real estate investments which, absent the Lot Rental Amount increase in question, might reasonably be expected to yield a greater return on investment capital; (4) the levels of the United

NOT A CERTIFIED COPY

EXHIBIT "A"

States Department of Labor, Consumer Price Index, U.S. City Average -- All Urban Consumers, 1967=100 (the "Consumer Price Index"), or in the event of the discontinuation of publication of the Consumer Price Index, then an alternative index which has been reasonably related to the Consumer Price Index in evaluating economic conditions, and which has been, or can reasonably be expected to be, generally accepted as a replacement index for the Consumer Price Index; (5) the level at which the Lot Rental Amount must be established in order that the Community Owner will realize a reasonable return, as compared to similar "at risk" real estate investments, on the "Owner's Equity" (for this purpose the "Owner's Equity" refers to the fair market value of the Community from time to time, less existing mortgage indebtedness); and (6) other economic factors which might reasonably be expected to affect either the value of the Community, the rate of return available to the Community Owner at the existing level of rent, the present value of the real estate investment in the then current economic conditions, and which would be taken into consideration by a prudent businessman in considering the amount of Lot Rental Amount increase required in the Community in order to realize a rate of return similar to other "at risk" real estate ventures from the then current value of the Community.

(iv)     To the extent permitted by law, the Tenant may also be required to bear, in the form of increases in the Lot Rental Amount, the costs incurred by the Community Owner in installing capital improvements or performing major repairs in the Community.

(v)     The amount of increases in Base Rent and in other fees and charges may be affected by increases in water rates, sewer rates, costs of waste disposal, maintenance costs (including costs of deferred maintenance), management costs, property taxes, or other operating expenses or charges, and/or, to the extent permitted by law, by the necessity of major capital repairs or improvements.

(vi)     Further factors which may affect the amount of increases in the Base Rent and in other fees and charges include the costs incurred as a result of actions by State or local governments or utility companies, including but not limited to costs, fees and expenses for: legal, accounting, attorneys, appraisers, surveyors, consultants, managerial, clerical, transportation with meals and housing, and any other associated items.

(vii)     Further factors which may affect the amount of increases in Base Rent and in other fees and charges include cost of living increases based upon one of the following government prepared indexes, whichever is greater at the time when the Community Owner furnishes notice of any increase to the Tenant: Consumer Price Index for All Urban Consumers; or the Consumer Price Index for Urban Wage Earners and Clerical Workers; or the Consumer Price Index, U.S. City Average - All Urban Consumers, 1967=100; or in the event of the discontinuation of publication of such Consumer Price Index, then an alternative index which has been reasonably related to the Consumer Price Index in evaluating economic conditions, and which has been, or can reasonably be expected to be, generally accepted as a replacement index for the Consumer Price Index, or a combined Consumer Price Index.

(viii)     Finally, annual increases in Base Rent and other fees and charges may be the greater of an increase predicated upon the factors as listed above, or a ten percent (10%) increase in the Base Rent and other listed fees and charges.

C.     Additional Considerations

An increase in any one or more of the above described factors may result in an increase in the Lot Rental Amount or other charges.  The reason for each increase or other fees and charges will be set forth in the notice of increase.

The Community Owner reserves the right to amend this Prospectus or any Exhibit hereto from time to time to the extent permitted by law to conform with changes in relevant statutory provisions, or changes as a result of decisions rendered by courts of law, or changes in relevant rules of the Division, or any other agency having jurisdiction over the operation of the Community.

EXHIBIT "A"

Tenants assuming the remaining portion of a tenancy as prescribed by §723.059(3), Florida Statutes, are hereby notified that upon the expiration of the assumed tenancy, the Community Owner expressly reserves the right to increase the Lot Rental Amount in an amount deemed appropriate by the Community Owner with such increase being imposed in the manner disclosed in the Prospectus delivered to the initial occupant of the applicable lot.

## X.  OPTIONAL USER FEES

The term "Optional User Fees" means those amounts which would be charged in addition to the Lot Rental Amount for non-essential optional services provided by or through the Community Owner to the Tenant under a separate written agreement between the Tenant and the person or entity furnishing the optional service or services. If such services were offered, copies of the written agreement(s) would be attached to this Prospectus as an exhibit; however, no such services are offered at this time. If there were any Optional User Fees, pursuant to any agreement between the Community Owner and the Tenant, they would be increased in the same manner as the Lot Rental Amount, pursuant to the terms of this Prospectus.

## XI.  COMMUNITY RULES AND REGULATIONS

A.   Existing Rules and Regulations.  The Community Rules and Regulations in effect as of the Filing Date are attached to this Prospectus as Exhibit "A."

In the event that the Community Rules and Regulations in effect as of the Filing Date are changed in accordance with the provisions of this Section XI of this Prospectus prior to the Delivery Date, then the Community Rules and Regulations in effect on the Delivery Date shall be attached to this Prospectus as Exhibit "A" instead of the Community Rules and Regulations in effect as of the Filing Date.

Notwithstanding anything to the contrary set forth in the attached Community Rules and Regulations, the Community Owner unconditionally reserves the right to amend the Community Rules and Regulations or to promulgate new Community Rules and Regulations, in accordance with the provisions of Paragraph B, below, or in any other manner which may from time to time be permitted by law.

B.   Amendments to Community Rules and Regulations.  The Community Owner may, from time to time, amend the Community Rules and Regulations by modifying or changing any existing rule or regulation or adopting any new rule or regulation; provided, however, the Community Owner shall give at least ninety (90) days prior written notice (or such lesser period as may be allowed under applicable law) to each owner of a mobile home in the Community of such amendment, and provided further that no new rule or regulation, except rules adopted as a result of restrictions imposed by governmental entities and required to protect the public health, safety and welfare, shall be enforced by the Community Owner prior to the expiration of such ninety (90) day period (or such lesser period as may be allowed under applicable law).

A committee, not to exceed five (5) in number, designated by a majority of the affected mobile home owners, or, if a homeowners association has been formed, designated by the board of directors, may meet with the Community Owner to discuss any such change within thirty (30) days of delivery of notice thereof from the Community Owner.

Within thirty (30) days of the meeting described above, the homeowners may request that the dispute be submitted to mediation pursuant to §723.038, Florida Statutes, if a majority of the affected homeowners have stated in writing that the change in the Rules and Regulations is unreasonable.

If both parties subsequently agree, they may request that the dispute be arbitrated rather than mediated.  No action relating to a dispute as to changes in rules and regulations may be filed in any court unless and until a request has been submitted to the Division for mediation and the request has been processed in accordance with Chapter 723, Florida Statutes.  However, the mediation shall not be binding unless the parties agree otherwise in writing.

EXHIBIT "A"

## XII.  COMMUNITY ZONING

As of the Filing Date, the zoning classification of the Community is AR, Agricultural Residential; which classification includes usage as a mobile home community; however the density of the Community qualifies as a legal nonconforming use under the AR classification.  A copy of the applicable zoning regulations is attached hereto as Exhibit "C."  The zoning authority having jurisdiction over the Community is Palm Beach County.  As of the Filing Date, the Community Owner has no definite future plans for changes in the use of the land comprising the Community but reserves the right to do so.

## XIII. MISCELLANEOUS

A.      Tenant More Than One Person.  If more than one person is named as a Tenant hereunder, the Community Owner may require the signatures of all such persons in connection with any notice to be given or action to be taken by the Tenant hereunder, including but not limited to any request for consent to assignment or subletting.  Each person named as Tenant shall be jointly and severally liable for all of the Tenant's obligations hereunder.  Any notice by the Community Owner to any person named as Tenant shall be sufficient and shall have the same force and effect as though given to all persons named as Tenant.

B.      Effect of Partial Invalidity.  If any clause or provision herein contained shall be adjudged invalid, the same shall not affect the validity of any other clause or provision of this Prospectus or constitute any cause of action in favor of either party as against the other.

C.      The Principal Directing the Creation and Development of the Community.  The Community was not originally developed by the Community Owner.  The Community Owner acquired the Community with many facilities and recreation areas and facilities already in place at the time of acquisition.   It is the Community Owner's intent to disclaim any warranties, expressed or implied.  In addition to the foregoing, the Community Owner hereby disclaims, and each Tenant, by residency in the Community, hereby waives, all other express or implied warranties with respect to the Community and each lot, all buildings and improvements, and all appurtenances thereto, including all EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND HABITABILITY.  In the event a court of competent jurisdiction shall determine that any disclaimer hereunder is ineffective, the parties agree that any action brought hereunder shall be brought within one (1) year from the date of the applicable Tenant's closing on the purchase of the Tenant's mobile home or within such shorter or longer period as said court may determine.

D.      Waiver.  The failure of the Community Owner to insist, in any one or more instances, upon strict performance of any of the provisions of this Prospectus, including but not limited to the Community Rules and Regulations, or to exercise any right or option herein contained, or to serve any notice, or to institute any action or proceeding, shall not be construed as a waiver or a relinquishment for the future of any such provisions, options or rights, but such provisions, options or rights shall continue and remain in full force and effect.  The receipt by the Community Owner of monies due hereunder, with knowledge of the breach of any covenant hereof, shall not be deemed a waiver of such breach, and no waiver by the Community Owner of any provision hereof shall be deemed to have been made unless in writing and expressly approved by the Community Owner.

E.      Entire Agreement.  This Prospectus, together with the exhibits attached hereto (for the purposes of this paragraph, collectively referred to as the "Prospectus"), contains the entire agreement between the parties with respect to the subject matter hereof.  No promise, representation, warranty or covenant, whether written or oral, not included in this Prospectus has been or is relied on by either party.  Each party has relied on its own examination of this Prospectus, the counsel of its own advisors, and the promises, representations, warranties and covenants in this Prospectus.  Failure or refusal of either party to inspect the lot or Community, to read this Prospectus or other documents, or to obtain legal or other advice relevant to this transaction constitutes a waiver of any objection, contention or claim that might have been based on such reading, inspection or advice.

EXHIBIT "A"

## XIV. AMENDMENTS TO PROSPECTUS

THE COMMUNITY OWNER RESERVES THE RIGHT TO AMEND THIS PROSPECTUS OR ANY EXHIBIT THERETO FROM TIME TO TIME TO THE EXTENT PERMITTED BY LAW TO CONFORM WITH CHANGES IN RELEVANT STATUTORY PROVISIONS OR CHANGES IN RELEVANT RULES OF THE DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION, OR ANY OTHER AGENCY HAVING JURISDICTION OVER THE OPERATION OF THIS MOBILE HOME COMMUNITY.



EXHIBIT "A"

LOT NUMBER TO WHICH THIS PROSPECTUS APPLIES: _____

This Prospectus was determined by the Division to be adequate to meet the requirements of Chapter 723, Florida Statutes on _____

PROSPECTUS IDENTIFICATION NUMBER: _____ PRMZ000681-P20110 _____

DATE LAST AMENDMENT APPROVED BY FLORIDA DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION: _____

NOT A CERTIFIED COPY

EXHIBIT "A"

**EXHIBIT "A"**
<u>**RULES AND REGULATIONS**</u>



STP:267015:11

EXHIBIT "A"

## RULES AND REGULATIONS

### A GUIDE FOR RESIDENTS OF
### <u>MARALAGO CAY OF WEST PALM BEACH</u>

### <u>EFFECTIVE AS OF MAY 27, 2004</u>

The owner of MARALAGO CAY OF WEST PALM BEACH, 6280 South Ash Lane, Lantana, Florida 33462 (the "COMMUNITY"), has adopted the following rules and regulations ("Rules and Regulations") to provide the COMMUNITY'S residents ("RESIDENTS") a safe, convenient and attractive community in which to live. Most of the Rules and Regulations deal with common sense courtesy; some of them are necessary to comply with law. All of the Rules and Regulations are intended to promote the convenience, safety and welfare of the RESIDENTS and to provide comfortable and pleasant surroundings. RESIDENTS are encouraged to make suggestions on any aspect of COMMUNITY life.

As used herein, the term "MANAGEMENT" means MHC Operating Limited Partnership, an Illinois limited partnership that is the owner ("COMMUNITY OWNER") and manager of the COMMUNITY, together with its agents, employees and managers. MANAGEMENT is affiliated with Manufactured Home Communities, Inc.

A.   <u>MANUFACTURED HOMES - QUALITY STANDARDS</u>

1.   The location and installation of all manufactured homes must comply with all applicable governmental laws, codes and regulations.

2.   No manufactured home may be moved into the COMMUNITY, or be transferred to a new RESIDENT within the COMMUNITY, unless the size, condition, appearance and design thereof have been approved in writing by MANAGEMENT in accordance with the quality standards set forth in these Rules and Regulations. MANAGEMENT may reject any manufactured home if the same does not meet the reasonable requirements of MANAGEMENT as to its size, condition, appearance, design, location and compatibility with the COMMUNITY and other manufactured homes therein. No unfinished, unsafe or highly combustible materials may be used for any repair or patch work on the exterior of the manufactured home or other home site improvements. RESIDENT is responsible for any damage to other manufactured homes or the COMMUNITY caused by RESIDENT or the mover. Hitches must be removed from the manufactured home within thirty (30) days of set up.

3.   All manufactured homes must continue to meet all applicable laws, codes and regulations as such may be amended from time to time. Under state law, RESIDENT'S tenancy may be terminated for failure of RESIDENT to comply with local ordinances and state laws and regulations relating to manufactured homes, or with these Rules and Regulations.

4.   No unauthorized structures may be erected on any home site. Permission to erect any structure must be obtained in writing from MANAGEMENT in advance.

5.   All permits and approvals required for the installation or removal of a manufactured home must be obtained by RESIDENT, at RESIDENT'S sole expense, in advance of such installation or removal.

6.   No materials or items of any nature may be used to secure the roof of a manufactured home without the prior written approval of MANAGEMENT, and the same must be installed in compliance with all applicable laws, codes and regulations. "Tie-downs" satisfactory to MANAGEMENT must be installed within thirty (30) days of set up.

1-15-09

EXHIBIT "A"

7.     Manufactured Homes shall be attractively maintained by RESIDENT and comply with all applicable laws, codes and ordinances, these rules and regulations, as from time to time amended, and the COMMUNITY Prospectus. Failure to properly maintain the manufactured home shall be a breach of these Rules and Regulations and shall constitute a grounds for eviction pursuant to Section 723.061, Florida Statutes. To maintain a clean, attractive appearance, the home should be washed every year or as needed.

8.     MANAGEMENT reserves the right of access to home sites at all reasonable times for the purpose of preventive maintenance and protection of the COMMUNITY pursuant to Florida law. Home sites not maintained to COMMUNITY standards may be maintained by MANAGEMENT as permitted by Chapter 723, Florida Statutes, and in such event a fee will be charged.

9.     MANAGEMENT must approve all homesite landscaping plans and any digging in order to protect underground utility lines, pipes and cables and RESIDENT'S safety. RESIDENT is responsible for edging RESIDENT'S yard, for the maintenance and trimming of shrubbery and trees thereon and for maintenance of RESIDENT'S lawn, including, but not limited to, landscaping, fertilization and application of insecticide as necessary (fertilization and application of insecticide are included in the Lot Rental Amount of some RESIDENTS, as set forth in their respective Prospectuses).

10.     COMMUNITY OWNER reserves the right to modify these requirements at its sole discretion, subject to Chapter 723, Florida Statutes.

B.     STORAGE SHEDS

1.     All existing sheds must be in good condition and maintained by RESIDENT on RESIDENT'S home site. Location of storage sheds must be approved in writing by MANAGEMENT prior to installation. Any such installation shall begin only after appropriate building permits have been obtained. All work must be performed by a licensed, qualified and bonded contractor, who has proof of valid liability and workmen's compensation insurance coverage, if applicable.

2.     RESIDENT, at RESIDENT'S expense, shall maintain in good condition and repair a storage shed on RESIDENT'S home site. Location of storage sheds must be approved in writing by MANAGEMENT prior to installation. Any such installation shall begin only after appropriate building permits have been obtained. All work is to be done by a licensed, qualified and bonded contractor, who has proof of valid liability and workmen's compensation insurance coverage.

3.     There may be only one (1) storage shed to a home site. MANAGEMENT may give written approval in certain cases, in its discretion, for an extension to a storage shed.

4.     There may be no sleeping facilities within the storage shed.

5.     All storage sheds must be properly anchored.

6.     Any damage caused by storage sheds or their construction or removal shall be the sole responsibility of the applicable RESIDENT.

7.     Storage sheds may not exceed the height of the manufactured home.

C.     FENCES

No fences or privacy walls are allowed on home sites in the COMMUNITY. The use of fencing materials in any manner whatsoever must be approved by MANAGEMENT prior to installation.

EXHIBIT "A"

**D.    MOTOR VEHICLES**

1.    All drivers must observe speed limits and stop signs as posted within the COMMUNITY.

2.    Parking:

(a)    Two (2) vehicles are permitted to each home site within the COMMUNITY. Vehicles must be parked in specific areas as designated by MANAGEMENT.

(b)    Guest and visitor vehicles must be parked in areas as designated by MANAGEMENT. RESIDENTS are responsible for ensuring that their guests and visitors comply with this requirement.

(c)    No vehicles may be parked in or on common areas except as specifically authorized by MANAGEMENT in advance.

(d)    Illegally parked vehicles may be removed, at MANAGEMENT'S discretion, at the risk and expense of the vehicle's owner.

(e)    No vehicles may be parked on the lawns. No overnight street parking.

3.    Only registered vehicles are allowed within the COMMUNITY. RESIDENTS must register each vehicle kept within the COMMUNITY in the COMMUNITY office. Vehicles which are mechanically inoperable or without valid current license plates are not allowed within the COMMUNITY.

4.    Only drivers with valid driver's licenses may operate motor vehicles within the COMMUNITY.

5.    No excessively noisy vehicles are allowed within the COMMUNITY.

6.    There may be no overnight sleeping within the COMMUNITY except within RESIDENTS' manufactured homes. No overnight sleeping is allowed in any motor vehicle, camper or camping trailer.

7.    Trucks no larger than eight thousand five hundred pounds (8,500) gross vehicle weight are permitted; however construction or farm equipment my not be stored, parked or kept within the COMMUNITY. RESIDENTS are advised that any unauthorized or prohibited vehicles may be removed by a private towing service under Florida law and that the vehicle owner will be responsible for paying the towing service's charges.

8.    Any vehicle which drips oil, gasoline or any other fluid must be repaired immediately by the applicable RESIDENT, and any damage caused by such dripping fluid must be cleaned and/or repaired by such RESIDENT.

9.    The immobilization of any vehicle for major repairing or overhauling is prohibited everywhere within the COMMUNITY unless otherwise authorized in writing by MANAGEMENT in advance.

10.    Recreational vehicles and boats kept in the COMMUNITY must be parked in the COMMUNITY storage area designated for these units (to the extent space is available within such storage area), except as otherwise authorized in writing by MANAGEMENT in advance. No person may sleep or live in any type of recreational vehicle within the COMMUNITY, and under no circumstances may a recreational vehicle be attached to water and sewer connections or electrical outlets.

11.    Licensed motorcycles may be ridden to and from RESIDENTS' manufactured homes only, by licensed drivers. Motorcycles must have quiet mufflers. No "joy riding" of any kind is allowed in the COMMUNITY.

EXHIBIT "A"

E.    **PETS**

1.    RESIDENT shall be entitled to keep any pet(s) owned as of the effective date hereof (the "Existing Pets"), but RESIDENT shall not be entitled to replace the Existing Pet(s) or acquire any additional pets without the prior written consent of MANAGEMENT. RESIDENT acknowledges that in the event any of the Existing Pet(s) die or otherwise leave the COMMUNITY they shall not be replaced, and that when the Existing Pet(s) either die or otherwise leave the COMMUNITY, RESIDENT shall reside in the COMMUNITY without a pet in compliance with these Rules and Regulations, unless first obtaining prior written consent of MANAGEMENT for a replacement pet and entering into a Pet Agreement in the form attached hereto as Exhibit "1." Within thirty (30) days of the effective date hereof, RESIDENTS owning Existing Pets shall enter into a Pet Agreement with MANAGEMENT.

2.    All pets must be approved by MANAGEMENT in writing before the pet's owner moves into the COMMUNITY, or before RESIDENT obtains a pet after move-in.

3.    The following regulations must be complied with at all times by RESIDENT and their pet(s):

(a)    RESIDENT may keep not more than two (2) pets, none of which shall exceed thirty-five (35) pounds in weight at maturity, defined as followed:

i)       Dog;
ii)      Domestic cat;
iii)     Bird;
iv)      Other domestic animal as approved by MANAGEMENT.

(b)    No exotic pets are allowed in the COMMUNITY.

(c)    No more than two (2) pets per household.

(d)    Noisy or unruly animals, animals considered dangerous or vicious by MANAGEMENT, and animals with respect to which other RESIDENTS file justifiable complaints with MANAGEMENT must be removed from the COMMUNITY. No animal which has been removed from the COMMUNITY under this rule shall thereafter again be permitted within the COMMUNITY without MANAGEMENT'S prior written consent.

(e)    Certain breeds of dogs whose temperament and disposition are generally regarded to be dangerous or vicious are not allowed within the COMMUNITY under any circumstances. This includes, but is not limited to, pit bulls, German Shepherds, Rottweilers, Chows, Doberman Pinschers, etc.

(f)    Each animal must be registered and identified as to owner in the COMMUNITY office.

(g)    Exceptions for size and weight will be made for service animals which are licensed and registered for use by the disabled.

(h)    All pets must be on a leash no longer than six (6) feet at any time the pet is outside of RESIDENT'S homesite.

(i)    Any animal left roaming the COMMUNITY unattended may be removed by MANAGEMENT.

(j)    Pets may not be tied unattended outside of RESIDENT'S manufactured home at any time.

EXHIBIT "A"

(k)    Pets may not be walked on the lawns of any homesite in the COMMUNITY, other than RESIDENT'S homesite.

(l)    When walking the pet, RESIDENT must have with them at all times a suitable means to pick up and properly dispose of all pet litter immediately. Pet litter must not be buried or covered over, but must be put in a suitable closed container and placed in the garbage for trash collection. It is RESIDENT'S responsibility to maintain their homesite free and clear of pet litter at all times.

(m)    Pet owners must comply with all applicable state, county and local laws.

(n)    No pet enclosures, including, but not limited to dog houses, are allowed. Pets must be kept inside RESIDENT'S manufactured home if unattended.

(o)    Excessive noise is not allowed, and pets must not annoy RESIDENT'S neighbors. Pets must not be left alone if they bark, cry or whine when by themselves.

(p)    No pets are allowed in the COMMUNITY recreation or common areas at any time.

(q)    If for any reason your pet becomes lost or runs away, please notify MANAGEMENT at once to assist in its prompt return.

(r)    Guests' pets are not permitted in the COMMUNITY.

(s)    If a complaint concerning a pet is received by MANAGEMENT and determined justifiable, the applicable RESIDENT will receive a warning. If a second complaint concerning the same pet is received by MANAGEMENT after RESIDENT has received the first warning, and MANAGEMENT determines the second complaint is justifiable, RESIDENT may be required to permanently remove the pet from the COMMUNITY.

(t)    RESIDENT shall at all times be responsible for any and all damages caused by RESIDENT'S pet to property of the COMMUNITY or another RESIDENT in the COMMUNITY, and for any and all injuries caused by RESIDENT'S pet.

4.    RESIDENT shall not conduct any breeding or commercial enterprise or activity in the COMMUNITY.

5.    RESIDENT acknowledges that COMMUNITY OWNER'S agreement to allow Existing Pets shall in no way affect RESIDENT'S continuing obligations pursuant to the COMMUNITY Prospectus and these Rules and Regulations, for which RESIDENT understands and agrees it shall continue to be fully responsible. COMMUNITY OWNER'S agreement to allow Existing Pets shall in no way waive RESIDENT'S continuing obligation under these Rules and Regulations, or the Pet Agreement or under any other term or condition of the COMMUNITY Prospectus. In the event RESIDENT violates these Rules and Regulations or the Pet Agreement, MANAGEMENT shall have all rights and remedies available to it against RESIDENT pursuant to Chapter 723, Florida Statutes, as if the Pet Agreement had never been entered into and no allowance made for the Existing Pets.

F.    **TV ANTENNAS AND SATELLITE DISHES**

Federal Communications Commission regulations allow reasonable restrictions affecting the placement, appearance or installation of satellite dishes and antennas. In order to maintain an attractive COMMUNITY, thereby preserving the market value of RESIDENTS' manufactured homes, RESIDENTS

EXHIBIT "A"

are strongly urged to rely on indoor broadcast antennas or cable television service as opposed to installing outdoor antennas or satellite dishes. To maintain the appearance of the COMMUNITY and help avoid safety hazards to other RESIDENTS, all antennas and satellite dishes of every kind should be installed from the middle to the rear of the manufactured home. They may not extend higher above the manufactured home's roofline than the distance between the manufactured home itself and the adjacent lot line. Such limitation is to protect other RESIDENTS from injury if the antenna or satellite dish fails. A satellite dish may be installed on RESIDENT'S manufactured home, or on RESIDENT'S homesite, so long as it does not exceed one (1) meter in diameter. Dishes larger than one (1) meter in diameter are prohibited on manufactured homes or home sites in the COMMUNITY. Satellite dishes and antennas may not be installed on any other RESIDENT'S home site or on common property. Moreover, satellite dishes and antennas may serve only one (1) RESIDENT'S manufactured home.

G.     CLOTHESLINES

1.     No new or replacement clotheslines may be installed or erected in the Community; however, clotheslines existing as of the Effective Date hereof may be kept for the use of drying bathing suits and towels only. No undergarments may be hung.

2.     Clotheslines have been erected in the Clothesline Area, next to the Clubhouse, to be used for bathing suits and towels only. No undergarments may be hung on the clothesline. No other clotheslines are permitted.


H.     SALE OF MANUFACTURED HOMES

In the event RESIDENT elects to sell RESIDENT'S manufactured home, two (2) "For Sale" signs not to exceed a total size of nine (9) inches by twelve (12) inches may be installed on the inside of a window only. No "For Sale" sign may be used without the prior written permission of MANAGEMENT, which permission shall not be unreasonably withheld. No other "For Sale" sign nor any other sign of any nature, whether relating to the sale of the manufactured home or for any purpose, shall be permitted on the home site. RESIDENT ACKNOWLEDGES THAT THE SALE OF THE MANUFACTURED HOME DOES NOT INCLUDE A TRANSFER OF THE HOME SITE TO THE BUYER UNLESS THE BUYER: (i) IS APPROVED BY MANAGEMENT AS A RESIDENT IN ACCORDANCE WITH MANAGEMENT'S PRE-QUALIFICATION PROCEDURES AND STANDARDS; (ii) SIGNS A RENTAL AGREEMENT; AND, (iii) MEETS ALL OTHER CONDITIONS AND REQUIREMENTS AS SET FORTH IN THESE RULES AND REGULATIONS, THE COMMUNITY PROSPECTUS AND THE RENTAL AGREEMENT.

I.     OPEN FIRES; FIREWORKS

No open fires are allowed within the COMMUNITY (charcoal grills do not constitute open fires for purposes of this Rule). Charcoal grills must be used outside of the manufactured home and not within five (5) feet of the manufactured home. Fireworks are prohibited within the COMMUNITY.

J.     OUTSIDE CONSTRUCTION

1.     Any construction or repairs other than routine home improvements or yard maintenance must be approved by MANAGEMENT in writing in advance.

2.     No contractor or construction company may perform any service within the COMMUNITY unless it has reported to the COMMUNITY office for clearance. All contractors and repair, maintenance and landscaping personnel must have proper workmen's compensation, liability and performance bonding insurance coverages, as determined by MANAGEMENT in its discretion.

3.     RESIDENT may not, and shall not have the power or authority to, allow the COMMUNITY or any improvements therein to become subject to any mechanics', laborers' or materialmen's liens.

4.     RESIDENT should not give instructions to, or make requests of, the COMMUNITY'S maintenance personnel. All requests should be made directly to MANAGEMENT.

EXHIBIT "A"

K.   NOISE; UNACCEPTABLE CONDUCT

1.      Excessive noise, loud and/or abusive language, drunkenness, or uncontrolled or loud parties are prohibited.  RESIDENTS shall be required to operate televisions, radios, stereos, etc., in a way that does not disturb their neighbors and conversation must be kept at a level low enough not to disturb any other RESIDENT.

2.      Radio volume in vehicles should be lowered at the COMMUNITY entrance and at all times while in the COMMUNITY must be maintained at a volume that can only be heard inside the vehicle.

3.      Loud noises, disorderly conduct, abusive, profane and/or threatening language, harassment of RESIDENTS or their guests and annoying parties shall not be permitted.  RESIDENTS and their guests shall conduct themselves so as not to interfere with the peaceful enjoyment of the COMMUNITY by its RESIDENTS.

4.      Drunkenness and immoral behavior shall not e tolerated. No alcoholic beverages shall be consumed or served in any building or recreation area which is COMMUNITY OWNER'S outside property, however, exception may be made with MANAGEMENT'S prior written approval. Smoking is not permitted in the clubhouse.

L.   COMMERCIAL ENTERPRISES

No commercial enterprise or business of any nature may be conducted by RESIDENT in the COMMUNITY without the prior written approval of MANAGEMENT, nor may advertising materials be distributed or posted within the COMMUNITY without MANAGEMENT'S prior written approval. This restriction applies to the delivery of handbills of any nature, although MANAGEMENT may distribute written materials to RESIDENTS. This rule does not preclude RESIDENTS' right, as allowed by Section 723.058, Florida Statutes, to communicate on matters of common interest relative to the COMMUNITY. Further, COMMUNITY recreational and social or news organizations may distribute written materials of a non-commercial nature provided such written materials are also given to MANAGEMENT.

M.   DAMAGE

1.      Any damage caused by any RESIDENT, or by any visitor, guest, agent or representative of such RESIDENT, or by any of their property (storage shed, TV antenna, etc.) to the person or property of another shall be the sole responsibility of the applicable RESIDENT.

2.      MANAGEMENT is not responsible for damage, injury or loss due to theft, fire or other casualty to either the person or property of any person, whether a RESIDENT, visitor or guest.

N.   COMMON AREA DECORUM AND CONDUCT

1.      MANAGEMENT has established separate rules and guidelines for behavior and conduct of RESIDENTS, visitors and guests within common areas such as swimming pools, clubhouses and recreation facilities. These rules and guidelines are posted in each common area where they are applicable and are incorporated herein. (See below.) They may be changed from time to time by MANAGEMENT. RESIDENTS will be given ninety (90) days notice (or such period as may be allowed under applicable law) of any changes to such rules and guidelines.

2.      MANAGEMENT will undertake to make the common areas and recreational facilities of the COMMUNITY conveniently available and open to RESIDENTS at reasonable times, except when closed for emergencies, repairs, maintenance or for scheduled events. RESIDENT is responsible for the behavior and conduct of all guests, including minor children, visiting RESIDENT.

EXHIBIT "A"

3.      Gambling or the use of alcoholic beverages is not permitted in the recreational areas or in any other portion of the COMMUNITY except in individual manufactured homes, and then only in accordance with all applicable laws. Exceptions may be made with MANAGEMENT'S prior written approval.

4.      Violations of these Rules and Regulations by RESIDENTS or their guests are grounds for eviction or for denial of use of the applicable facility to such RESIDENTS or guests, at the discretion of MANAGEMENT. Violation of any applicable laws or regulations shall also constitute grounds for eviction.

O.      UTILITIES

1.      The Base Rent for RESIDENTS of the COMMUNITY as of the effective date does include water or sewer charges.  However, the charge for sewer provided by the Town of Lake Clarke Shores will be passed on to new RESIDENTS coming into the COMMUNITY after the effective date of these rules and regulations.

2.      In the event of an emergency, damage or water line breakage, utility service may be interrupted without notice for the time required to restore such service.

P.      PRE-QUALIFICATION OF PROSPECTIVE RESIDENTS

1.      In accordance with the Federal Housing for Older Persons Act of 1995 (as amended or modified from time to time, "HOPA"), the COMMUNITY is intended to be and is operated as "housing for older persons". Under HOPA, "older persons" are defined as persons fifty-five (55) years of age or older. The COMMUNITY complies with HOPA and is intended to be reserved for occupancy by persons fifty-five (55) years of age or older, with certain exceptions as allowed by HOPA. At least eighty percent (80%) of all occupied home sites within the COMMUNITY must be permanently occupied by at least one RESIDENT fifty-five (55) years of age or older as of the date of occupancy, and all RESIDENTS of the COMMUNITY must be at least forty (40) years of age. All prospective RESIDENTS of the COMMUNITY will be screened for compliance with these provisions, and no application for residency will be accepted without satisfactory proof of age such as a valid driver's license, birth certificate or passport. Under HOPA, MANAGEMENT may, in its sole discretion, make certain exceptions to the foregoing provisions.

2.      Applicants for COMMUNITY residency are required to complete an application for homesite rental and obtain MANAGEMENT'S prior written approval to become a RESIDENT of the COMMUNITY. A credit check, financial affordability and background check will be performed for every applicant. An application fee of One Hundred Dollars ($100.00) will be charged for a married couple. For unmarried applicants, a fee of Fifty Dollars ($50.00) will be charged per person. MANAGEMENT reserves the right to change this fee.

3.      Each prospective RESIDENT is offered a rental agreement upon the approval of their application.  Rental agreements may not be assigned or transferred, except as arranged with and approved by MANAGEMENT, nor may any manufactured home be sub-leased except as arranged through MANAGEMENT, subject to §723.059(3), Florida Statutes.

4.      RESIDENT may not sublet RESIDENT'S manufactured home or home site or assign RESIDENT'S interest under RESIDENT'S rental agreement.

5.      Residency is based on two (2) persons per manufactured home, unless otherwise approved by MANAGEMENT in writing in advance.  An additional charge will be made pursuant to the COMMUNITY prospectus for each additional occupant or visitor if such person's stay exceeds fifteen (15) consecutive days or exceeds thirty (30) total days in one (1) calendar year, at the discretion of MANAGEMENT. Guests are not allowed to occupy the manufactured home in the absence of the approved permanent homeowner/RESIDENT. No guests are permitted in a RESIDENT'S home for a time period great than thirty (30) days.

NOT A CERTIFIED COPY

EXHIBIT "A"

6.    Any amendment to a rule dealing with conditions of occupancy in the COMMUNITY (including submission of information, interview, and age requirements), whether heretofore or hereafter adopted, shall operate prospectively only from the effective date of the amendment and shall not apply to, nor be enforced against, any person residing in the COMMUNITY at the effective date.

**Q.  CONDUCT OF CHILDREN**

RESIDENTS with visiting minor children guests must supervise the outside play and conduct of such minor children so as not to disturb or annoy any other RESIDENTS. Repeated or serious failure of a RESIDENT to supervise the conduct of such RESIDENT'S visitors under this rule will be grounds for eviction.

**R.  GUESTS AND VISITORS**

RESIDENTS ARE RESPONSIBLE FOR THE CONDUCT OF THEIR GUESTS AND VISITORS, AND ANY VIOLATION OF THESE Rules and Regulations by a guest or visitor of any RESIDENT shall be deemed a violation of these Rules and Regulations by such  RESIDENTS. All overnight guests must be registered in the COMMUNITY office and obtain a pool pass with a required deposit. Pool passes must be shown at the request of MANAGEMENT when in the clubhouse and pool(s) area.

**S.  SALES**

No patio of yard sales or similar sales are allowed at any homesite without MANAGEMENT'S prior written approval, other than COMMUNITY sponsored sales. General notices and advertisements of articles for sale may be posted on the bulletin board located in the Clubhouse after MANAGEMENT approved the same.

**T.  EVICTION**

A manufactured homeowner or a manufactured home may be evicted from the COMMUNITY only on one (1) or more of the grounds listed in Chapter 723, <u>Florida Statutes</u>. The currently approved grounds are:

(a)    Nonpayment of lot rental amount.

(b)    Conviction of a violation of a federal or state law or local ordinance, which violation may be deemed detrimental to the health, safety or welfare of other RESIDENTS of the COMMUNITY.

(c)    Violation of a COMMUNITY Rule or Regulation, the rental agreement or the provisions of Chapter 723, <u>Florida Statutes</u>.

(d)    Change in the use of the land comprising the COMMUNITY, or the portion thereof from which one (1) or more manufactured home(s) are to be removed.

(e)    Failure of the purchaser of a manufactured home situated in the COMMUNITY to be qualified as, and to obtain approval to become, a RESIDENT.

**U.  AMENDMENTS**

These Rules and Regulations may be amended with ninety (90) days (or such lesser period as may be allowed under applicable law) notice by MANAGEMENT following the procedures as set forth in Chapter 723, <u>Florida Statutes</u>.

EXHIBIT "A"

**V.**   **OTHER AGREEMENTS**

ALL AGREEMENTS BETWEEN MANAGEMENT AND RESIDENT MUST BE IN WRITING.

**W.**   **SPECIAL RULES FOR RECREATIONAL AREA**

1.   RESIDENTS are responsible for the proper use of recreational facilities by their guests. Guests who use the facilities in such a manner as to unduly disturb RESIDENTS shall lose their privilege to use such facilities.

2.   Children may use Pool Number 1 only. For the purpose of these Rules and Regulation, a child is designated as any person under the age of fourteen (14) years. Children under the age of fourteen (14) years must be accompanied by an adult at all times when using the pool. There shall be no diving, running, jumping, or loud and boisterous behavior.

3.   To use the pool and pool area, all children must be registered in the COMMUNITY office prior to such use and must be the guest of a RESIDENT.

4.   Children are not permitted to use any of the recreation facilities other than the designated pool and pool area (Pool Number 1 only.)

5.   Appropriate swimming attire must be worn in and around the swimming pool. Use of oil or suntan lotion in the pool is not permitted. Swimmers must shower before going into the pool.

6.   Attire appropriate for the swimming area is not allowed in other portions of the recreation area, especially within the clubhouse and throughout the COMMUNITY.

7.   All guests must be registered in the COMMUNITY office and obtain a pool pass with a required deposit. Pool passes must be shown at the request of MANAGEMENT when in the clubhouse and areas.

8.   Cover-ups must be worn throughout the COMMUNITY.

9.   No glass containers or objects are allowed in the pool area.

**X.**   **SPECIAL RULES FOR CLUBHOUSE**

1.   All RESIDENT functions must be coordinated through the COMMUNITY office to avoid schedule conflicts.

2.   All off-premises businesses that have a clubhouse function for RESIDENTS must provide adequate proof of insurance to protect MANAGEMENT from any liability.

3.   Any organization or individual that uses the facilities must remove all trash, put furniture back in its original position and completely clean the area, including kitchen facilities and appliances.

4.   No private functions are allowed without MANAGEMENT approval.

5.   RESIDENTS may not generally be excluded from the clubhouse during special functions. However, RESIDENTS must conduct themselves in a manner so as not to disturb such special functions.

6.   Any damage caused during a function is the responsibility of the organization or individual holding the function.

7.   MANAGEMENT shall not be liable for any personal injury to any persons using the Clubhouse, or for any damage to any private personal property located therein, irrespective of how such

STP:267139:11                                    11                            7/7/2003 9:55 AM

NOT A CERTIFIED COPY

EXHIBIT "A"

AA.   **TERMINATION**

Upon expiration or earlier termination of RESIDENT'S lease or rental agreement, RESIDENT shall surrender the homesite to MANAGEMENT in good order, condition and repair, ordinary wear and tear excepted.

BB.   **VACANT PREMISES**

When leaving the COMMUNITY for any period of time greater than thirty (30) consecutive days, RESIDENT shall file a Departure Notice at the COMMUNITY office with certain information including how to contact RESIDENT in event of an emergency and the name of the person who will be responsible for maintaining RESIDENT'S homesite and the manufactured home in RESIDENT'S absence. The use of foil, corrugated cardboard, paper, or sheets to cover windows and glass doors creates an unsightly appearance and is prohibited. Storm shutters, shades, drapes, and/or awnings are suggested for this purpose.



STP:267139:11                                    13                                    7/7/2003 9:56 AM

EXHIBIT "A"

EXHIBIT "B"
<u>PLAN OF COMMUNITY</u>

NOT A CERTIFIED COPY

STP:267015:11

EXHIBIT "A"



NOT CERTIFIED COPY

EXHIBIT "A"

**EXHIBIT "C"**
**ZONING, COVENANTS AND RESTRICTIONS**

NOT A CERTIFIED COPY

STP:2G7015:11

EXHIBIT "A"



**Department of Planning, Zoning & Building**

100 Australian Avenue

West Palm Beach, FL 33406

(561) 233-5000

Planning Division 233-5300

Zoning Division 233-5200

Building Division 233-5100

Code Enforcement 233-5500

Contractors Certification 233-5525

Administration Office 233-5005

Executive Office 233-5003

www.pbcgov.com/pzb

■

**Palm Beach County Board of County Commissioners**

Warren H. Newell, Chairman

Carol A. Roberts, Vice Chair

Karen T. Marcus

Mary McCarty

Burt Aaronson

Tony Masilotti

Addie L. Greene

**County Administrator**

Robert Weisman

*"An Equal Opportunity Affirmative Action Employer"*

printed on recycled paper

September 9, 2002

David S. Bernstein, Esq.
Ruden, McClosky, Smith
Po Box 14034
St. Petersburg, Fl 33733

RE:   **Zoning Confirmation Letter — Arrowhead Village Mobile Home Park (MHP)**

**PCN: 00-42-45-01-00-000-1030**

Dear Mr. Bernstein:

We have reviewed your Zoning Confirmation request and prepared this response based on the information you submitted to us and the information available in our records. Should any of the information we relied on be incorrect, this response may not be valid and it would be the property owner's responsibility to develop the site in accordance with the proper provisions and most recent code changes in the Palm Beach County Unified Land Development Code (ULDC).

The site has an Agricultural Residential Urban-Suburban Tier (AR-U/ST) Zoning designation, which is not consistent with the High Residential 8 (HR-8) Comprehensive Plan land use category.

According to Table 1.7-1, a mobile home development in the AR zoning district is a legal nonconforming use and subject to Article 1, Section 1.7.C of the ULDC (attached). If the park were destroyed or damaged beyond the scope permitted in Section 1.7, the site would have to be re-zoned and meet current ULDC regulations prior to re-establishing the use.

There are no Code Enforcement violations on the site at this time.

If you have any questions, please contact Jim Frogner, Zoning Technician, at (561) 233-5213.

Sincerely,

William C. Whiteford, AICP
Zoning Director

WCW/jf

Attachment(s) ULDC Provisions

cc:     Zoncon 2002-183 file
        Petition File



EXHIBIT "A"

Table 1.7-1
Schedule of Nonconforming Uses

| Uses of Land* | Zoning Districts | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | P C | A G R | A P A | S A | R E S R | A R M | R E | R T S | R T U | R T S | R M | R H | C N | C C | C G | C H O | C R E | C L G | I L G | Pl P P D | P O |
| AGRC[1] | A | B | B | B | B | B | B | B | B | B | B | B | B | B | B | B | B | B | B | B | B |
| RSF[2] | A | B | B | B | B | B | B | B | B | B | B | B | B | B | B | B | B | B | B | B | B |
| RMF[3] | A | B | A | B | A | A | A | A | A | A | B | B | B | B | B | B | A | B | B | B | B |
| MH[4] | A | B | B | B | B | B | B | B | B | B | B | B | B | B | A | B | A | B | B | B | B |
| Comm-<25[5] | A | A | A | A | A | A | A | A | A | A | A | A | B | B | B | B | A | B | B | B | B |
| Comm->25[6] | A | A | A | A | A | A | A | A | A | A | A | A | B | B | B | B | A | A | A | B | B |
| OFF[7] | A | A | A | A | A | A | A | A | A | A | A | A | A | B | B | A | A | A | B | B | A |
| L-Ind[8] | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | B | B | A |
| H-Ind[9] | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | B | B | A |
| Inst[10] | A | A | A | A | A | A | A | A | A | A | A | B | B | B | B | B | B | B | B | B | B |

Notes:

\* Regardless of zoning district, whether a use is a major nonconforming or a minor nonconforming use is determined by the specified land use in the zoning district.

\*\* "A" constitutes a Major Nonconforming Use.

\*\*\* "B" constitutes a Minor Nonconforming Use.

1. AGRC means an Agricultural land use.
2. RSF means a Residential Single Family land use.
3. RMF means a Residential Multi Family land use.
4. MH means a Mobile Home land use.
5. Comm-<25 means a Commercial land use of less than 25,000 sq ft.
6. Comm->25 means a Commercial land use of greater than 25,000 sq ft.
7. OFF means an Office land use.

NOT CERTIFIED COPY

Case 9:21-cv-80049-DMM   Document 1-1   Entered on FLSD Docket 01/11/2021   Page 82 of 137

EXHIBIT "A"

C. <u>Minor Nonconforming Use</u>. A minor nonconforming use is a use which was legally established in a zoning district where the use is now prohibited under the terms of this code, or is inconsistent with the physical or permit requirements of this Code. Minor nonconforming uses do not create or threaten to create incompatibilities injurious to the public welfare. Therefore, provisions which allow limited expansion of minor nonconforming uses are established.

1. **Normal maintenance or repair.** Normal maintenance or repair of structures where minor nonconforming uses are located may be performed in any period of twelve (12) consecutive months, as well as repair or replacement of nonbearing walls, fixtures, wiring or plumbing to an extent not exceeding thirty (30) percent of the current assessed value of the structure.

2. **Enlargement or expansion.** A minor nonconforming use may be enlarged or expanded as follows:

   a. **Prohibited in district.** A minor nonconforming use prohibited in the district in which it is located may be expanded on one (1) occasion, by the DRC. The expansion shall be permitted provided that the enlargement or expansion complies with Art. 11, Adequate Public Facilities Standards, would not exceed ten (10) percent of the floor area of that individual structure or ten (10) percent of the original assessed value of the structures on site, whichever is less. [Ord. No. 99-37]

   b. **Noncompliance with physical limitations or permitting requirements.** A minor nonconforming use that is not in compliance with this Code's physical requirements, such as landscaping, locational criteria or parking regulations, or this Code's permit requirements, such as possessing a required development order for conditional use, may expand on one (1) occasion, pursuant to Development Review Committee review. Based on the standards set forth in this section, the DRC shall deny, approve or approve with conditions the request for expansion pursuant to the process established in Article 5.6 of this Code.

   The request shall be permitted provided all of the following apply:

   (1) The enlargement or expansion would not exceed ten (10) percent of the floor area of the structure or appraised value of the structures on site, whichever is less;
   (2) The expansion does not create any additional nonconformities;
   (3) The use and expansion are in compliance with Article 11, Adequate Public Facilities Standards;
   (4) The use and the expansion complies with Environmental Control Rules 1 and II;
   (5) The use and the expansion will result in a reduction of nonconforming features to the greatest extent practicable;
   (6) The use and the expansion will comply with the landscape, vegetation preservation and protection, and lighting provisions of this Code; and,
   (7) The use and the expansion will comply with Article 15.1, Traffic Performance Standards.

3. **Relocation.** A structure containing a minor nonconforming use shall not be moved in whole, or in part, to another location on or off the parcel of land on which it is located, unless the relocation of the structure containing the minor nonconforming use decreases the nonconformity.

EXHIBIT "A"

4. **Change in use.** A minor nonconforming use shall not be changed to any other use, unless any new or additional use conforms to the provisions of this Code for the zoning district in which the use is located. A minor nonconforming use that is physically superseded by a permitted use shall not be reestablished.

5. **Discontinuance or abandonment.** If a minor nonconforming use is discontinued, abandoned, or becomes an accessory use for a period of more than six (6) consecutive months or for eighteen (18) months during any three (3) consecutive years, then such use may not be re-established or resumed, and any subsequent use shall conform to the provisions specified by this Code. When government action can be documented as the reason for discontinuance or abandonment, the time of delay by government shall not be calculated for the purpose of this section.

(This space intentionally left blank)

NOT A CERTIFIED COPY

EXHIBIT "A"

**D. Urban residential districts.**

1. **AR-U/S, Agricultural Residential District in the Urban/Suburban Tier.** The purpose and intent of the AR district in the Urban/Suburban Tier is to provide the opportunity to utilize land for limited agricultural purposes, where appropriate. The intent is to prevent premature urbanization of certain areas, while protecting the lifestyle of residents until such time the agricultural uses convert to other uses consistent with the Comprehensive Plan.[Ord . No. 01-62]

**PERMITTED USES:**
Congregate living facility, type 1
Estate kitchen
Excavation, type IA
Farrier
Garage sale
Guest cottage
Home occupation
Kennel, private
Shadehouse
Single family residence
Stable, equestrian type one
Storage, indoor agricultural
Storage, outdoor, agricultural

**SPECIAL USES:**
Accessory dwelling
Agricultural stand
Air curtain incinerator, temporary
Amusements, temporary or special events
Bed & breakfast
Communication cell site on wheels (COW)
Security/caretaker quarters

**PERMITTED SUBJECT TO DRC SITE PLAN:**
Excavation, agricultural
Excavation, type II
Excavation, type IB
Groves/row crops
Livestock raising
Park, passive

**PERMITTED SUBJECT TO DRC SITE PLAN (cont'd):**
Stable, equestrian type two
Storage, indoor agricultural
Utility, minor

**CONDITIONAL USE, CLASS A:**
Agriculture, bona fide
Cemetery
Church or place of worship
College or university
Communication tower, commercial
Congregate living facility, type 2
Day care center, general
Day care center, limited
Electrical power facility
Government services
Grooms quarters
Heliport or helipad
Nursery, retail
School, elementary or secondary
Solid waste transfer station
Water or wastewater treatment plant

**CONDITIONAL USE, CLASS B:**
Communication panels, antennas,
Commercial
Nursery, wholesale
Packing plant
Park, public
Veterinary clinic

**Reference Sections:**
1) Supplementary Use Standards -- See Section 6.4.D
2) Property Development Regulations -- See Section 6.5
3) Accessory/Temporary Structure Standards -- See Section 6.6
4) Off-street Parking/Loading -- See Section 7.2
5) Landscaping -- See Section 7.3
6) Lighting/Noise Standards -- See Section 7.8
7) Signs -- See Section 7.14
8) Vegetation Protection -- See Section 9.5
[Ord. No. 01-01] [Ord. No. 01-62]

EXHIBIT "A"

**EXHIBIT "D"**
<u>RENTAL AGREEMENT</u>

NOT A CERTIFIED COPY

STP:267015:11

EXHIBIT "A"

## MARALAGO CAY OF WEST PALM BEACH
## LOT RENTAL AGREEMENT

This Lot Rental Agreement (this "Agreement") is made and entered into this ___ day of _____, 20___, by and between MHC OPERATING LIMITED PARTNERSHIP, herein called the Community Owner or Lessor, and _____ herein called the Tenant(s) or Lessee(s):

WITNESSETH, That in consideration of the covenants herein contained, on the part of the said Tenant(s) to be kept and performed, the said Lessor does hereby lease to the said Tenant(s), the following described property:

Lot _____, Block _____, MARALAGO CAY OF WEST PALM BEACH (the "Community"), also known as:
No_____, _____ Street/Avenue/Lane.

Community Owner will furnish the following services:

1.   Maintenance of the recreational area, pools, shuffleboard courts and grounds;
2.   Mowing and edging of the lawn along the street side of each Lot;
3.   Maintenance of streets and common areas;
4.   Sewage disposal, garbage and trash collection, water supply and storm drainage.

TO HAVE AND TO HOLD the same for the term of one (1) year from the 1st day of January, 20___, the said Lessee(s) paying therefor the monthly base lot rent, in advance, of $_____. Payments are due on the 1st day of each month for that month, and become delinquent on the 5th day of each month, incurring a delinquency charge of $_____.

The said Tenant(s) further covenant and agree with the said Lessor to the following:

1.   To make no unlawful, improper, or offensive use of the premises.

2.   To comply with the Rules and Regulations of the Community.

3.   This Rental Agreement is subject to the provisions of Chapter 723, Florida Statutes, known as the "Florida Mobile Home Act". Any provisions of this Agreement contrary to that law are void and any right of the Community Owner or Tenant(s) provided for in that law is incorporated herein by reference.

4.   Actions of the Tenant(s) which constitute grounds for eviction under Chapter 723, Florida Statutes, or any other Florida Statute, shall be a violation of this Agreement. Failure of the Community Owner to evict the Tenant(s) for a violation of any one of the grounds set forth in Chapter 723, Florida Statutes, or any other Florida Statute, or for any grounds provided for in this Agreement, shall not constitute a waiver of the right of the Lessor to consider any subsequent violation of the same grounds or the violation of any other grounds, as a breach of this Agreement by the Tenant(s).

5.   As provided in the Rules and Regulations, rules may be modified, eliminated, or additional rules adopted by the Community upon giving the Tenant(s) notice therefor as required by law and said Rules and Regulations.

EXHIBIT "A"

WITNESS our hands and seals to this Maralago Cay of West Palm Beach Lot Rental Agreement the day and year first above written.

Signed, Sealed, and Delivered in our presence:          MHC Operating Limited Partnership

_____          By:_____
                                                                   Print Name:_____
As to Community Owner                                              Authorized Representative

_____          _____

_____          _____
As to Tenant(s)                                                   Tenant(s)

NOT A CERTIFIED COPY

EXHIBIT "A"

EXHIBIT "E"
INVENTORY OF PERSONAL PROPERTY



NOT A CERTIFIED COPY

STP:267015:8

EXHIBIT "A"

## MARALAGO CAY OF WEST PALM BEACH
### INVENTORY OF PERSONAL PROPERTY AVAILABLE FOR USE BY RESIDENTS

Tables and chairs in the Library area.

Tables and chairs located in the Main Clubhouse.

Exercise equipment located in the Exercise Room.

Pool and poker tables in Billiards Room.

Desks, computers and chairs in the Financial Room.

Lounge chairs, end tables, tables with umbrellas and chairs in the Pool Area.

Benches in the Shuffleboard Court area.

Shuffleboard Equipment available for use on the Shuffleboard Courts.

Commercial icebox/freezer, dishes, tableware, pots and pans in the Kitchen.

Washing machines, dryers, folding tables and racks in the Laundry facility.

Umbrella-type clotheslines in the Laundry drying area.

NOT A CERTIFIED COPY

STP:270382:1

EXHIBIT "A"

EXHIBIT "1"
PET AGREEMENT

NOT A CERTIFIED COPY

STP:267015:11

EXHIBIT "A"

## MARALAGO CAY OF WEST PALM BEACH
### AGREEMENT TO ALLOW PETS

THIS AGREEMENT (the "Agreement") is made this ___ day of _____, 20___ by and between MHC OPERATING LIMITED PARTNERSHIP ("Management" and "Community Owner"), and _____ ("Resident"):

### RECITALS

A.     Community Owner is the owner of that certain real property (the "Property") comprised of the manufactured home community known as MARALAGO CAY OF WEST PALM BEACH (the "Community") located in Palm Beach County, Florida.

B.     Resident is a tenant residing on the Property on Lot # _____ (the "Lot") pursuant to the Community Prospectus ("Prospectus") and Community Rules and Regulations (the "Community Rules"), copies of which the Resident acknowledges receipt.

C.     Resident has desires to keep _____ (___) pet(s) described on Exhibit "A" attached hereto (the "Pet[s]") on the Lot, which Resident shall be entitled to keep until said Pet(s) die or otherwise leave the Community, but Resident shall not be entitled to replace the Pet(s) or to have any additional pets, without the prior written consent of Management.

D.     Resident shall not conduct any breeding or commercial enterprise on the Lot and will abide by and comply with the Community Prospectus and Community Rules.

NOW THEREFORE, in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

1.     Recitals.   The above recitals are true and correct and are incorporated herein by reference.

2.     Pet(s).   Resident shall be entitled to keep the Pet(s), but shall not be entitled to replace the Pet(s) or acquire any additional pets without prior written consent of Management.   Resident acknowledges that in the event either of the Pet(s) die or otherwise leave the Property they shall not be replaced and that when the Pet(s) either die or otherwise leave the Property the Resident shall reside on the Property without a Pet in compliance with the Community Prospectus and Community Rules, unless first obtaining prior written consent of Management for a replacement pet.

3.     Pet Regulations.   All pets must be approved by MANAGEMENT in writing before the pet's owner moves into the COMMUNITY, or before RESIDENT obtains a pet after move-in.  The following regulations must be complied with at all times by the Resident and their Pet(s):

(a)     RESIDENT may keep not more than two (2) pets, none of which shall exceed thirty-five (35) pounds in weight at maturity, defined as follows:

i)     Dog;
ii)    Domestic cat;
iii)   Bird;
iv)    Other domestic animal as approved by MANAGEMENT.

NOT A CERTIFIED COPY

STP:269046:3

1/17/2003 10:54 AM

EXHIBIT "A"

(b)     No exotic pets will be allowed in the COMMUNITY.

(c)     No more than two (2) pets per household.

(d)     Noisy or unruly animals, animals considered dangerous or vicious by MANAGEMENT, and animals with respect to which other RESIDENTS file justifiable complaints with MANAGEMENT must be removed from the COMMUNITY. No animal which has been removed from the COMMUNITY under this rule shall thereafter again be permitted within the COMMUNITY without MANAGEMENT'S prior written consent.  Failure to comply with this rule shall be considered a breach of the Rules and Regulations and shall constitute a grounds for eviction pursuant to Section 723.061, Florida Statutes.

(e)     Certain breeds of dogs whose temperament and disposition are generally regarded to be dangerous or vicious are not allowed within the COMMUNITY under any circumstances. This includes, but is not limited to, pit bulls, German shepherds, Rottweilers, Chows, Doberman Pinschers, etc.

(f)     Each animal must be registered and identified as to owner in the COMMUNITY office.

(g)     Exceptions for size and weight will be made for Service Animals which are licensed and registered for use by the disabled.

(h)     All pets must be on a leash no longer than six (6) feet at any time the pet is outside of the RESIDENT'S lot.

(i)     Any animal left roaming the COMMUNITY unattended may be removed by the MANAGEMENT.

(j)     Pets may not be tied unattended outside of RESIDENT'S home at any time.

(k)     Pets may not be walked on the lawns of any lot in the COMMUNITY, other than the RESIDENT'S.

(l)     When walking the pet, RESIDENT must have with them at all times a suitable means to pick up and properly dispose of all pet litter immediately.  Pet litter must not be buried or covered over, but is to be put in a suitable closed container and placed in the garbage for trash collection.  It is the RESIDENT'S responsibility to maintain their lot free and clear of pet litter at all times.

(m)     Pet owners must comply with all state, county and local laws.

(n)     No pet enclosures, including, but not limited to dog houses, will be allowed.  Pets must be kept inside the RESIDENT'S manufactured home if unattended.

(o)     Excessive noise is not allowed, and pets must not annoy the neighbors.  Pets must not be left alone if they bark, cry or whine when by themselves.

(p)     No pets are allowed in the Recreation Areas at any time.

(q)     If for any reason your pet becomes lost or runs away, please notify MANAGEMENT at once to assist in its quick return.

(r)     Guests' pets are not permitted.

EXHIBIT "A"

(s)   If a complaint concerning a pet is received by MANAGEMENT and determined justifiable, the RESIDENT will receive a warning. If a second complaint concerning the same pet is received by MANAGEMENT after RESIDENT has received the first warning, and MANAGEMENT determines the second complaint is justifiable, the RESIDENT may be required to permanently remove the pet from the COMMUNITY.

(t)   RESIDENT shall at all times be responsible for any and all damages caused by RESIDENT'S pet to property of the COMMUNITY or another RESIDENT in the COMMUNITY, and for any and all injuries caused by RESIDENT'S pet.

4.   No Commercial Enterprise.   Resident shall not conduct any breeding or commercial enterprise or activity on the Lot.

5.   Continuing Obligation.   Resident acknowledges that Community Owner's agreement to allow the Pet(s) shall in no way affect Resident's continuing obligations pursuant to the Community Prospectus and Community Rules which Resident understands and agrees it shall continue to be fully responsible for Community Owner's agreement to allow the Pet(s) shall in no way waive Resident's continuing obligation under this Agreement or under any other term or condition of the Community Prospectus. In the event Resident violates this Agreement, Community Owner shall have all rights and remedies available to it against Resident pursuant to Chapter 723, Florida Statutes, as if this Agreement had never been entered into and no allowance made for the Pet(s).

6.   Ratification.   All terms and conditions of the Community Prospectus and Community Rules are hereby ratified and confirmed and shall remain binding on Resident throughout its tenancy on the property in addition to the terms of this Agreement.

7.   Binding Effect.   This Agreement shall be binding upon and inure to the benefit of each parties respective successors, assigns, heirs and legal representatives.

IN WITNESS WHEREOF, this Agreement to Allow Pets has been duly executed this ____ day of _____ 20___.

WITNESSES:                                                     MHC OPERATING LIMITED PARTNERSHIP

Print Name:_____

_____             By:_____
                                                             Print Name:_____
Print Name:_____                 Authorized Agent
                                                                     "Community Owner"
_____
Print Name:_____

_____             Print Name:_____
Print Name:_____

_____
Print Name:_____

_____             Print Name:_____
Print Name:_____
                                                                     "Resident"

EXHIBIT "A"

MARALAGO CAY OF WEST PALM BEACH
EXHIBIT "A"
<u>DESCRIPTION OF PETS</u>

<u>FIRST PET</u>:

Type: _____

Breed: _____

Name: _____

Sex: _____

Color: _____

Weight: _____

Age: _____

Vet Record: _____

Photo: _____

<u>SECOND PET</u>:

Type: _____

Breed: _____

Name: _____

Sex: _____

Color: _____

Weight: _____

Age: _____

Vet Record: _____

Photo: _____

NOT A CERTIFIED COPY

1/17/2003 10:54 AM

EXHIBIT "A"

Filing # 114774237 E-Filed 10/12/2020 02:20:56 AM

NOTICE OF RIGHT TO PURCHASE
MOBILE HOME PARK

ARROWHEAD MOBILE HOMEOWNERS ASSOCIATION, INC., a Florida corporation not

for profit, hereby gives notice of its right, as set forth in Section 723.071,

F.S., to purchase the mobile home park described below:

ARROWHEAD VILLAGE
6255 Lawrence Road
Lantana, Florida 33462

The mobile home park described above is owned by:

ARROWHEAD VILLAGE, INC.

ARROWHEAD MOBILE HOMEOWNERS
ASSOCIATION, INC.

DATED: 8-14-86

BY: Edmund Dunne
    EDMUND DUNNE, President

STATE OF FLORIDA
COUNTY OF PALM BEACH

I HEREBY CERTIFY that on this day before me, an officer duly qualified to
take acknowledgments, personally appeared EDMUND DUNNE, to me known to be the
person described in and who executed the foregoing instrument and acknowledged
before me that he executed the same.

WITNESS my hand and official seal in the County and State aforesaid this
14th day of August, 1986.

                                        Margaret L. Evans
                                        NOTARY PUBLIC
                                My Commission Expires:
                                        NOTARY PUBLIC STATE OF FLORIDA
                                        MY COMMISSION EXP. MAR. 31 1990
                                        BONDED THRU GENERAL INS. UND.

ARROWHEAD MOBILE HOMEOWNERS
ASSOCIATION, INC.

DATED:

BY: Lois L. Broecker
    LOIS L. BROECKER, Secretary
    BROECKER

STATE OF New York
COUNTY OF Suffolk

I HEREBY CERTIFY that on this day before me, an officer duly qualified to
take acknowledgments, personally appeared LOIS L. BROECKER, to me known to be
the person described in and who executed the foregoing instrument and
acknowledged before me that she executed the same.

WITNESS my hand and official seal in the County and State last aforesaid
this 11th day of August, 1986.

                                        Barbara Roepe
                                        NOTARY PUBLIC
My Commission Expires:              RECORD VERIFIED
                                    PALM BEACH COUNTY FLA
                                    JOHN B. DUNKLE
                                    CLERK CIRCUIT COURT

                    BARBARA ROEPE
            Notary Public, State of New York
                    No. 4765846
            Qualified in Suffolk County
        Commission Expires March 30, 19     EXHIBIT B
                    Dec 30, 1988

Filing # 114774237 E-Filed 10/12/2020 02:20:56 AM

296270
18194.09000

PREPARED BY AND RETURN TO:
Robert M. Graham, Esq.
Gunster, Yoakley, Valdes-Fauli & Stewart, P.A.
777 S. Flagler Drive, Suite 500E
West Palm Beach, FL 33401

SEP-17-1997  3:02pm 97—334363
(RB  9991 Pg  971

## AFFIDAVIT OF COMPLIANCE

STATE OF FLORIDA     )
            ) ss.
COUNTY OF PALM BEACH   )

  BEFORE ME, the undersigned authority, personally appeared, Ellis A. Johnson (the "Affiant"), on behalf of ARROWHEAD VILLAGE, INC., a Florida corporation (the "Corporation"), who being first duly sworn on oath, deposes and says:

   1.   That the Affiant is President of the Corporation.

   2.   That the Corporation is the owner of a mobile home park which is located on real property more particularly described on Exhibit "A" attached hereto and made a part hereof (the "Property").

   3.   That there is a Notice of Right to Purchase Mobile Home Park by Arrowhead Mobile Homeowners Association, Inc., (the "Association") recorded in Official Record Book 4973, Page 1021, Public Records of Palm Beach County, Florida (the "Notice").

   4.   That the Corporation received an offer to purchase the Property which it has accepted (the "Offer").

   5.   That pursuant to Florida Statute §723.071 (2) (the "Statute") the Corporation is required to give notice to the Association of the Offer and disclose the price and material terms and conditions upon which the Corporation would consent to selling the Property.

   6.   That the Corporation has complied with the Statute.

**EXHIBIT C**

NOT A Certified Copy

Oß   9991 Pg   972

7       That the Corporation is filing this Affidavit in accordance with Florida Statute
        §723.072 to memorialize its compliance with the Statute.

8.      Further your Affiant saith naught.

                                                   _Ellis H. Johnson_
                                                   Ellis A. Johnson
                                                   H.

        Sworn to and subscribed to before me this _15th_ day of September, 1997, by ELLIS A.
JOHNSON, as President of ARROWHEAD VILLAGE, INC., a Florida corporation, who is
personally known to me or has shown _Drivers License_ as identification.

                                                   _Carol Ann Decker_
                                                   Printed Name
                                                   NOTARY PUBLIC
                                                   State of Florida
                                                   Commission No._____
                                                   My Commission expires:_____

                                                   CAROL ANN DECKER
                                                   MY COMMISSION # CC 446443
                                                   EXPIRES: April 29, 1999
                                                   Bonded Thru Notary Public Underwriters

This is not a certified copy

NOT A CERTIFIED COPY

EXHIBIT

ORB   9991 Pg   973
DOROTHY H. WILKEN, CLERK PB COUNTY, FL

EXHIBIT A

**PARCEL I:**

That portion of Section 1, Township 45 South, Range 42 East, described as follows:

The Northeast 1/4 of the Northeast 1/4 (LESS the Northeast 1/4 of the Northeast 1/4 of the Northeast 1/4; AND LESS the North 40 feet of the East 222 feet of the Northwest 1/4 of the Northeast 1/4 of the Northeast 1/4 of Section 1, Township 45 South, Range 42 East, Palm Beach County, Florida);
the Southeast 1/4 of the Northeast 1/4 (LESS the South 1/2 of the Southeast 1/4 of the Southeast 1/4 of the Northeast 1/4);
the East 1/2 of the Northwest 1/4 of the Northeast 1/4;
the North 1/2 of the Northwest 1/4 of the Northwest 1/4 of the Northeast 1/4;
ALSO that part of the Northeast 1/4 of the Northeast 1/4 of the Northwest 1/4 lying East and North of State Road 809 right of way.

LESS right of way of Lawrence Road, Palm Beach County, Florida.

**PARCEL II:**

The South 1/2 of the Southeast 1/4 of the Southeast 1/4 of the Northeast 1/4 of Section 1, Township 45 South, Range 42 East;

LESS the right of way of Lawrence Road, Palm Beach County, Florida.

**PARCEL III:**

The West 30 feet of that portion of the Northeast 1/4 of the Southeast 1/4 of Section 1, Township 45 South, Range 42 East, lying North of the existing drainage ditch, Palm Beach County, Florida.



NOT A CERTIFIED COPY

EXHIBIT "A"

Filing # 114774237 E-Filed 10/12/2020 02:20:56 AM

296098.1

Prepared by and return to
Jennifer L. Dolce, Esquire
Gunster, Yoakley, Valdes-Fauli & Stewart, P.A.
Philips Point, Suite 500 East
777 South Flagler Drive, P.O. Box 4587
West Palm Beach, FL 33402-4587
Will Call #22

SEP-17-1997 3:07pm 97-334362
ORB 9991 Pg 967

Con  20,325,000.00 Doc  142,275.00

Property Tax Folio #'s:   00-42-45-01-00-000-1060
00-42-45-01-00-000-1030
00-42-45-01-00-000-5013

Grantee's Federal Taxpayer ID #

## SPECIAL WARRANTY DEED

THIS SPECIAL WARRANTY DEED ("Deed") is made as of September 11th, 1997 by ARROWHEAD VILLAGE, INC., a Florida corporation ("Grantor"), with a mailing address at 6255 Lawrence Road, Lantana, Florida 33428, to MHC OPERATING LIMITED PARTNERSHIP, an Illinois limited partnership ("Grantee"), with a mailing address at Suite 800, Two North Riverside Plaza, Chicago, Illinois 60606.

### W I T N E S S E T H:

GRANTOR, in consideration of TEN DOLLARS ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, grants, bargains and sells to Grantee that certain real property located in Palm Beach County, Florida, and legally described on the attached Exhibit "A"  (collectively, "Property").

TO HAVE AND TO HOLD the same, together with all of Seller's right, title and interest in all buildings, fixtures and other improvements in, on, over and under the Property and all rights, tenements, hereditaments and appurtenances thereunto belonging or appertaining, in fee simple forever;

SUBJECT TO only those instruments and permitted exceptions set forth on the attached Exhibit "B".

GRANTOR covenants with Grantee that except as set forth on the attached Exhibit "B" at the time of delivery of this Deed, the Property was free from all encumbrances and exceptions made by Grantor, and that Grantor will warrant and defend the Property against the lawful claims of all persons, claiming by, through or under Grantor, but against none other.

EXHIBIT D

NOT A CERTIFIED COPY

ORB 9991 Pg 968

**IN WITNESS WHEREOF**, Grantor has executed this Deed as of the date first above written.

Signed, sealed and delivered
in the presence of:

**ARROWHEAD VILLAGE, INC.,**
a Florida corporation

Print Name: H.W. Perry

By Ellis H. Johnson

Print Name: DENISE NO SCHENER

Ellis H. Johnson
President

[Corporate Seal]

**STATE OF FLORIDA**

**COUNTY OF PALM BEACH**

The foregoing instrument was acknowledged before me this 16th day of September, 1997, by Ellis H. Johnson, the President of **ARROWHEAD VILLAGE, INC.**, a Florida corporation, on behalf of the corporation. The foregoing individual ☒ is personally known to me or ☐ has produced _____ as identification.

Print Name: H.W.P
Notary Public - State of Florida
Commission Number: CC 463112
Commission Expires: May 11, 1999

[Notarial Seal]

H. W. PERRY
MY COMMISSION # CC 463112
EXPIRES: May 11, 1999
Bonded Thru Notary Public Underwriters

EXHIBIT "A"

ORB 9991 Pg 969

Exhibit "A"

Legal Description

Parcel I

That portion of Section 1, Township 45 South, Range 42 East, described as follows:

The Northeast 1/4 of the Northeast 1/4 (LESS the Northeast 1/4 of the Northeast 1/4 of the Northeast 1/4) AND LESS the North 40 feet of the East 222 feet of the Northwest 1/4 of the Northeast 1/4 of the Northeast 1/4 of Section 1, Township 45 South, Range 42 East, Palm Beach County, Florida);
the Southeast 1/4 of the Northeast 1/4 (LESS the South 1/2 of the Southeast 1/4 of the Southeast 1/4 of the Northeast 1/4);
the East 1/2 of the Northwest 1/4 of the Northeast 1/4;
the North 1/2 of the Northwest 1/4 of the Northwest 1/4 of the Northeast 1/4;
ALSO that part of the Northeast 1/4 of the Northeast 1/4 of the Northwest 1/4 lying East and North of State Road 809 right of way.

LESS the right of way of Lawrence Road, Palm Beach County, Florida.

Parcel II

The South 1/2 of the Southeast 1/4 of the Southeast 1/4 of the Northeast 1/4 of Section 1, Township 45 South, Range 42 East;

LESS the right of way of Lawrence Road, Palm Beach County, Florida.

Parcel III

The West 30 feet of that portion of the Northeast 1/4 of the Southeast 1/4 of Section 1, Township 45 South, Range 42 East, lying North of the existing drainage ditch, Palm Beach County, Florida.

NOT A CERTIFIED COPY Not a certified copy

EXHIBIT "A"

ORB 9991 Pg 970
DOROTHY H. WILKEN, CLERK PB COUNTY, FL

Exhibit "B"

Permitted Exceptions

1.   The lien of the taxes for the year 1997 and all subsequent years, which are not yet due and payable.

2.   Right-of-Way Easement granted to Southern Bell Telephone and Telegraph Company, from Arrowhead Village, Inc., dated March 20, 1968, recorded March 28, 1968 in O.R. Book 1646, Page 359, Palm Beach County Records. (As to Parcel I)

3.   Easement granted to Florida Power & Light Company, from Arrowhead Village, Inc., dated November 26, 1968, recorded December 17, 1968 in O.R. Book 1691, Page 13, Palm Beach County Records. (As to Parcel I)

4.   Easement granted to Florida Power & Light Company, from Arrowhead Village, Inc., dated October 29, 1970, recorded November 18, 1970 in O.R. Book 1853, Page 1348, Palm Beach County Records. (As to Parcel I)

5.   Permit-Buried Lines granted to Southern Bell Telephone and Telegraph Company, from Arrowhead Village, Inc., recorded September 17, 1973 in O.R. Book 2213, Page 1376, Palm Beach County Records. (As to Parcels I and II)

6.   Easement granted to Florida Power & Light Company, from Arrowhead Village, Inc., dated January 7, 1975, recorded January 24, 1975 in O.R. Book 2386, Page 625, Palm Beach County Records. (As to Parcels I and II)

7.   Easement Grant granted to Perry Cable TV Corp., a Florida corporation, from Arrowhead Village, Inc., a Florida corporation, dated April 27, 1983, recorded May 5, 1983 in O.R. Book 3936, Page 1331, Palm Beach County Records. (As to Parcel I)

8.   Rights of tenants in possession as tenants only under any unrecorded leases.

9.   The following matters as shown on the survey by Miller Legg and Associates, Inc., being Bock & Clark's National Survey Network Project No. 97798/1 (JJB) dated September 12, 1997:

   (a)   Encroachment of fences along the north boundary of the property.

EXHIBIT A

Filing # 114774237 E-Filed 10/12/2020 02:20:56 AM

10/28/2003  15:09:01  20030664369
OR BK 16097 PG 1014
Palm Beach County, Florida
AMT 10.00
Doc Stamp 0.70

Mail to:
Kimberly E. Fuldauer, Esq.
Katten Muchin Zavis Rosenman
525 West Monroe Street, Suite 1600
Chicago, Illinois 60661

This instrument prepared by:
Kimberly E. Fuldauer, Esq.
Katten Muchin Zavis Rosenman
525 West Monroe Street, Suite 1600
Chicago, Illinois 60661

Address: 6380 South Ash Lane, Lantana, FL 33462

Property appraisers parcel identification (Folio number(s)): 00-42-45-01-00-000-1030

Grantees S.S. #(s)

RETURN TO:
CHICAGO TITLE INSURANCE CO.
601 S. LAKE DESTINY DRIVE, SUITE 200
MAITLAND, FLORIDA 32751
FILE # 1003 5450

## SPECIAL WARRANTY DEED

This **SPECIAL WARRANTY DEED**, made the 17th day of October, 2003, by

Between **MHC OPERATING LIMITED PARTNERSHIP**, an Illinois limited partnership ("Grantor"), party of the first part

and

**MHC MARALAGO CAY, L.L.C.**, a Delaware limited liability company ("Grantee"), whose permanent address is c/o Manufactured Home Communities Inc., Two North Riverside Plaza, Suite 800, Chicago, Illinois 60606, party of the second part.

WITNESSETH, that, the said party of the first part, for and in consideration of the sum of ten dollars, lawful money of the United States of America, in hand paid by the said party of the second part, at or before the ensealing and delivery of these presents, the receipt whereof is hereby acknowledged, granted, bargained, sold, aliened, remised, released, conveyed and confirmed, and by these presents do grant, bargain, sell, alien, remise, release, convey and confirm unto the said party of the second part, and their heirs and assigns forever, all the following piece, parcel, or tract of land, situate, lying and being in the County of Palm Beach County, State of Florida, and being more particularly described as follows:

SEE EXHIBIT A ATTACHED HERETO AND MADE A PART HEREOF

Together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof, and also all the estate, right, title, interest, dower and right of dower, separate estate, property, possession, claim and demand whatsoever, as well

Maralago Cay , FL

Doc #:CHI01 (207947-00060) 50143485v1;10/02/2003/Time:12:23

EXHIBIT E

as in equity, of the said part of the first part, of in and to the same, and every part and parcel thereof, with the appurtenances.

To have and to hold the above granted, bargained and described premises with the appurtenances, unto the said party of the second part its heirs and assigns, to its own proper use, benefit and behoof forever.

And the said party of the first part, for itself and for its heirs, personal representatives and administrators, does covenant, promise and agree to and with the said party of the second part, its heirs and assigns, that the said party of the first part, at the time of the ensealing and delivery of these presents, its lawfully seized of and in all and singular the above granted, bargained and described premises with the appurtenances, and has good right, full power and lawful authority to grant, bargain, sell and convey the same in manner and form aforesaid. And the said party of the second part, its heirs and assigns, shall and may at all times hereafter peaceably and quietly have, hold, use, occupy, possess and enjoy the above granted premises and every part and parcel thereof, with the appurtenances, without any let, suit, trouble, molestation, eviction or disturbance of the said party of the first part, heirs or assigns, or of any other person or persons lawfully claiming or to claim the same, by, through and under the grantor herein.

And the said party of the first part, for itself and for its heirs, warrants the above described and hereby granted and released premises, and every part and parcel thereof, with the appurtenances, unto the said party of the second part, his heirs and assigns, against the said party of the first part, his heirs, and against all and every person or persons whomsoever lawfully claiming or to claim the same, by, through and under the grantor herein, shall and will warrant and by these presents forever defend.

[EXECUTION PAGE FOLLOWS]



Maralago Cay, FL

Doc #:CHI01 (207947-00060) 50143485v1;10/02/2003/Time:12:23

IN WITNESS WHEREOF, the said party of the first part has hereunto set hand and seal the day and year first above written.

Signed, sealed and delivered in the presence of:

_____
Witness signature (as to first Grantor)

Eric Greenfield
Printed name

_____
Witness signature (as to first Grantor)

William C. Boom
Printed name

**MHC OPERATING LIMITED PARTNERSHIP**, an Illinois limited partnership

By:   Manufactured Home Communities, Inc., a
      Maryland corporation,  its general partner

      By:   David W. Fell
      Name:  David W. Fell
      Title:   Vice President, Associate General
              Counsel, Assistant Secretary

Post office address:  c/o Manufactured Home
Communities Inc., Two North Riverside Plaza,
Suite 800, Chicago, Illinois  60606

State of Illinois

County of Cook

The foregoing instrument was acknowledged before me this _17th_ day of  October, 2003, by David W. Fell, as Vice President, Associate General Counsel, Assistant Secretary of Manufactured Home Communities, Inc., a Maryland corporation, as general partner of MHC Operating Limited Partnership, an Illinois limited partnership , who is personally known to me or has produced  _Illinois_  (state) driver's license as identification.

My Commission Expires:

(AFFIX NOTARY SEAL)

_____
Notary Public (Signature)

"OFFICIAL SEAL"
LYDIA TAN
Printed Name
Notary Public, State of Illinois
My Commission Expires Dec. 11, 2006

Maralago Cay, FL

Doc #:CHI01 (207947-00060) 50143485v1;10/02/2003/Time:12:23

Book16097/Page1016          Page 3 of 4          EXHIBIT "A"

EXHIBIT A

LEGAL DESCRIPTION

PARCEL I:

That portion of Section 1, Township 45 South, Range 42 East, described as follows:

The Northeast 1/4 of the Northeast 1/4 (LESS the Northeast 1/4 of the Northeast 1/4 of the Northeast 1/4; AND LESS the North 40 feet of the East 222 feet of the Northwest 1/4 of the Northeast 1/4 of the Northeast 1/4 of Section 1, Township 45 South, Range 42 East, Palm Beach County, Florida); the Southeast 1/4 of the Northeast 1/4 (LESS the South 1/2 of the Southeast 1/4 of the Southeast 1/4 of the Northeast 1/4); the East 1/2 of the Northwest 1/4 of the Northeast 1/4; the North 1/2 of the Northwest 1/4 of the Northwest 1/4 of the Northeast 1/4;

ALSO that part of the Northeast 1/4 of the Northeast 1/4 of the Northwest 1/4 lying East and North of State Road 809 right of way.

LESS right of way of Lawrence Road, Palm Beach County, Florida. PARCEL II:

The South 1/2 of the Southeast 1/4 of the Southeast 1/4 of the Northeast 1/4 of Section 1, Township 45 South, Range 42 East;

LESS the right off way of Lawrence Road, Palm Beach County, Florida. PARCEL III:

The West 30 feet of that portion of the Northeast 1/4 of the Southeast 1/4 of Section 1, Township 45 South, Range 42 East, lying North of the existing drainage ditch, Palm Beach County, Florida.

Being the same property conveyed to Arrowhead Village, Inc., a Florida corporation (successor by name change to Milaw Associates, Inc., a Florida corporation) by deed from Everett Wurtz and Evelyn C. Wurtz, his wife; Morris B. Simpson and Evelyn C. Simpson, his wife; L. Frank McGee and Lorine McGee, his wife; Thomas W. Barnes and Patricia C. Barnes, his wife; Ellis B. Johnson and Mildred B. Johnson, his wife; and Edward J. Roos and Hazel S. Roos, his wife dated September 1, 1966 and recorded October 10, 1966 in the Official Records of Palm Beach County, Florida in Official Records 1436, Page 4, with regard to Parcel I; by Warranty Deed from Frank McGee and Lorine McGee, his wife; Morris B. Simpson and Mary Apes Simpson, his wife; Thomas W. Barnes and Patricia C. Barnes, his wife; Edward J. Roos and Hazel S. Roos, his wife; and Ellis B. Johnson and Mildred B. Johnson, his wife dated July 18, 1973 and recorded February 1, 1974 in the Official Records of Palm Beach County, Florida in Official Records 2266, Page 471, with regard to Parcel II; and by Warranty Deed from Norma L. Gray, a widow, dated September 3, 1968 and recorded September 4, 1968 in the Official Records of Palm Beach County, Florida in Official Records 1672, Page 156, with regard to Parcel III.

Maralago Cay Village of West Palm Beach
Doc #:CHI01 (207947-00060) 50138916v1;09/12/2003/Time:17:31

Filing # 114774237 E-Filed 10/12/2020 02:20:56 AM

# A G R E E M E N T

This agreement (the "Agreement") is made this _____ day of _____, 20__ (the "Effective Date") by and between _____ ("Owner") and _____, a Florida not-for-profit corporation, (the "HOA") and its negotiating committee created pursuant to Section 723.037(4), Florida Statutes, (the "Negotiating Committee") (the HOA and the Negotiating Committee collectively the "Association") (the HOA, the Negotiating Committee and the Owner collectively the "Parties").

# R E C I T A L S

A.    Owner owns and operates_____, a manufactured housing community located in _____ County, Florida (the "Community").

B.    In September of ___, Owner properly served upon the homeowners of the Community (each a "Homeowner" and collectively, the "Homeowners") and the board of directors of the HOA, a legally sufficient notice of lot rental increase (the "Notice") providing for an increase in lot rental amount effective January 1, __.    THESE ARE JUST SAMPLE DATES.    THE DATES MAY NEED TO BE CHANGED TO MATCH THE RENT INCREASE TIMING FOR THE COMMUNITY.

C.    The HOA created the Negotiating Committee pursuant to Section 723.037(4), Florida Statutes, to meet and negotiate with Owner concerning the Notice and other matters. Following good faith negotiations between the Parties, an Agreement was reached as specified below. The Parties intend that this Agreement shall be considered a contract between the Parties within the meaning of Section 723.038(6), Florida Statutes. This Agreement shall be binding upon the Parties and all Homeowners on the Effective Date (the "Included Homeowners") subject to any limitations stated

**EXHIBIT F**

1

NOT A CERTIFIED COPY

below.  Any Homeowner who has executed a lease, an agreement, an assignment and assumption, or an acknowledgement for market lot rental amount different from the lot rental amounts stated herein, shall be bound by the Homeowner's existing agreement shall not be considered an Included Homeowner subject to this Agreement.

Now, therefore, in consideration of the foregoing recitals (which are accurate, material and incorporated into this Agreement), the mutual promises and covenants set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Base Rent Increases:**  TO BE DETERMINED. THIS IS THE PARAGRAPH WHERE THE TERMS OF THE AGREEMENT WILL BE SPECIFIED – THE NUMBER OF YEARS AND THE AMOUNT OF INCREASE EACH YEAR DURING THAT TIME PERIOD.

The foregoing amounts shall be payable without set-off or escrow whatsoever.

2. **Other Charges:**  The limitations on base rent increases specified in numbered paragraph 1 above shall not affect any fees, charges or assessments other than base rent.  Owner reserves the right to charge, increase or decrease any other fees, charges and/or assessments (collectively "Fees") available under the Community's prospectuses and any other Fees permitted by law.  Such Fees may include, but shall not be limited to, special use fees, government and utility charges, pass through charges and pass on charges.

3. **Ad Valorem and Non-Ad Valorem Assessments:**  Ad valorem taxes and non-ad valorem assessments shall be separately charged in addition to base rent as part of each Homeowner's lot rental amount.  Ad valorem taxes and non-ad valorem assessments

2

EXHIBIT "A"

may be determined and charged based upon the sum of all the maximum tax charges estimated on all of the annual TRIM Notices issued to the Community pursuant to Section 200.069, Florida Statutes, (each a "TRIM Notice" and collectively the "TRIM Notices"). If the sum of the ad valorem taxes and non-ad valorem assessments billed to all the Homeowners based on the sum of the maximum tax charges stated on all the TRIM Notices differs by more than one-half percent (1/2%) from the sum of the ultimate ad valorem taxes and non-ad valorem assessments, a revised Notice shall promptly be served adjusting the ad valorem tax and non-ad valorem assessment charges to coincide with the ultimate amounts charged in the final tax bill or bills.

4.    **Waiver and Notice:**  If either Owner or the Association contends that the other is in violation of this Agreement, the prospectus or rental agreement governing any Homeowner's tenancy, or Chapter 723, Florida Statutes, (any or all of which a "Non-Compliance"), the Party alleging default (the "Notice Party") shall notify the Party alleged to be in default (the "Recipient Party") of any such alleged Non-Compliance, including the particulars of the facts giving rise to and constituting such alleged Non-Compliance, within ninety (90) days of the date the Notice Party receives reasonable notice of such facts.  The Recipient Party shall have forty-five (45) days from receipt of any such notice to cure the alleged Non-Compliance and, upon completion of any such cure, the Recipient Party shall be deemed not to have been in default or in violation. Notice shall be sent by certified mail or trackable overnight delivery service to:

As to Owner:

(A)    The Community Manager at the Community office;

(B)    <u>With a copy to:</u>    Equity Lifestyle Properties, Inc.
ATTN:  David P. Eldersveld

3

EXHIBIT "A"

Executive Vice President//General Counsel,
Corporate Secretary
2 North Riverside Plaza
Chicago, IL 60606

As to the Association:

(A)    To the then current President of the Homeowners' Association at the address shown on the Secretary of State website;

(B)    <u>With a copy to:</u>   the Registered Agent of the Homeowners' Association at the address shown on the Secretary of State website

The Notice and opportunity to cure provisions stated herein shall be a condition precedent to any legal, equitable or administrative action concerning the alleged Non-Compliance.

5.    **Attorneys' Fees; Litigation; Integrity of Agreement:**  In the event of any litigation between Owner and the Association relating to or arising out of this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party all costs and expenses of any nature, including, but not limited to, attorneys' fees, expert fees, and other taxable and non-taxable costs and expenses, both at the trial and appellate levels; provided, however, the foregoing shall not apply to any statutory meeting with Owner, subsequent mediation or to any proceeding by or on behalf of any former or current Homeowner seeking to invalidate or otherwise dispute the validity of this Agreement. The Association and Owner agree to mutually enforce this Agreement and cooperate fully in the event the validity or integrity of this Agreement is attacked or disputed by any such Homeowner.

6.    **Dispute Resolution; Waiver of Jury Trial:**  Any controversy or claim arising out of or relating to this Agreement, its interpretation, construction, breach or enforcement hereof, shall first require non-binding mediation pursuant to either Section

4

EXHIBIT "A"

723.038 or Chapter 44, Florida Statutes.  In any proceeding arising out of or relating to this Agreement, the parties waive trial by jury.

7. **Homeowners Affected by this Agreement; Transferees:** *(a)* This Agreement shall apply to Included Homeowners.  If, during the term of this Agreement, any Included Homeowner transfers or sells any legal or equitable interest in such Homeowner's mobile home to any transferee or resale purchaser (collectively, a "Transferee"), the Transferee shall be permitted to assume such Included Homeowners rental agreement but only for the remainder of the annual lease term then in effect between the Included Homeowner and Owner.  Upon the expiration of such annual lease term the Transferee's rent shall be adjusted to the Community's then prevailing market rate, as determined by Owner in its discretion, which shall be deemed such Transferee's base rental amount, as that term is used in paragraph 1 of this Agreement, for the year in which such initial increase occurs.  Owner may, but shall not be required to, redeliver a prospectus to the Transferee.  Any Included Homeowner who sells or transfers any legal or equitable interest in such Homeowner's mobile home shall be responsible for redelivering such Homeowner's prospectus to such Homeowner's Transferee at the time of the initial transfer.  *(b)*  Any Included Homeowner who relocates during the term of this Agreement to a home owned by Owner shall pay the then prevailing market rate for the site on which such mobile home is located. Owner may offer incentive arrangements for the sale or rental of new or used homes in amounts or structures at Owner's sole discretion and nothing contained herein shall affect or apply to these incentive arrangements.

5

EXHIBIT "A"

8.    **Mutual Release:**  The Association, on its behalf and on behalf of each Homeowner as such Homeowner's representative, hereby releases Owner, Equity Lifestyle Properties, Inc., Manufactured Home Communities, Inc., MHC Operating Limited Partnership, and their parents, affiliates, subsidiaries, officers, directors, agents, stockholders, members, attorneys, successors and assigns, and Owner hereby releases the Association, its officers, directors, agents and attorneys from any and all claims, actions or causes of action of any kind whatsoever ("Claims"), whether legal, equitable, administrative, or otherwise, including, but not limited to, Claims involving or relating to the subject matter of this Agreement, services, maintenance, or Owner's compliance with or delivery of the Community's prospectuses, rental agreements, as well as any other alleged violation of Chapter 723, Florida Statutes. With the exception of Claims involving the subject matter of this Agreement, this release shall address only Claims existing on the Effective Date.  This release shall not apply to any Homeowner's failure to pay rent or a rules violation.

9.    **Applicability of Prospectus, Rental Agreement and Chapter 723, Florida Statutes:**  Each Homeowner's tenancy shall be governed by his or her prospectus and rental agreement.  In the event of any conflict between a Homeowner's prospectus or rental agreement and this Agreement, this Agreement shall control.

10.    **Entire Agreement; Modification:**  This Agreement constitutes the entire agreement of the Parties hereto with respect to the subject matter hereof.  This Agreement supersedes all prior and contemporaneous discussions, negotiations, conditions or understandings relating to the subject matter hereof.  This Agreement may not be amended or modified except by an instrument in writing signed by all Parties hereto.

EXHIBIT "A"

11.    **Further Assurances:** The Parties shall, at any time and from time to time following the execution hereof, confirm the validity of this Agreement, and execute and deliver all such further instruments and documents and take all further actions as may be reasonably necessary or appropriate in order to carry out or more effectively satisfy the intent and purposes of this Agreement.

12.    **Representations; Binding Effect:**

a.    **By Owner:** Owner represents that it is authorized to enter into this Agreement. This Agreement shall be binding upon Owner, its successors and assigns.

b.    **By the Association:** The Association represents that it is a duly incorporated Homeowners' Association and Negotiating Committee created and maintained pursuant to Sections 723.075 through 723.079, Florida Statutes. The Association represents that the negotiating committee was created in strict compliance with Section 723.037(4), Florida Statutes. The Association enters into this Agreement on its behalf and on behalf of each Homeowner of the Community as such Homeowner's representative pursuant to Sections 723.075(1) and 723.079(1), Florida Statutes.

13.    **Execution in Counterparts:** This Agreement may be executed in counterparts.

**OWNER**

_____
_____

By: _____

Its: _____

Date: _____

7

EXHIBIT "A"

**HOA**

_____

_____

By: _____

Its: _____

Date: _____

**NEGOTIATING COMMITTEE**

_____

_____

_____

_____

_____

Date: _____

8

NOT A CERTIFIED COPY

EXHIBIT "A"

Filing # 114774237 E-Filed 10/12/2020 02:20:56 AM

**NETWORKING FOR PROGRESS**
**MEETING NOTES**
**SELECT COMMITTEE/ELS**
**Meeting date:  3-28-13**

Through the combined efforts of ELS Regional Executives and the Select Committee of Networking for Progress, the following information is provided:

1.  ELS will provide name, address, phone number and site number of new residents, providing that they agree to fill out the "Voluntary New Resident Information form".

2. The "Voluntary New Resident Information form" will have an attached Introduction to the HOA, if provided by the HOA.

3.  HOAs will be provided the information required in Chapter   723.037 (1), regarding 90 day notice of rent increase.  (all affected homeowners, which may be by lot number, name, group, or phase). ELS typically sends this information by lot number but makes available by name to be viewed in the office.  Upon written request from the HOA Board, we will provide the information including names. HOAs not putting the request in writing may still access the information by visiting the Managers office.

4. Upon request, ELS will provide the percentage of residents meeting the reporting requirements of HOPA, (55+ communities) - the percentage of occupied sites in the community that have at least one person over the age of 55. The personal data used to arrive at the percentages will not be provided.

FYI

CapX budgets are determined by input from residents, local Managers, Regional Managers and Vice Presidents, while final decisions are made in meetings with upper management in Chicago.  Capx budgets can be modified based on the needs of all ELS properties, so that emergencies can be addressed.  Larger capx projects may be delayed due the the involvement of the Asset Management group, whereas smaller projects are typically overseen by the regional manager or manager. Permitting can cause delays also.

Contracts for services, i.e. lawn service, may be delayed due to the involvement of the Procurement Department.

Regional Managers may refuse to work with a company even if they are approved for other areas.

Training programs for community managers are developed in Chicago, with additional input provided by Vice Presidents and Regional Managers.

Every community manager undergoes an audit annually.  Audits focus on accounting issues along with theft and fraud prevention.  Customer service monitoring is the

EXHIBIT G

responsibility of the operations group, from the community manager to the regional manager to the vice president.

Both Credit/Criminal checks are done as a condition to being approved for residency in an ELS community. ELS hires a service to do these checks. Background checks include employment verification as well as landlord and/or mortgage verification. A new computer system currently being introduced will not permit a felon to be approved for residency by a manager, unless an override is provided at the Vice President level.   An example of a legitimate override reason would be for a felony that occurred 20 years ago with a clean record since then . The manager does not have the authority to approve felons for residency.    Residents will not undergo a new background check when moving to another location within the community or when moving to a different ELS community.  Qualifications for renters (if allowed per prospectus) are essentially the same as for home owners, but are, in practice, more strict, since a renter's rent would be higher than that of a homeowner.  There are section 8 residents being approved in some parks.

Caregivers and pets (claimed as medically necessary) are treated essentially the same.  A form must be filled out by a doctor, saying they/it are medically necessary as a reasonable accommodation, and the doctor would be willing testify in court to that effect.  Approval will not be given without the signed form.

ELS standardized the Long Term Agreement 3-4 years ago but has made some minor tweaks to it as needed.  The only thing that will change from community to community will be the amount of the increase and the term.  There will be no wish lists included in future LTAs, strictly rent.  Wish lists (to be included in the Capx budget), are to be discussed with the manager and regional manager at the quarterly meetings (which must be requested).

ELS hires a third party real estate tax consultant every year to    evaluate tax situations, based on trim notices.  The study is used to determine if ELS will appeal or not.


ATTACHMENTS INCLUDED WITH NOTES:
   • Voluntary Submission – New Resident Info form
   • Introduction to the HOA – Sample Letter


*It is agreed that these notes are to be distributed to all ELS manufactured home community managers, regional managers, and Vice Presidents in Florida by Eric Zimmerman; and these notes are to be distributed to all Networking for Progress Select Committee and general members by Jan McMeans.*

EXHIBIT "A"

## NEW RESIDENT INFORMATION

I (We), hereby, voluntarily ask that my (our) name(s), address and contact number(s) be given to the _____ _____ for the purpose of allowing them to contact me (us). This information will not be distributed to other entities for any purpose.

_____

_____
Address                                                                Site #

_____            _____
Name                                                        Phone #

_____            _____
Name                                                        Phone #

_____            _____
Name                                                        Phone #

_____
Date

NOT A CERTIFIED COPY

EXHIBIT "A"

WELCOME

ANYTOWN HOMEOWNERS ASSOCIATION

Florida Statute, Chapter 723, mandates that a Homeowner's Association be created for the purpose of representing the homeowners in all manners relating to Chapter 723.

The Anytown Homeowners Association will represent you and insure that the community owners adhere to the provisions of FS-723 including, in some cases, the negotiation of rental agreements.  It is for that reason we encourage you to become a member.

In addition to the activities of the HOA, we are also privileged to have activities sponsored by the
Men's Club
Women's Club
Camera Club
Collectors Club

A member of the Homeowner's Association will be contacting you shortly and arrange to provide you with a schedule of all activities, a list of all committees and the names and contact information for the Board of Directors of The Anytown Homeowners Association.

At that time we will gather information needed to represent you effectively.

Sincerely,

HOA President

EXHIBIT "A"

**NETWORKING FOR PROGRESS**
**MEETING NOTES**
**SELECT COMMITTEE/ELS**
**Meeting date: 6-13-13**

Through the combined efforts of ELS Regional Executives and the Select Committee of Networking for Progress, the following information is provided.

HOA involvement vs., ELS responsibility:
Direct supervision of employees, rule enforcement, selection of vendors and/or services and the scope of a project are all the responsibility of ELS.

Even though a resident may be highly qualified in the areas mentioned above and wish to become involved, it is ELS that is financially and legally responsible for the management of their communities.  Legitimate concerns regarding management should be brought to the attention of management.

RULE ENFORCEMENT
ELS agrees that it is responsible for rule enforcement, and acknowledges that staff and management are under the same rules and regulations as residents (per 723.022 Mobile home park owner general obligations. (5) Comply with properly promulgated park rules and regulations and require other persons on the premises with his or her consent to comply therewith and conduct themselves in a manner that does not unreasonably disturb the park residents or constitute a breach of the peace).  One exception, for example, is that a manager or and his family is are exempt from the HOPA (over 55 age) requirement.  Per 723.035 Rules and Regulations (1) A copy of all rules and regulations shall be posted in the recreation hall, if any, or in some other conspicuous place in the park. The HOA should work with the community manager to determine the best location, and the HOA should notify the community manager if the copy ever needs to be replaced for any reason.  There should be a copy available for review in the office as well.

We need to point out that all new resident should make themselves aware of the rules and regulations prior to moving into our communities, and it is a resident problem that rules HAVE TO BE ENFORCED.  It is obvious, in other communities, when the residents have pride in their homes and the community.  WE SHOULD ALL MAKE THIS A PRIORITY. The most visible and common rule violations are:
Carport clutter, weeds, mold growing on the outside of the home, and installation of forbidden items, for example, fences, stone covered yards, air conditioners in lanai windows, and widened driveways with gravel or concrete blocks.  NOTE:
HOA's/Residents can't complain about the value of our homes, and allow these rule violations to exist.  The ELS communities that are maintaining the value of their homes seldom experience the rule violations listed above.   Cleaning up the community solves

NOT A CERTIFIED COPY

EXHIBIT "A"

two problems, and they should be apparent.   #1.  Increases the value of the homes.  #2. Eliminates the problem of enforcing rules and regulations.

**NOTE; IT MAY BE WORTHWHILE TO ORGANIZE A CLEANUP EVENT IN YOUR COMMUNITY** -

Residents should be reminded that, it is not their responsibility to enforce the rules. Violations should be reported to the manager.  Residents should have a clear understanding of the managers responsibility  and when it is necessary to call outside authority such as the police, the health dept, the dog catcher, etc.  The ELS VP's present agreed **that the rules and regulations will be enforced to the prospectus standards and that management can always do a better job with enforcing the rules and regulations of the communities.  Dawn and Eric agree to focus on this area with the regional managers and community managers in Florida and to make it a point of emphasis. They have agreed to include this statement in these meeting notes which will be distributed to all of the regional managers and community managers as well as Networking for Progress members, so that everyone is aware of the importance of this issue.**

There are some communities that have rules that have become outdated, and HOA's are working to get them changed.  Eric stated that hopefully, at some time in the future, a uniform set of rules and regulations could be worked on, for all ELS communities in Florida

**REMINDER: PER 723.037, HOA's WILL RECEIVE 90 DAYS NOTICE OF ANY CHANGES TO THE RULES AND REGULATIONS AND HAVE THE RIGHT TO DISPUTE ANY CHANGES WITH WHICH IT DISAGREES.**

Eric and Dawn confirmed that ride arounds and 360 inspections are still being done. Ride arounds are expected to be done monthly and 360 inspections are expected to be done twice a year.  HOA representatives are encouraged to ride around with the manager while he/she reviews the community for non-compliance.  It is not the job of the HOA rep to point them out.  Simply to observe.  (Eric and Dawn, the section stating HOA representatives are encouraged, is taken from actual notes from the meeting we held with Brad on November 8, 2009.  Since that exact statement has been sent out to the Networking for Progress members since that date, we felt it was important to re-emphasize the issue exactly as Brad stated it).

Because of the vast array of circumstances in rule violations there is no "one size fits all" procedure in place to address them.  Depending on the situation the manager may, address the issue by phone, e-mail, letter or a personal visit.

Suggestions were made that a standard procedure be put in place but ELS explained the difficulty in doing so due to the variations of the violations.  There was  a recommendation from the committee that it would be beneficial if a sit down meeting were held with  an alleged violator before "last resort" eviction proceedings were initiated.

EXHIBIT "A"

Violations regarding safety are given priority.  Otherwise there is no classification.  Other than those involving safety, one type of rule violation is given no preference over another.

Repeated public drunkenness or commitment of a violent act were two examples of conduct that could lead to an eviction.  There is a paragraph in most prospectuses to the effect:  Noise or conduct that disturbs the peaceful enjoyment of the Community by Residents or which constitutes a nuisance to other residents or which constitutes a breach of the peace is prohibited.

Eviction may be pursued by management as a result of violating the resident conduct clause.

**MANAGEMENT DISCRETION**

Discussion took place regarding allowances for the installation of those items not approved in the prospectus. Because of the turnover of community managers and the variation of their discretion,  items previously approved may be viewed as eye sores. It was agreed that the management discretion provision be used sparingly, if at all.

Due to the fact that managers may be responsible for more than one community, some communities feel not enough time is spent with them to review current issues.  If after communicating this to the manager, time is not allocated to address the issues, a complaint should be filed with the regional manager. Following the complaint procedure through, if necessary.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FYI:

Dawn shared that CAPX budgets had been frozen for a short period of time.  They have currently been re-opened with some projects being shifted.  It was stated that 50% and closer to 75% of projects are actually unbudgeted.   It is estimated that more than half of the projects completed in a typical year are unbudgeted due to unforeseen and/or unexpected projects. For example, a clubhouse air conditioner may be expected to have a useful life of 10 years, but if it breaks in year 7, it has to be replaced, even if it was not budgeted.

The question was asked " what happens when rentals increase and what effect is there on the values of other owned properties"?  The answer was that ELS is putting a stronger emphasis on sales as a result of some improving economic indicators. in the last 90 days sales and rentals were 50/50%, whereas in the past, the majority of move-ins were rentals due to economic conditions.  Sales prices are trending up.  In the past lack of financing has affected values more than rentals. but now ELS is seeing multiple lenders re-enter the market.

Rental home contracts are for one year and do not have automatic renewal.  Also, the new homes in the community that do not meet the standards of the prospectus are for rentals. Determinations will be made at the point of purchase how adjustments to prospectus standards will be met.

EXHIBIT "A"

Present: ELS: Eric Zimmerman, Dawn Rumpf
      SELECT COMMITTEE: Luanne Putnam, Judy Hale, Lynn Mercer, Walt Stone, Dee Gleason, Dick Miller, Stan Jablonski, Jan McMeans
Present via Skype:  Dan Aubin, Vince Malorni
Absent:  Hank Curran, Tony Pinzone, Bob Sweitzer, Dick Gebo



EXHIBIT "A"

**NETWORKING FOR PROGRESS**
**MEETING NOTES**
**SELECT COMMITTEE/ELS**
**Meeting date: 9-12-13**

Through the combined efforts of ELS Regional Executives and the Select Committee of Networking for Progress, the following information is provided.

Notes from 6-13-13 were reviewed with minor changes.

The subjects of ride arounds and the new resident procedure were tabled for further review. Both will be added to the agenda for the next meeting.

Water main breaks: happen more frequently due to the age of some of our communities. There exists a varying array of circumstances: in some communities the City is responsible, in others it may be City/County, in some it is the responsibility of the residents or ELS. A major concern with water main breaks is the decision whether to shut the water off to the residents. Where ELS is responsible, every effort is made to try and fix the problem immediately. Some communities have their own maintenance crew, and it would be the maintenance supervisor (in consultation with the community manager) who would decide whether to fix it immediately or not. Decisions in the past have been to not do repairs on the weekend that would result in employee overtime (for example - a pinhole leak can wait while a rushing geyser cannot). There has been a freeze on funds thru the third quarter, relief is expected by October. Eric stressed that no essential or emergency services would be affected during the freeze - only discretionary items (i.e. budgeted purchasing of mulch may be postponed to the next quarter). It would be extremely difficult to replace all the water lines throughout a community. Larger pipes can be relined after running cameras thru to locate the problems. Water lines for individual sites are more difficult to run a camera through due to the small size.

Long Term Agreements: were discussed, first with the ELS definition being a rental agreement that may change the terms of the prospectus. This was not an in depth discussion of rental agreements but was brought up because several communities are reporting that ELS has refused to meet and discuss long term agreements. We were reminded by Eric that they are actually required to meet just once and that should be within the thirty days (as requested) after receiving the 90 day notice per FS, Chapter 723.037. Eric pointed out that the negotiating committee has the full authority to sign the long term agreement.

Discussion of meeting notes prior to release: The subject of discussing the meeting notes prior to release took place. It was later determined that discussion alone is not a problem. We ask that items in the notes not be enacted until such time as they are released to both the HOA's and ELS representatives. The goal is for everyone to be on the same page.

EXHIBIT "A"

ELS advertising:  it was pointed out that ELS is using the same pictures from one community in ads for several other communities.  If you think this is occurring at your community, please let the manager know.

Eric made the point that registration as a 55+ community is not required.

ELS restructuring:  recently (in September) ELS restructured the supervision of all MH communities in Florida.  Eric Zimmerman and Dawn Rumpf are Vice Presidents of Florida.  Leslie Taylor-Rharbi and Sara Whittington were both promoted to Senior Regional Managers.  Jeff Fannon is now assigned to the Chicago office, working with the company's internet technology requirements.

Sex offenders, Felons and unauthorized residents:  It was reported that some communities have had problems with residents that were not supposed to be approved.  723.061 Evictions; ground, proceeding. - (b) Conviction of a violation of a federal or state law or local ordinance, if the violation is detrimental to the health, safety, or welfare of other residents of the mobile home park.  The mobile home owner or mobile home tenant must vacate the premises within 7 days after the date the notice to vacate is delivered.  This paragraph constitutes grounds to deny an initial tenancy of a purchaser of a home under paragraph (e) or to evict an unapproved occupant of a home.

This continues to be a problem; many times a resident takes in a relative without going through the approval procedure. If you believe this to be an issue at your community, please report it to the manager. This, more than any other issue demands that the complaint procedure be followed. If you have followed the three part complaint procedure with no results, send copies to Eric Zimmerman, registered receipt, and he assures us he will address it and respond to you.  Eric pointed out that it is often difficult to get an eviction based upon a rules violation such as an unauthorized resident.

When residents are known to be hiding someone not authorized for residency, not answering the phone, not answering the door, etc., a registered letter will be sent regarding unauthorized residents.  If a response is not forthcoming, ELS will work thru the attorney and request that they move out, following the legal process for eviction.  Sometimes it comes down to management's word vs. the resident.  It may be necessary to get neighbors to testify about the violation on behalf of management.

When rent payment is received in a name other than what's on record, a note will be sent saying "we accept your rent, but it does not assure your residency".  The question came up regarding residents that rent from ELS that may bring children in to live with them.  As stated above - if you believe this to be an issue at your community, please report it to the manager.

EXHIBIT "A"

According the FS, Chapter 723.022, Mobile home park owner's general obligations. - (5) Comply with properly promulgated park rules and regulations and require other persons on the premises with his or her consent to comply therewith and conduct themselves in a manner that does not unreasonably disturb the park residents or constitute a breach of the peace.  It was agreed that this means ANYBODY on the premises must comply with the park rules and regulations.  Another example given was: a concrete truck started mixing and pouring concrete at 7:10 am.  The community prospectus has a noise restriction from 10:00 pm to 8:00 am.  Even though the county has a special starting time for concrete work of 7:00 am, the community prospectus prevails.

2014 Schedule of Networking for Progress/Select Committee/ELS meetings was discussed.  Colony Cove and Ridgewood Estates have generously offered to continue hosting the meetings.

Present:
ELS:  Eric Zimmerman, Leslie Taylor-Rharbi
SELECT COMMITTEE:  Robert Frank, Dee Gleason, Judy Hale, Bob Hogan, Stan Jablonski, Lynn Mercer, Dick Miller, Bob Sweitzer, Jan McMeans
Present via Skype:  Vince Malorni
Absent:  Hank Curran, Tony Pinzone, Walt Stone, Dick Gebo, Dan Aubin

EXHIBIT "A"

**NETWORKING FOR PROGRESS**
**MEETING NOTES**
**SELECT COMMITTEE/ELS**
**Meeting date: 11-21-13**

Through the combined efforts of ELS Regional Executives and the Select Committee of Networking for Progress, the following information is provided:

New Resident Procedure:
We will continue using the existing new resident form, with the suggestion that community managers encourage new residents to sign.

Ride around inspections:
ELS developed the "Manager Site Inspection Monthly Report" (copy enclosed)  that will reflect the month, date and the date inspections were completed. It will also report the number of homes inspected for the month, the number of violations cited and whether any were second and third cited violations.
HOAs may request to see the monthly report.   Ride around inspections may be done by any on site ELS employee.  **Once each quarter** a member of the HOA board may request (from the manager) that they ride around (as an observer only) to gain a better understanding of the process and how management evaluates violations .Charges are being assessed for violations that are not addressed by the homeowner and processed as part of the rent.  The prospectus for your community will determine if this type of assessment is acceptable. In my particular prospectus it appears under BASE RENT AND OTHER CHARGES: Service Fee  $_____per hour, but not less than $_____ per service call, for any repair, maintenance or service that is performed by the Community on behalf of Resident. Some prospectuses may not have similar language, therefore management's only recourse to resolve a violation may be eviction.

360 Inspections:
A review of all sides of the mobile home is a 360 inspection, done twice a year.  There are no provisions for HOA involvement, mentioned only as another step in the process to keep homes up to the requirements of the community.

Statutory meeting with ELS:
Chapter 723.037, clearly defines when the owner is required to meet with the HOA, it is within 30 days after receipt of the statutory 90 day rent increase notice.

LTA:
Future LTAs will be reviewed by in house counsel. It was pointed out that the language in the LTA, particularly that referring to the waiver,  is one of the reasons that communities are not signing the agreement.  Eric pointed out that that paragraph refers only to situations that have occurred to that point (NOT FUTURE SITUATIONS).  If there are issues serious enough that you are considering legal action against ELS they should be discussed (prior to signing the agreement) in an effort to work them out.  The

EXHIBIT "A"

purpose of the waiver is after working out a favorable agreement in good faith, they (ELS) don't want to be faced with a lawsuit.

Remember, if you previously signed the long term agreement (LTA) (containing the clauses referenced above), when the LTA expires, so do the terms of those clauses, UNLESS the LTA contained language stating otherwise.  Communities with CPI (only) based increases typically don't have long term agreements.  Eric explained that the release for ELS in the LTA speaks to the many reasons somebody may choose to sue them.  The reason the HOA isn't offered the same release is because there don't appear to be any reasons why ELS would want to sue them.
Long Term Agreements may vary, but are typically three years.  Rounding of rent increases are determined by the prospectus for the community, some allow rounding up to one (1) dollar, some allow up to five (5) dollars.

There are no penalties for not signing the long term agreement.

Market, CPI, home sales and a variety of economic factors are taken into consideration to determine rates of increase, not the expected return to stockholders, as suggested.

Managers seldom seen:
In some communities the managers are seldom seen.  As the face of ELS, managers should be out in the community at least weekly.  Managers will meet with the HOA monthly, regional managers will meet with the HOA quarterly, if requested.  This is not to say that all communication should cease with the above exceptions, it is expected that each will approach the other with an attitude of cooperation and respect.

Understanding rules and regulations:
Many times residents don't fully understand the rules and regulations. The regional manager will (upon request by the HOA) review the rules and regulations with the board.  The board could then pass the information on to their residents.  The quarterly meeting with the regional manager would be a good time to do this.  Community managers and regional managers have copies of the rules and regulations and the prospectus for their communities.

Wish lists:
(Capx budget requests) should be started by July of the current year, for the following year.  It depends on a lot of factors but should generally be approved by the first of the following year. The question was asked "do managers have discretionary funds".  While there is not a surplus fund, managers and regional managers work together to reallocate budgeted funds, as needed, to address unanticipated expenses that may arise during the year.

Registration on FCHR website:
Regional Assistants of ELS send in a registration to the FCHR-Florida Commission on Human Relations along with a check for the annual fee.  The owners of age qualified

EXHIBIT "A"

communities need to do this annually to maintain the 55+ status on the commission's website.  Confusion exists regarding this process due to the example (on the FCHR website) showing it being done by the Homeowners Association.  Note:  Further information regarding the requirements of a housing facility or community to qualify as housing for persons 55 years of age or older, may be viewed on the internet by entering Housing for Older Persons Act of 1995, Chapter 100.306, Intent to operate as housing designated for persons who are 55 years of age or older.  This information should also be incorporated into booklets prepared for effective leadership by Home Owners Associations.

An issue called "right of first sale" (giving ELS the opportunity to sell your home) was mentioned but the ELS representatives present were not familiar with it.

Present:
ELS: Leslie Taylor-Rharbi, Sara Whittington-McFarland, Dawn Rumpf, Eric Zimmerman
Select Committee:  Dan Aubin, Judy Hale, Stan Jablonski, Vince Malorni, Lynn Mercer, Walt Stone, Bob Sweitzer, Jan McMeans

Absent:  Hank Curran, Robert Frank, Dick Gebo, Dee Gleason, Bob Hogan
Dick Miller, Tony Pinzone

EXHIBIT "A"

**Manager Site Inspection Monthly Report**

Month:_____

Date:_____

Inspections completed
  by:_____

_____ # of sites inspected this month

_____ # of violations cited this month

_____ # of second/third  (follow-up) violations cited

NOT A CERTIFIED COPY

EXHIBIT "A"

Filing # 114774237 E-Filed 10/12/2020 02:20:56 AM

SELECT COMMITTEE/ELS

MEETING NOTES

2-19-2015

*Through the combined efforts of ELS Regional Executives and the Select Committee of Networking for Progress, the following information is provided. Please note: though it is the intention that these notes address common issues and concerns, it is still the prospectus/lease/rules and regulations for each resident and community that take priority for any situation that may arise.*

*Brad Nelson, Senior Regional Vice President, Eastern Region retired in December, but was our guest on the 19th, which gave us the opportunity to thank him for his support. Brad was always above board and stood by his unwavering position. Dale Almond, the new Senior Regional Vice President also attended. Dale is from Arizona and is accustomed to much warmer weather than what we've been having. Dale hasn't had a need for a winter coat for a long time, until his arrival in Florida. Let's all hope it warms up as he transitions to his new position.*

1. Heirs on the lease will continue the same lease as their parents/relatives. Heirs not on the lease will be treated like a resale buyer – they can assume the remainder of the lease term and then will go to the then market rent. Currently, spouses not on the lease do not automatically become leaseholders. This is being addressed by current legislation, introduced by FMO and is projected to become effective July 1, 2015.

2. Relocating resident policy: ELS's policy regarding relocating residents is the same as addressed in the LTA under <u>Homeowners Affected by this Agreement; Transferees.</u> If....any included Homeowner transfers or sells any legal or equitable interest in such Homeowner's mobile home to any transferee or resale purchaser (collectively, a "Transferee"), the Transferee shall be permitted to assume such included Homeowners rental agreement but only for the remainder of the annual lease term then in effect between the included Homeowner and Owner. Upon the expiration of such annual lease term the Transferee's rent shall be adjusted to the Community's then prevailing market rate....."

   Which is basically the same as FS Chapter 723.059 (3) The purchaser of a mobile home who becomes a resident of the mobile home park in accordance with this section has the right to assume the remainder of the term of any rental agreement then in effect between the mobile home park owner and the seller............

   It should be noted that residents relocating within the community that are purchasers of ELS inventory homes won't have a lease to assume and will start their new lease at market rent but are eligible for any rent concession programs being offered to new residents at that time.

3. Quarterly meetings: There appears to be confusion regarding the intent of the quarterly meetings. There are four quarters in a year. ELS want you to be able to meet with your regional manager once during each quarter. Example: If the HOA board meets with the regional manager in January, your next meeting can be in April, May or June. Many HOA boards have been upset because they felt, after meeting in January, they absolutely had to meet in April and their requests were not able to be honored. To clarify:
   (a) The HOA board must request the meeting quarterly. *We suggest scheduling the meetings for the upcoming year.*
   (b) The HOA board will create an agenda and present it to the community manager with a copy to the regional manager, at least a week in advance (common courtesy). This allows time for all expected participants invited to the meeting to be prepared.
   (c) Agenda definition: a list of items to be discussed. There is no requirement to list each "question" that's going to be asked. The purpose of the agenda is to list the topics to be discussed. There are no limits as to what can be discussed nor are there limitations on the age of an issue. The exception being an item previously discussed with the determination by ELS that no action be taken. Topics not on the agenda may be discussed if time permits.
   (d) The HOA board should be given the opportunity to provide input to the capx budget for their community by June or July. If, information <u>regarding the approved capx budget has not been provided by now, request it from the manager.</u> Requests for ELS contributions to HOA events may also be discussed.

EXHIBIT H

EXHIBIT "A"

(e) Notes should be taken for the purpose of following through on topics discussed.  Recordings are not permitted by ELS.

4. It is not the policy of ELS to pass the cost of removing _dead and dangerous_ trees on to the resident.  Understand this is a very different issue from _maintaining_ trees.

5. Insurance:  Liability insurance is required by ELS if the HOA holds functions where liquor is served or where the public is invited.  HOA's that are required to have liability insurance are required to provide a copy of the policy to ELS, listing them as a co-insured.  If a private resident party includes people from outside the property, and/or is serving liquor, the private resident is required to provide proof of insurance.  Attached is a form that ELS community managers utilize to provide specifics for amounts of insurance and language for co-insured that is required.

6. Care givers require approval and a background check.  Two different situations exist.  One, the care giver moves in with the resident requiring care.  This can be a family member, or not, young or old.  The other is when the resident is the care giver and moves another person, family or not, into their home.

Note:  The following subjects have been advanced to the next meeting for further discussion:
ELS sharing policy, boil water notice, underage survey, and new resident information.


Present:
ELS: Dale Almond, Brad Nelson, Leslie Taylor-Rharbi, Dawn Rumpf, Eric Zimmerman

Select Committee: Robert Frank, Judy Hale, Bob Hogan, Bill Krimson, Vince Malorni, Lynn Mercer, Walt Stone, Bob Sweitzer, Jan McMeans.

Absent:  Dan Aubin, Dee Gleason, Hank Curran

NOT A CERTIFIED COPY

EXHIBIT "A"

Filing # 114774237 E-Filed 10/12/2020 02:20:56 AM

## ADDITIONAL HEALTH INFORMATION

The sources of drinking water (both tap water and bottled water) include rivers, lakes, streams, ponds, reservoirs, springs, and wells. As water travels over the surface of the land or through the ground, it dissolves naturally occurring minerals and, in some cases, radioactive material, and can pick up substances resulting from the presence of animals or from human activity.

Contaminants that may be present in source water include:

(A) **Microbial contaminants**, such as viruses and bacteria, which may come from sewage treatment plants, septic systems, agricultural livestock operations, and wildlife.

(B) **Inorganic contaminants**, such as salts and metals, which can be naturally occurring or result from urban stormwater runoff, industrial or domestic wastewater discharges, oil and gas production, mining, or farming.

(C) **Pesticides and herbicides**, which may come from a variety of sources such as agriculture, urban stormwater runoff, and residential uses.

(D) **Organic chemical contaminants**, including synthetic and volatile organic chemicals, which are by-products of industrial processes and petroleum production, and can also come from gas stations, urban stormwater runoff, and septic systems.

(E) **Radioactive contaminants**, which can be naturally occurring or be the result of oil and gas production and mining activities.

To ensure that tap water is safe to drink, the EPA prescribes regulations which limit the amount of certain contaminants in water provided by public water systems. The Food and Drug Administration (FDA) regulations establish limits for contaminants in bottled water which must provide the same protection for public health.

Drinking water, including bottled water, may reasonably be expected to contain at least small amounts of some contaminants. The presence of contaminants does not necessarily indicate that the water poses a health risk. More information about contaminants and potential health effects can be obtained by calling the Environmental Protection Agency's Safe Drinking Water Hotline at 1-800-426-4791.

---

### For Customers with Special Health Concerns

Some people may be more vulnerable to contaminants in drinking water than the general population. Immuno-compromised persons such as persons with cancer undergoing chemotherapy, persons who have undergone organ transplants, people with HIV/AIDS or other immune system disorders, some elderly, and infants can be particularly at risk from infections. These people should seek advice about drinking water from their health care providers. EPA/CDC guidelines on appropriate means to lessen the risk of infection by Cryptosporidium and other microbiological contaminants are available from the Safe Drinking Water Hotline (1-800-426-4791).

## SOURCE WATER ASSESSMENT PLAN

In 2018, the Department of Environmental Protection performed a Source Water Assessment on our system and a search of the data sources indicated one potential source of contamination with a low susceptibility level. The assessment results are available on the FDEP Source Water Assessment and Protection Program website at https://fldep.dep.state.fl.us/swapp/

## HOW TO REACH US

If you have any questions about this report or concerning your water utility, please contact U.S. Water Services Corporation at (727) 848-8292. We encourage our valued customer to be informed about their water utility.

## ABOUT LEAD

If present, elevated levels of lead can cause serious health problems, especially for pregnant women and young children. Lead in drinking water is primarily from materials and components associated with service lines and home plumbing. Maralago Cay is responsible for providing high quality drinking water, but cannot control the variety of materials used in plumbing components. When your water has been sitting for several hours, you can minimize the potential for lead exposure by flushing your tap for 30 seconds to 2 minutes before using water for drinking or cooking. If you are concerned about lead in your water, you may wish to have your water tested. Information on lead in drinking water, testing methods, and steps you can take to minimize exposure is available from the Safe Drinking Water Hotline or at http://www.epa.gov/safewater/lead.

---

## MARALAGO CAY MHP

## 2018 ANNUAL DRINKING WATER QUALITY REPORT
PWS ID # 4500062

We're pleased to provide you with this year's Annual Water Quality Report. We want to keep you informed about the quality water and services we have delivered to you over the past year. Our goal is and always has been, to provide to you a safe and dependable supply of drinking water.

We want you to understand the efforts we make to continually improve the water treatment process and protect our water resources. We are committed to ensuring the quality of your water. If you have any questions or concerns about the information provided in this report, please feel free to call any of the numbers listed.

This report shows our water quality results and what they mean. This report will be directly mailed to customers only upon request and is available at the office upon request.

## WHERE YOUR WATER COMES FROM

Our water source consists of two ground water wells drawing from the Surficial Aquifer. We use lime softening for our water which is filtered and disinfected with chloramines.

## HOW WE ENSURE YOUR DRINKING WATER IS SAFE

We routinely monitor for contaminants in your drinking water according to Federal and State laws, rules, and regulations. Except where indicated otherwise, this report is based on the results of our monitoring for the period of January 1 to December 31, 2018. Data obtained before January 1, 2018, and presented in this report are from the most recent testing done in accordance with the laws, rules, and regulations.

As authorized and approved by the EPA, the State has reduced monitoring requirements for certain contaminants to less often than once per year because the concentrations of these contaminants are not expected to vary significantly from one year to another. As a result some of our data is more than one year old.

**EXHIBIT I**

EXHIBIT "A"

2018 Water Quality Table – PWS No. 4500062

## How to Read the Table

In the table, you may find unfamiliar terms and abbreviations. To help you better understand these terms we've provided the following definitions.

**Action Level (AL):** The concentration of contaminants which, if exceeded, triggers treatment or other requirements that a water system must follow.

**Maximum contaminant level or MCL:** The highest level of a contaminant that is allowed in drinking water. MCLs are set as close to the MCLGs as feasible using the best available treatment technology.

**Maximum contaminant level goal or MCLG:** The level of a contaminant in drinking water below which there is no known or expected risk to health. MCLGs allow for a margin of safety.

**Maximum residual disinfectant level or MRDL:** The highest level of a disinfectant allowed in drinking water. There is convincing evidence that addition of a disinfectant is necessary for control of microbial contaminants.

**Maximum residual disinfectant level goal or MRDLG:** The level of a drinking water disinfectant below which there is no known or expected risk to health. MRDLGs do not reflect the benefits of the use of disinfectants to control microbial contaminants.

**ND:** Means not detected and indicates that the substance was not found by laboratory analysis.

**ppm:** parts per million or milligrams per liter is one part by weight of analyte to one million parts by weight of the water sample.

**ppb:** parts per billion or micrograms per liter is one part by weight of analyte to one billion parts by weight of the water sample.

### Table Notes:

A. Results in the Level Detected column for inorganic contaminants are the highest detected level at any sampling point.

B. For chlorine and disinfection by-products, the level detected is the highest running annual average (RAA), computed quarterly, of monthly averages of all samples collected. The range of results is the range of results of all the individual samples collected during the past year.

C. In 2018, our water system exceeded the MCL for Color. Secondary Contaminants are considered to be aesthetic violations, and they are not considered to have major health effects. The Dept. of Environmental Protection and the utility continue to monitor the situation.

### INORGANIC CONTAMINANTS

| Contaminant and Unit of Measurement | Dates of sampling (mo./yr.) | MCL Violation Y/N | Level Detected | Range of Results | MCLG | MCL | Likely Source of Contamination |
|---|---|---|---|---|---|---|---|
| Arsenic (ppb) | 6/2018 | N | 0.13 | N/A | 0 | 10 | Erosion of natural deposits; runoff from orchards; runoff from glass and electronics production wastes |
| Barium (ppm) | 6/2018 | N | 0.0089 | N/A | 2 | 2 | Discharge of drilling wastes; discharge from metal refineries; erosion of natural deposits |
| Fluoride (ppm) | 6/2018 | N | 0.21 | N/A | 4 | 4 | Erosion of natural deposits; discharge from fertilizer and aluminum factories; Water additive which promotes strong teeth when at the optimum level of 0.7 ppm |
| Nitrate (as Nitrogen) (ppm) | 6/2018 | N | 0.27 | N/A | 10 | 10 | Runoff from fertilizer use; leaching from septic tanks, sewage; erosion of natural deposits |
| Nitrite (as Nitrogen) (ppm) | 6/2018 | N | 0.23 | N/A | 1 | 1 | Runoff from fertilizer use; leaching from septic tanks, sewage; erosion of natural deposits |
| Sodium (ppm) | 6/2018 | N | 23 | N/A | N/A | 160 | Salt water intrusion, leaching from soil |

### LEAD AND COPPER (TAP WATER)

| Contaminant and Unit of Measurement | Dates of sampling (mo/yr) | AL Violation Y/N | 90th Percentile Result | Sites Exceeding the AL | MCLG | AL (Action Level) | Likely Source of Contamination |
|---|---|---|---|---|---|---|---|
| Lead (tap water) (ppb) | 9/2018 | N | ND | N/A | 0 | 15 | Corrosion of household plumbing systems; erosion of natural deposits |
| Copper (tap water) (ppm) | 9/2018 | N | 0.04 | 0 | 1.3 | 1.3 | Corrosion of household plumbing systems; erosion of natural deposits; leaching from wood preservatives |

### STAGE 1 DISINFECTANTS AND DISINFECTION BY-PRODUCTS

| Disinfectant or Contaminant and Unit of Measurement | Dates of sampling (mo./yr.) | MCL or MRDL Violation Y/N | Level Detected | Range of Results | MCLG or MRDLG | MCL or MRDL | Likely Source of Contamination |
|---|---|---|---|---|---|---|---|
| Chlorine (ppm) | Monthly 2018 | N | 2.19 | 1.65 – 2.65 | MRDLG = 4 | MRDL = 4.0 | Water additive used to control microbes |

### STAGE 2 DISINFECTANTS AND DISINFECTION BY-PRODUCTS

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Haloacetic Acids (HAA5) (ppb) | 8/2018 | N | 23.77 | 21.54 – 25.99 | N/A | MCL = 60 | By-product of drinking water disinfection |
| Total Trihalomethanes (TTHM) (ppb) | 8/2018 | N | 11.95 | 11.51 – 12.38 | N/A | MCL = 80 | By-product of drinking water disinfection |

### SECONDARY CONTAMINANTS

| Contaminant and Unit of Measurement | Dates of sampling (mo./yr.) | MCL Violation Y/N | Highest Result | Range of Results | MCLG | MCL | Likely Source of Contamination |
|---|---|---|---|---|---|---|---|
| Color (color units) | 2/2018, 4/2018, 6/2018, 7/2018, 11/2018 | Y | 30 | ND – 30 | N/A | 15 | Naturally occurring organics |

EXHIBIT "A"

Filing # 114774237 E-Filed 10/12/2020 02:20:56 AM

**FORM 1.997.   CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

### I.   CASE STYLE

IN THE CIRCUIT COURT OF THE <u>FIFTEENTH</u> JUDICIAL CIRCUIT, IN AND FOR <u>PALM BEACH</u> COUNTY, FLORIDA

<u>Maralago Cay Homeowners Association Inc</u>
Plaintiff

Case # _____
Judge _____

vs.

<u>MHC Operating Limited Partnership</u>
Defendant

### II.   AMOUNT OF CLAIM

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

- ☐ $8,000 or less
- ☐ $8,001 - $30,000
- ☐ $30,001- $50,000
- ☐ $50,001- $75,000
- ☐ $75,001 - $100,000
- ☒ over $100,000.00

### III.   TYPE OF CASE   (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

- 1 -

EXHIBIT "A"

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
       ☐ Business governance
       ☐ Business torts
       ☐ Environmental/Toxic tort
       ☐ Third party indemnification
       ☐ Construction defect
       ☐ Mass tort
       ☐ Negligent security
       ☐ Nursing home negligence
       ☐ Premises liability—commercial
       ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
       ☐ Commercial foreclosure
       ☐ Homestead residential foreclosure
       ☐ Non-homestead residential foreclosure
       ☐ Other real property actions

☐ Professional malpractice
       ☐ Malpractice—business
       ☐ Malpractice—medical
       ☐ Malpractice—other professional
☒ Other
       ☒ Antitrust/Trade regulation
       ☐ Business transactions
       ☐ Constitutional challenge—statute or ordinance
       ☐ Constitutional challenge—proposed amendment
       ☐ Corporate trusts
       ☐ Discrimination—employment or other
       ☐ Insurance claims
       ☒ Intellectual property
       ☐ Libel/Slander
       ☐ Shareholder derivative action
       ☐ Securities litigation
       ☐ Trade secrets
       ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

EXHIBIT "A"

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.**     **REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☒ Nonmonetary declaratory or injunctive relief;
☒ Punitive

**V.**     **NUMBER OF CAUSES OF ACTION:** [   ] (Specify)

   2

**VI.**     **IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☒ yes
    ☐ no

**VII.**     **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☒ no
    ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.**     **IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☒ yes
    ☐ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ Daniel Perry          Fla. Bar # 376671
       Attorney or party                  (Bar # if attorney)

Daniel Perry             10/12/2020
(type or print name)           Date

- 3 -

EXHIBIT "A"